# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF IOWA

| | |
|---|---|
| Christy Banwart and Lance Banwart, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| Cedar Falls Community School District | ) |
| And Area Education Agency 267 | ) |
| | ) |
| Defendants. | ) |
| | ) |

## COMPLAINT

Plaintiffs Christy Banwart and Lance Banwart, parents of C.B., make the following complaint against Defendants Cedar Falls Community School District ("District") and Area Educational Agency 267 ("AEA"), collectively referred to as ("Defendants").

## PARTIES

1. Christy Banwart and Lance Banwart (collectively "Plaintiffs" or "Banwarts") are residents of the City of Cedar Falls, County of Blackhawk, State of Iowa.

2. C.B. is the son of Plaintiffs Christy Banwart and Lance Banwart. C.B. was born in 2002 and is 16 years old.

3. C.B. was adopted by Plaintiffs when he was 2-1/2. He has had IEPs since first grade because of an emotional disability which leaves him unable to conform his behavior to that which is expected from same aged peers. C.B. has been diagnosed with Reactive Attachment Disorder ("RAD"), anxiety and cognitive delays. C.B. has also been diagnosed with Autism.

4. The District is a local education agency and the AEA is an area education agency that includes parents and students in the Cedar Falls, Iowa area including Plaintiffs.

1

## PROCEDURAL STATUS

5. As a result of Defendants failing to comply with the Individuals with Disabilities Education Act ("IDEA"), Plaintiffs filed an initial Due Process Complaint on or about December 15, 2015, after which the parties entered into a Legally Binding Mediation Agreement on February 8, 2016. As a result of the District and the AEA again failing to comply with the IDEA and failing to comply with the Legally Binding Mediation Agreement, Plaintiffs filed a Due Process Complaint with the Iowa Department of Education on or about August 5, 2017.

6. Administrative Law Judge Laura Lockard ("ALJ") issued a Decision on July 3, 2018 stating Plaintiffs have not proven Defendants denied student a free appropriate public education as alleged in the Due Process Complaint, denied Plaintiffs' requested relief and dismissed Plaintiffs' Due Process Complaint.

7. Plaintiffs disagree with the Decision of the ALJ and now file this Complaint asking this Court to receive the records of the Administrative proceedings, hear additional evidence to be requested by the Plaintiffs, base its decision *de novo* on the preponderance of the evidence and grant the relief this Court deems to be appropriate pursuant to the 20 U.S.C.S. § 1415(i)(2)(c).

## JURISDICTION AND VENUE

8. The federal question jurisdiction of the court is invoked pursuant to 28 U.S.C. § 1331, and 20 U.S.C. § 1415(i)(2)(A) and § 1415(i)(3)(A).

9. Venue is proper in this Court under 28 U.S.C. Sect. 1391(b).

## LEGAL STANDARDS

10. The Individuals with Disabilities Education Act (IDEA or ACT), 84 Stat. 175, as amended, 20 U.S.C.A. §1400 *et seq*. (main ed. and Supp. 2005), is a Spending Clause statute that seeks to ensure that "all children with disabilities have available to them a free appropriate public education" (FAPE). §1400(d)(1)(A).

11. In 1982, the Supreme Court held that the IDEA establishes a substantive right to a "free appropriate public education" for certain children with disabilities. *Board of Ed. Of Hendrick Hudson Central School Dist., Westchester Cty. v. Rowley,* 458 U.S. 176, 102 S. Ct. 3034, 73 L. Ed. 2d 690 (1982).

12. IDEA offers States federal funds to assist in educating children with disabilities. 20 U.S.C. §1400 et seq.; *Arlington Central School Dist. Bd. of Ed. v. Murphy,* 548 U.S. 291, 295, 126 S. Ct. 2455, 165 L. Ed. 2d. 526 (2006).

13. A FAPE, as the Act defines it, includes both "special education" and "related services." §1401(9). "Special education" is "specially designed instruction… to meet the unique needs of a child with a disability"; "related services" are the support services "required to assist a child… to benefit from" that instruction. §§1401(26), (29). A State covered by the IDEA must provide a disabled child with such special education and related services "in conformity with the [child's] individualized education program." or IEP. §1401(9)(D).

14. One of the components of a FAPE is "special education," defined as "specially designed instruction… to meet the unique needs of a child with a disability." §§1401(9), (29). In determining what it means to "meet the unique needs" of a child with a disability, the provisions governing the IEP development process are a natural source of guidance: It is

3

through the IEP that "[t]he 'free appropriate public education' required by the Act is tailored to the unique needs of" a particular child. *Id.,* at 181, 102 S. Ct. 3034, 73 L. Ed. 2d 690. Under IDEA, school districts must create an "individualized education program" (IEP) for each disabled child. §1414(d).

15. At the time the IDEA was enacted, the majority of disabled children in America were "either totally excluded from schools or sitting idly in regular classrooms awaiting the time when they were old enough to 'drop out,'" H.R. Rep. No. 94-322, p. 2 (1875). IDEA was intended to reverse this history of neglect.

16. The IDEA was designed to overcome the pattern of disregard and neglect disabled children historically encountered in seeking access to public education. See §1400(c)(2); *Mills v. Board of Ed. of District of Columbia,* 348 F. Supp. 866; *Pennsylvania Assn. for Retarded Children v. Pennsylvania*, 334 F. Supp. 1257 (ED Pa. 1971), and 343 F. Supp. 279 (ED Pa. 1972).

17. The IDEA casts an affirmative beneficiary-specific obligation on providers of public education. School districts are charged with responsibility to offer to each disabled child an IEP suitable to the child's special needs. 20 U.S.C. §§1400(d)(1), 1412(a)(4), 1414(d).

18. In the "Findings" of IDEA 2004 (Section 1400(c)), Congress found that: "30 years of research and experience has demonstrated that the education of children with disabilities can be made more effective by having high expectations for such children," educating them in the regular classroom so they can "meet developmental goals and, to the maximum extent possible, the challenging expectations that have been established for all children and be prepared to lead productive and independent adult lives, to the maximum extent possible." (§1400(c)(5)(A)).

19. In the "Purposes" of IDEA 2004 (§1400(d)), Congress describes what they intend the law to accomplish:

> "The purposes of this title are to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique need and prepare them for further education, employment and independent living." (§1400(d)(1)(A)).

20. IDEA is "frequently described as a model of 'cooperative federalist.'" *Little Rock School Dist. v. Mauney*, 183 F. 3d 816, 830 (CA8 1999). It "leaves to the States the primary responsibility for developing and executing educational programs for handicapped children, [but] imposes significant requirements to be followed in the discharge of that responsibility." *Board of Ed. of Hendrick Hudson Central School Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 183 (182).

21. The IDEA mandates cooperation and reporting between State and Federal educational authorities. Participating States must certify to the Secretary of Education that they have "policies and procedures" that will effectively meet the Act's conditions. 20 U.S.C. §1412(a).

22. State educational agencies, in turn, must ensure that local schools and teachers are meeting the State's educational standards. 20 U.S.C. §§1412(a)(11), 1412(a)(15)(A). Local educational agencies (school boards or other administrative bodies) can receive IDEA funds only if they certify to a state educational agency that they are acting in accordance with the State's policies and procedures. §1413(a)(1).

23. The core of the IDEA is the cooperative process that it establishes between parents and schools. *Rowley*, *supra,* at 205-206 ("Congress placed every bit as much emphasis upon compliance with procedures giving parents and guardians a large measure of participation at every stages of the administrative process…as it did upon the measurement of the resulting IEP against a substantive standard").

24. The central vehicle for this collaboration is the IEP process. State educational authorities must identify and evaluate disabled children, §§1414(a)-(c), develop an IEP for each one, §1414(d)(2), and review every IEP at least once a year, §1414(d)(4).

25. The IEP is "the centerpiece of the statute's education delivery system for disabled children." A comprehensive plan prepared by a child's "IEP Team" (which includes teachers, school officials, and the child's parents), an IEP must be drafted in compliance with a detailed set of procedures. §1414(d)(1)(B). These procedures emphasize collaboration among parents and educators and require careful consideration of the child's individual circumstances. §1414. The IEP is the means by which special education and related services are "tailored to the unique needs" of a particular child. *Rowley,* 458 U.S., at 181, 102 S. Ct. 3034, 73 L. Ed. 2d 690.

26. Each IEP must include an assessment of the child's current educational performance, must articulate measurable educational goals, and must specify the nature of the special services that the school will provide. §1414(d)(1)(A).

27. More specifically, the IDEA requires that every IEP include "a statement of the child's present levels of academic achievement and functional performance," describe "how the child's disability affects the child's involvement and progress in the general education

6

curriculum," and set out "measurable annual goals, including academic and functional goals," along with a "description of how the child's progress toward meeting" those goals will be gauged. §§1414(d)(1)(A)(i)(I)(III). The IEP must also describe the "special education and related services… that will be provided" so that the child may "advance appropriately toward attaining the annual goals" and, when possible, "be involved in and make progress in the general education curriculum." §1414(d)(1)(A)(i)(IV).

28. Parents and guardians play a significant role in the IEP process. They must be informed about and consent to evaluations of their child under the Act. §1414(c)(3).

29. Parents are included as members of "IEP teams." §1414(d)(a)(B).

30. Parents have the right to examine any records relating to their child, and to obtain an "independent educational evaluation of the[ir] child." §1415(b)(1).

31. Parents must be given written prior notice of any changes in an IEP, §1415(b)(3), and be notified in writing of the procedural safeguards available to them under the Act, §1415(d)(1).

32. When disagreement arises, parents may turn to dispute resolution procedures established by the IDEA. The parties may resolve their differences informally, through a "[p]reliminary meeting," or, somewhat more formally, through mediation. §§1415(e), (f)(1)(B)(i).

33. If these measures fail to produce accord, the parties may proceed to what the Act calls a "due process hearing" before a state or local educational agency. §§1415(f)(1)(A), (g). And at the conclusion of the administrative process, the losing party may seek redress in state or federal court. §1415(i)(2)(A).

7

34. To meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances.

35. The "reasonably calculated" qualification reflects a recognition that crafting an appropriate program of education requires a prospective judgment by school officials. *Id.,* at 207, 102 S. Ct. 3034, 73 L. Ed. 2d 690. The Act contemplates that this fact-intensive exercise will be informed not only by the expertise of school officials, but also by the input of the child's parents or guardians. *Id.,* at 208-209, 102 S. Ct. 3034, 73 L. Ed. 2d 690. Any reviews of an IEP must appreciate that the question is whether the IEP is *reasonable*, not whether the court regards it as ideal. *Id.,* at 206-207, 102 S. Ct. 3034, 73 L. Ed. 2d 690.

36. The IEP must aim to enable the child to make progress. After all, the essential function of an IEP is to set out a plan for pursuing academic and functional advancement. §§1414(d)(1)(A)(i)(I)-(IV).

37. A substantive standard not focused on student progress would do little to remedy the pervasive and tragic academic stagnation that prompted Congress to act. That the progress contemplated by the IEP must be appropriate in light of the child's circumstances should come as no surprise.

38. The procedures are there for a reason, and their focus provides insight into what it means, for purpose of the FAPE definition, to "meet the unique needs" of a child with a disability. §§1401(9), (29).

39. A student offered an educational program providing "merely more than *de minimis*" progress from year to year can hardly be said to have been offered an education at all. For children with disabilities, receiving instruction that aims so low would be tantamount to "sitting idly… awaiting the time when they were old enough to 'drop out.'" *Rowley*, 458 U.S., at 179, 102 S. Ct. 3034, 73 L. Ed. 2d 690 (some internal quotation marks omitted). The IDEA demands more. It requires an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances. *Endrew F. v. Douglas County School District* 197 L. Ed. 2d 335, 137 S. Ct. 988, decided March, 22, 2017.

40. If parents believe that an IEP is not appropriate, they may seek an administrative "impartial due process hearing." §1415(f).

41. School districts may also seek such hearings, as Congress clarified in the 2004 amendments. See S. Rep. No. 108-185, p. 37 (2003). They may do so, for example, if they wish to change an existing IEP but the parents do not consent, or if parents refuse to allow their child to be evaluated.

42. Although state authorities have limited discretion to determine who conducts the hearings, §1415(a), Congress has chosen to legislate the central components of due process hearings.

43. Congress has imposed minimal pleading standards, requiring parties to file complaints setting forth "a description of the nature of the problem," §1415(b)(7)(B)(ii), and "a proposed resolution of the problem to the extent known and available at the time," §1415(b)(7)(B)(iii).

9

44. At the hearing, all parties may be accompanied by counsel, and may "present evidence and confront, cross-examine, and compel the attendance of witnesses." §§1415(h)(1)-(2). After the hearing, any aggrieved party may bring a civil action in state or federal court. §1415(i)(2). Prevailing parents may also recover attorney's fees. §1415(i)(3)(B).

45. In 1997 Congress mandated that States offer mediation for IDEA disputes. Individuals with Disabilities Education Act Amendments of 1997, Pub. L. 105-17, §615(e), 111Stat. 90, 20 U.S.C. §1415(e). In 2004, Congress added a mandatory "resolution session" prior to any due process hearing. Individuals with Disabilities Education Improvement Act of 2004, Pub. L. 108-446, §615(7)(f)(1)(B), 118 Stat. 2720, 20 U.S.C.A. §1415(f)(1)(B) (Supp. 2005).

46. Congress also made new findings that "[p]arents and schools should be given expanded opportunities to resolve their disagreements in positive and constructive ways," and that "[t]eachers, schools, local educational agencies, and States should be relieved of irrelevant and unnecessary paperwork burdens that do not lead to improved educational outcomes." §§1400(c)(8)-(9).

47. School districts have a "natural advantage" in information and expertise, but Congress addressed this when it obliged schools to safeguard the procedural rights of parents and to share information with them. See *School Comm. of Burlington v. Department of Ed. of Mass.*, 471 U.S. 359, 368 (1985).

48. Parents have the right to review all records that the school possesses in relation to their child. §1415(b)(1). They also have the right to an "independent educational evaluation of the[ir] child." *Ibid.* The regulations clarify this entitlement by providing that a "parent has the right to an independent educational evaluation at public expense if the parent

10

disagrees with an evaluation obtained by the public agency." 34 CFR §300.502(b)(1) (2005)

49. IDEA ensures parents access to an expert who can evaluate all the materials that the school must make available, and who can give an independent opinion.  Parents are not left to challenge the government without a realistic opportunity to access the necessary evidence, or without an expert with the firepower to match the opposition.

50. In 2004, Congress added provisions requiring school districts to answer the subject matter of a complaint in writing, and to provide parents with the reasoning behind the disputed action, details about the other options considered and rejected by the IEP team, and a description of all evaluations, reports and other factors that the school used in coming to its decision. Publ. L. 108-446, §615(c)(2)(B)(i)(I), 118 Stat. 2718, 20 U.S.C.A. §1415(c)(2)(B)(i)(I) (Supp. 2005).

51. Prior to a hearing, the parties must disclose evaluations and recommendations that they intend to rely upon. 20 U.S.C. §1415(f)(2).

52. IDEA hearings are deliberately informal and intended to give ALJs the flexibility that they need to ensure that each side can fairly present its evidence. IDEA, in fact, requires state authorities to organize hearings in a way that guarantees parents and children the procedural protections of the Act. See §1415(a).

53. Parents may recover attorney's fees if they prevail. §1415(i)(3)(B). These protections ensure that the school bears no unique advantage.

54. Iowa has adopted state statutes and administrative rules incorporating the above provision of the IDEA.

55. The IDEA says that the "establish[ment]" of "procedures" is a matter for the "State" and its agencies. §1415(a). It adds that the hearing in question, an administrative hearing, is to be conducted by the "State" of "local educational agency." 20 U.S.C.A. §1415(f)(1)(A) (Supp. 2005). And the statue as a whole foresees state implementation of federal standards. §1412(a); *Cedar Rapids Community School Dist. v. Garret F.*, 526 U.S. 66, 68 (1999); *Board of Ed. of Hendrick Hudson Central School Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 208 (1982).

56. IDEA's "stay-put" provision, 20 U.S.C. §1415(j), supports preserving the status quo. It is intended to work to the advantage of the child and the parents when the school seeks to cut services offered under a previously established IEP. Congress did not require that the IEP advanced by the school district go into effect during the pendency of a dispute.

57. An Out-of-District Placement must be consistent with the child's IEP, and must be primarily for an educationally relevant reason. If a condition interferes with a child's ability to benefit from an education and that condition requires residential treatment to address, this would be an educationally required placement, not merely a placement for treatment purposes. *See, e.g.* Iowa Admin. Code r 281-41.116; *C.B. v. Special Sch. Dist.,* 636 F. 3d 981 (8th Cir. 2011); *In re Richard U.,* 17 D.o.E. App. Dec. 20 (Iowa Dep't of Educ. 1999).

58. Placement must be at no cost to the child's parents. "At no cost" includes, in addition to educational costs, the costs of room, board, and transportation. Iowa Admin. Code r. 281-41.104; *Letter to Cousineau*, 30 IDELR 158 (OSEP 2001).

12

59. It is illegal to make placement decisions based on funding mechanism. 20 U.S.C. §1412(a)(5)(B). A District or AEA may not refuse a placement required under the IDEA based on actual or perceived financial inability to fund such a placement.

60. To obtain tuition reimbursement, the parent must prove two things in a proceeding under the IDEA. First, the parent must prove that the public school placement did not provide a "FAPE". 34 C.F.R. §300.148(c); *Florence County Sch. Dist. Four v. Carter,* 510 U.S. 7 (1993); *Burlington Sch. Comm. v. Department of Educ.,* 471 U.S. 359 (1985). Second, the parent must prove that the private school placement was proper. 34 C.F.R. §300.148(c); F*lorence County Sch. Dist.,* 510 U.S. 7; *C.B. v. Special Sch. Dist.,* 636 F.3d 981 (8th Cir. 2011). To be proper, the parental placement need only provide benefit to the child. If both things are proven, the parent is entitled to reimbursement from the district of residence.

61. The private school selected by the parent need not be accredited, approved, or meet other state requirements to be eligible for reimbursement so long as the placement is proper. 34 C.F.R. §300.148(c); *Carter*, 510 U.S. 7; *C.B.,* F.3d 981.

62. In IDEA 2004, the phrase "to the maximum extent possible" described the requirements to meet the developmental goals and challenging expectations established for nondisabled children, to prepare children with disabilities to lead independent and productive adult lives, and to improve their academic achievement and functional performance.

63. In IDEA 2004, Congress found that the education of children with disabilities can be made more effective if all school personnel who work with children with disabilities receive "high quality, intensive" professional development and training to ensure that they have "the skills and knowledge necessary to improve the academic achievement and

13

functional performance of children with disabilities, including the use of scientifically based instructional practices, to the maximum extent possible." (§1400(c)(5)(E)).

64. In IDEA 2004, Congress found that implementation of the IDEA "has been impeded by low expectations and an insufficient focus on applying replicable research and proven methods of teaching and learning for children with disabilities." (§1400(c)(5)).

65. By including frequent references to the need to use scientific, research based instruction and interventions, Congress clarified in IDEA 2004 that methodology is vitally important. By requiring the child's IEP to include "a statement of special education, related services and supplementary aids and services, based on peer reviewed research…," Congress clarified that IEPs must include research-based methodology. (§1414(d)(1)(A)).

66. Under IDEA 2004, the IEP must include "measurable annual goals, including academic and functional goals." (§1414(d)(1)(A)). The IEP must specifically identify all the child's needs, how the school will meet these needs, and how the school will measure the child's progress objectively.

67. IDEA 2004 requires school districts to provide a free appropriate public education to all children with disabilities, including children who have been suspended or expelled from school. (§1414(k)(1)(D) and §1414(a)(1)).

68. IDEA 2004 includes mandatory "resolution session" that provides the parties with an opportunity to resolve their dispute before the due process hearing. (§1414(f)(1)(B)). If the dispute is resolved in mediation, IDEA 2004 requires the parties to execute a legally binding agreement that sets forth the terms of the resolution. (§1415(3)(2)(F)).

14

## PRELIMINARY STATEMENT

69. As recently held by the United States Supreme Court in *Endrew F.*, the goal of the IDEA is to enable the child to make meaningful progress. "A student offered an educational program providing "merely more than *de minimis*" progress from year to year can hardly be said to have been offered an education at all. For children with disabilities, receiving instruction that aims so low would be tantamount to "sitting idly… awaiting the time when they were old enough to 'drop out.'" *Rowley*, 458 U.S., at 179, 102 S. Ct. 3034, 73 L. Ed. 2d 690 (some internal quotation marks omitted). The IDEA demands more. It requires an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances. *Endrew F. v. Douglas County School District,* 197 L. Ed. 2d 335, 137 S. Ct. 988, decided March, 22, 2017."

70. The IDEA demands C.B. receive an education that enables him to learn. Given his unique needs, that requires a residential/academic program. All other efforts to educate C.B. without a residential/academic program failed. Plaintiffs respectfully request this Court not fail C.B. and order his education at Waterfall Canyon/Oak Grove School continue its successful journey for C.B. to receive a FAPE that enables C.B. to make progress appropriate in light of his circumstances.

## C.B.'S UNIQUE CIRCUMSTANCES

71. In addition to the RAD diagnosis years earlier, C.B. was diagnosed with Autism Spectrum Disorder (ASD) by Dr. Paul Conditt and or about April 22, 2016. The Autism diagnosis was confirmed by Dr. Brandon Park, PhD, Licensed Clinical Neuropsychologist, based on his extensive evaluation from May 6 through June 29, 2016.

15

72. Autism is a neurodevelopmental disorder generally marked by impaired social and communicative skills, "engagement in repetitive activities and stereotyped movements, resistance to environmental change or change in daily routines, and unusual responses to sensory experiences." 34 CFR §300.8(c)(1)(i) (2016). Such things as students in the hallways, switching rooms for classes, having a locker, lunch room noise and other environmental stimuli are huge stresses for children with Autism.

73. A child with autism qualifies as a "[c]hild with a disability" under the IDEA, and Iowa (where C.B. resides) accepts IDEA funding. §1401(3)(A). C.B. is therefore entitled to the benefits of the Act, including a FAPE provided by the State of Iowa.

74. C.B. attended schools in Defendant Cedar Falls Community School District. Annually, his IEP Team drafted an IEP supposedly addressed to his educational and functional needs. By C.B.'s 8th grade year, however, C.B. was making little progress. Although C.B. displayed a number of strengths, he still exhibited multiple behaviors that inhibited his ability to access learning in the classroom. C.B. would be disruptive in class, climb over furniture and other students, throw things and frequently would refuse to go to school and would run away from school. C.B.'s academic and functional progress had essentially stalled: IEPs largely carried over the same generic basic goals and objectives from one year to the next, indicating that he was failing to make meaningful progress toward his goals.

## INITIAL VIOLATIONS OF IDEA

75. Prior to February 8, 2016, the District and the AEA had not properly evaluated C.B. to determine his unique needs that require specially designed instruction to progress in the academic curriculum.

76. Prior to February 8, 2016, the District and the AEA had not created or followed an IEP reasonably calculated to enable C.B. to make progress appropriate in light of his unique circumstances.

77. Prior to February 8, 2016, C.B.'s most current IEP and his IEPs for the prior two years had not provided him with a FAPE.

78. During the 2015-16 school year and prior to February 8, 2016, the District and the AEA had not followed C.B.'s IEP and Behavior Intervention Plan (BIP).

79. Prior to February 8, 2016, the District's and the AEA's failure to follow the IEP and BIP aggravated C.B.'s emotional problems and led to more severe behaviors than otherwise would have been encountered.

80. Because of the District's and the AEA's failures to implement with integrity, capability and commitment, C.B.'s IEPs and Behavior Intervention Plans prior to February 8, 2016, Defendants had denied C.B. a free appropriate public education.

81. On Saturday, December 12, 2015, the District sent Plaintiffs an email giving them notice of an IEP meeting on December 16, 2015. The email stated, in relevant part, "Attached please find the meeting notice for this Wednesday's IEP meeting for C.B."

82. The December 12, 2015 notice violated the procedural protections which IDEA affords Plaintiffs because it did not provide reasonable notice prior to the meeting.

17

83. The December 12, 2015 notice violated IDEA because it did not provide reasonable notice that a manifestation determination review would be conducted at the meeting.

84. The District and the AEA denied Plaintiffs a reasonable opportunity to participate as equals with the District's and the AEA's representatives in the December 16, 2015 IEP meeting.

85. In violation of IDEA, 34, C.F.R. §300.530(f)(1), the IEP team, at the December 16, 2015 meeting, neither made provision for anyone to conduct an appropriate functional behavior assessment nor reviewed the BIP or modified it as necessary to address the behavior issues prior to making any further decisions regarding C.B.'s IEP, BIP or placement.

86. The action to change C.B.'s placement to Bremwood School on December 16, 2015 violated 24 C.F.R. §300.530(f)(2) which prohibits a change in placement following manifestation determination review unless the parent agrees to the change as a part of the modification of the BIP.

87. At the December 16, 2015 IEP meeting, the principal at Bremwood himself stated Bremwood was not an appropriate placement for C.B.

88. The District's and the AEA's failures to offer appropriate services necessary for C.B.'s education violated 24 C.F.R. §300.115 which requires "Each public agency must ensure that a continuum of alternative placements is available to meet the needs of children with disabilities for special education and related services."

89. Based upon the facts and for the reasons more fully set forth above and in their initial Due Process Complaint, Plaintiffs served a Due Process Complaint on the District and the AEA on or about December 15, 2015. The facts and allegations set forth therein are specifically incorporated herein by this reference. (See attached Exhibit A).

18

## LEGALLY BINDING MEDIATION AGREEMENT

90. On February 8, 2016 the Plaintiffs and Defendants entered into an Agreement to Mediate, which mediation took place from 9:30 a.m. to 5:30 p.m. on February 8, 2016.

91. A Legally Binding Mediation Agreement was reached on February 8, 2016, the terms and conditions of which are fully incorporated herein by this reference. (See attached Exhibit B).

92. The Defendants have violated the Legally Binding Mediation Agreement ("LBMA") by, among other things, the following:

   a. Failure to ensure that the "primary focus of [C.B.'s] education would be that he attend school willingly in order to develop living, learning and working skills that prepare him for post-secondary life" as required by Paragraph 3 of the LBMA;

   b. Failure to ensure that "academic instruction will be adopted to the maximum extent possible in order to present the curriculum in a way that is attractive to [C.B.]" as required by Paragraph 4 of the LBMA;

   c. Failure to ensure that "persons identified as safe or trusted will be designated as [C.B.'s] contact who is primarily responsible for providing emotional support when [C.B.'s] anxieties or fears are heightened" and failure to ensure that "individuals will be available to provide emotional support to [C.B.] in the event that his preferred individuals are not available" as required by Paragraph 6 of the LBMA;

d.  Failure to meet and to agree to mutual modifications of the BIP, failure to provide an appropriate safe place within the school grounds where C.B. can escape, failure to provide appropriate strategies to redirect C.B., and failure to provide a protocol for how C.B. can access individuals he feels safe with, as required by Paragraph 7 of the LBMA;

e.  Failure to provide an appropriate script of specific strategies and language needed to allow C.B. to calm himself down when escalated, and as required by Paragraph 8 of the LBMA;

f.  Failure to appropriately train paraeducators who work and interact with C.B. in RAD and failure to provide appropriate strategies for communicating with C.B. and responding to his unique needs and failing to provide notification in writing and a summary or outline of what the training entailed, as required by Paragraph 9 of the LBMA;

g.  Failure to provide weekly consultation with Monarch Therapy, as required by Paragraph 11 of the LBMA;

h.  Failure to provide C.B. with an appropriate opportunity for physical activity daily, as required by Paragraph 12 of the LBMA;

i.  Failure to appropriately meet to review the behavioral evaluation and discuss which executive functioning needs C.B. has per the BRIEF assessment, as required by Paragraph 14 of the LBMA;

j.  Failure to devise an appropriate method to enable C.B. to understand his goals and the progress he is making towards those goals, as required by Paragraph 18 of the LBMA; and

k. Failure to provide C.B. with an extended school year program, in a timely

manner including the content and location of this program by May 1, 2016, as

required by Paragraph 20 of the LBMA;

93. As a result of the above failures and breaches of the LBMA, C.B. has been denied a

FAPE under the IDEA and Iowa Code Section 256.12.

94. As a result of the above violations of the IDEA and breaches of the LBMA, including

most egregiously the failure to meet and to determine the content and location of an

appropriate extended school year program for C.B. as required by Paragraph 20 of the

LBMA, Plaintiffs had no choice but to find and arrange for an appropriate Out-of-District

Placement so as to meet the needs of C.B. for an appropriate education, which facility

was Seven Stars Therapeutic Residential Treatment facility in Syracuse, Utah where C.B.

attended from April 29 – September 14, 2016.

95. As a result of the above violations of the IDEA and breaches of the LBMA, from

September 14, 2016 to the present, C.B. has attended the residential/academic program at

Waterfall Canyon Academy/Oak Grove School in Ogden, Utah as necessary for C.B. to

obtain an appropriate education.

96. C.B. has done much better in the residential/academic program at WFC/Oak Grove

School. The WFC/Oak Grove School developed a "behavioral intervention plan" that

identified C.B.'s most problematic behaviors and set out particular strategies for

addressing them. WFC/Oak Grove School also added heft to C.B.'s academic goals.

Within months, C.B.'s behavior improved significantly, permitting him to make a degree

of academic progress that had eluded him in the Cedar Falls Community public schools.

97. Some months after C.B. started the residential/academic program at WFC/Oak Grove School, Plaintiffs again met with representatives of the District. The District presented a new IEP. Plaintiffs considered the IEP no more adequate than the generic ones proposed earlier and rejected it. They were particularly concerned that the stated plan for addressing C.B.'s behavior did not differ meaningfully from the plan in his earlier IEP, despite the fact that his residential/academic experience at WFC/Oak Grove School suggested that he would benefit from a much different approach including a residential/academic program with similarly situated students with Autism in a small class setting.

98. Plaintiffs were also concerned that the proposed IEP and proposed BIP had been generated without taking into consideration the information contained in intervention logs, attendance logs, disciplinary logs and treatment plans for C.B. C.B.'s parents requested records in relation to C.B. (pursuant to their rights under §1415(b)(1)) as relating the IEP dated March 31, 2017, the BIP date March 31, 2017, the prior written notice dated March 31, 2017 and the PWN dated April 11, 2017.

99. The Defendants acknowledged the request for intervention logs, attendance logs, disciplinary logs and treatment plans for C.B. Having not previously produced these requested materials, the Defendants undertook to "continue to make inquiry concerning whether or not items exist within the following individuals or within the AEA or District Schools themselves. In the event additional materials become available, we will supplement our production". The Defendants have not provided intervention logs, attendance logs, disciplinary logs and treatment plans as requested by Plaintiffs and have since acknowledged destruction of these records. .

100.   In order for C.B. to receive the FAPE to which C.B. is entitled pursuant to the IDEA, the Defendants must reimburse the Plaintiffs for the educational costs, including the costs of tuition, room, board and transportation.

101.   For C.B. to receive a FAPE, the Defendants must reimburse the Plaintiffs for the reasonable attorneys' fees and special education consultant fees on IEP, BIP and FAPE matters that they have necessarily incurred to do so.

## DUE PROCESS COMPLAINT FOR BREACHES OF THE LBMA AND CONTINUED VIOLATIONS OF IDEA

102.   On or about August 15, 2017, Plaintiffs filed a Due Process Complaint against Defendants pursuant to the IDEA, 20 U.S.C. §§ 1400 et seq., as implemented by 281 Iowa Administrative Code chapter 41. The allegations in this Due Process Complaint are fully incorporated herein by this reference. (See attached Exhibit C).

103.   An administrative hearing in this matter was held on April 2 through April 5, 2018 at the offices of the Central Rivers Area Education Agency in Cedar Falls, Iowa. Attorneys Beth Hansen and Dustin Zeschke represented the District and the AEA. Rod Ball and Amy Knupp attended the hearing as representatives of the AEA. Tracy Johns and Dan Conrad attended the hearing as representatives of the district. Attorneys Michael Schwartz and Brandon Schwartz represented Plaintiffs. Christy Banwart and Lance Banwart attended the hearing.

104.   The following witnesses testified at the hearing: Christy Banwart; Lance Banwart; Debbie Morris, special education consultant for the AEA; Dan Conrad, director of secondary education for the District; Rod Ball, director of special programs for the AEA; Janelle Eddy, in-home provider employed by Monarch Therapy Services, Inc.; Bill

23

Aguiar, school administrative manager and intervention teacher at Bremwood; Tina Ford, former special education teacher at Bremwood; Jordan Smock, former special education paraeducator at Bremwood; Eric Rosburg, associate principal and activities director employed by the district; and Krista Hennager, school psychologist/team representative employed by the AEA.

105.     By prior agreement of the Plaintiffs and Defendants memorialized in an Order issued November 20, 2017, videotapes and transcripts of depositions taken of the following witnesses in Ogden, Utah on December 7 and 8, 2017 were submitted in lieu of testimony at hearing: Suzanne Ciraulo, administrator of special education at OakGrove School; Gabriel Gohier, program coordinator at Waterfall Canyon Academy; Karen Nickel, director of residential treatment at Waterfall Canyon Academy; Kate Lovatt, therapist/licensed clinical social worker at Waterfall Canyon Academy; Gordon Day, executive clinical director at Seven Stars; and Brandon Park, licensed psychologist.

106.     Plaintiffs' Exhibits 1-38, 41, 43-44, 62, 64, 67-68, 72, and 85-87 were admitted as evidence. Defendants' Exhibits B-K, M-O, S-U, W-CC, EE-LL, OO-RR, TT-ZZ, AAA, LLL, NNN, OOO, UUU, and AAAAA were admitted as evidence. Joint Exhibits 2001A-2006A and 2001B-2006B were also admitted as evidence. The joint exhibits are videotapes and transcripts of depositions taken of Ciraulo, Gohier, Nickel, Lovatt, Day, and Park in Utah prior to the hearing.

107.     Pursuant to 34 C.F.R. 300.511(d) and 281 Iowa Administrative Code 41.511(4), the issues in the administrative hearing was limited to those issues raised in the Due Process Complaint. By order dated November 2, 2017, the following issues were identified to be addressed at the administrative hearing:

- Whether Defendants violated the IDEA and failed to provide C.B. a FAPE by failing to implement the terms of the LBMA reached by the parties on February 8, 2016. The specific terms that Plaintiffs allege have been violated are identified at paragraph 84 of the Complaint.

- Whether the IEP and BIP proposed by Defendant Cedar Falls Community School District several months after C.B. started classes at WFC/Oak Grove School constituted a denial of a FAPE to C.B. and violated the IDEA.

- If a violation is proven, whether Plaintiffs were entitled to the proposed remedies articulated in paragraphs 95 through 98 of the Due Process Complaint.

108. Prior to commencement of the hearing on April 2, 2018, at the request of the Defendants, upon the agreement by the Plaintiffs, and pursuant to the Order of ALJ, Plaintiffs presented the testimony of Dr. Brandon Park and Dr. Gordon Day. Notwithstanding months of prior notice as to exactly what both of these highly qualified, extensively experienced and professionally licensed psychologists testified to, Defendants did not call any licensed psychologists or other qualified experts to refute or dispute in any way the findings and opinions of Dr. Park and Dr. Day as to their diagnosis of C.B. or his unique needs, including a residential/academic program in order to receive academic benefits.

109. The extensive neuropsychological evaluation conducted by Dr. Park set forth the specific disabilities and the unique needs of C.B. Given the undisputed diagnosis Defendants did not and indeed could not dispute that C.B. is entitled to the protections of the IDEA nor that he is entitled to an appropriate and meaningful IEP reasonably calculated to meet those unique needs.

110.     After many months of advanced notice of exactly what the witnesses who had

been providing C.B.'s education in the residential/academic program had testified to,

Defendants did not call any witnesses or present any testimony to dispute the facts and

lay opinions testified to by Karen Nickel, Gabriel Gohier, Kate Lovatt, and Susan

Ciraulo.

111.     The disregard of the Defendants for the factual information and for the expertise

of those witnesses who had the most extensive and most recent interactions with C.B.

was initially evidenced in the September 2016 IEP meetings.  The audio tapes of those

meetings, demonstrate that the Defendants' members on C.B.'s IEP team: asked no

meaningful questions; gave no meaningful consideration to the extensive psychological

evaluation done by Dr. Park and how this information illuminated the unique needs of

C.B.; and failed to detail what was required for an educational program reasonably

calculated to enable C.B. to make more than de minimis progress appropriate in light of

his circumstances.

112.     The essential function of an IEP is to set out a plan for pursuing academic and

functional advancement.  The "reasonably calculated" qualification for an IEP reflects a

recognition that crafting an appropriate program of education requires a fact intensive

exercise that includes input of the child's parents and other professionals who shed light

on the child's unique needs.  The procedures are there for a reason and their focus

provides insight into what it means, for purposes of the FAPE definition, to "meet the

unique needs" of a child with a disability.

113.     Defendants did not present any testimony from any witness that any

representative of Defendants had fully read the psychological evaluation by Dr. Park, let

alone gave meaningful input to his findings and recommendations on what was necessary to meet the unique needs of C.B. in formulating an appropriate IEP.

114.    Defendants presented no testimony from any witness that the findings and opinions of either Dr. Park or Dr. Gordon Day were given meaningful consideration notwithstanding their availability for input during the September 2016 IEP team meetings and thereafter.

115.    Nowhere in the record have Defendants presented any evidence that anyone from Defendants gave meaningful consideration to the unique needs of C.B. as identified by Dr. Park or Dr. Day in reasonably calculating an IEP to enable C.B. to make meaningful progress in his education or that the proposed IEP was appropriately modified in light of C.B.'s circumstances.

116.    The testimony of Karen Nickel, Gabe Gohier, Kate Lovatt and Susan Ciraulo detail the need for and the positive academic and non-academic benefits that C.B. has received from the residential/academic program at WFC/OGS. It is uncontradicted that the services are being provided in a coordinated and collaborative manner by the key stakeholders. The behavior logs, monthly progress reports, and quarterly education reports from WFC/OGS provide unrebutted evidence of the progress C.B. made and the objective standards measuring that progress.

117.    Testimony of the WFC/OGS witnesses, along with the exhibits offered and received during their testimony: set forth specific information regarding academic goals, achievement and progress; set forth specific information on behavioral progress beyond general impressions; established adequate progress monitoring information in both academic and behavioral areas; established the research and evidence base for the

27

strategies employed within the WFC/OGS programs; evidenced the programs being

individually designed with C.B.'s needs in mind, considering the entire program is

designed with the needs of the autistic students enrolled in the program; and evidenced

transition planning for C.B. and what would be required for C.B. to transition to a less

restricted environment.

118. As testified by Dr. Gordon Day, in order for C.B. to have an appropriate

education, he needed the residential program and the therapeutic program combined with

the academic program.

119. As testified by Dr. Brandon Park, with respect to C.B.'s future, it is important that

he receive a therapeutic program, the residential programs and the school programs in

order to increase the chances of C.B. having successful outcomes – "dramatically so".

120. Very importantly, Defendants did <u>not</u> present any testimony or present any

competent evidence to dispute the necessity of a residential/academic placement for C.B.

to receive meaningful educational benefit nor otherwise dispute that the

residential/academic placement was necessary for C.B.'s educational purposes.

121. Defendants themselves acknowledged in their ALJ Trial Brief (page 16): "If the

problems prevented a disabled child from receiving educational benefit, then it should not

matter that the problem was cognitive in nature or caused the child even more trouble

outside of school than within it. What controls the court's decision is not whether the

problem is "educational" or "non-educational" but whether it needs to be addressed in

order for the child to learn." There is no legitimate question that C.B.'s problems, which

came up in school, outside of school and in the home, needed to be addressed in order for

him to learn given his unique needs.

28

122.	Prior to the LBMA, Defendants had made a manifestation determination related to C.B.'s behavioral issues. Among the behavioral issues that the Defendants had determined needed to be addressed as part of C.B.'s education was a history of significant behavioral issues: he had been involved in physically aggressive behavior; multiple incidents of refusal to comply with directions and school expectations; had been disrespectful; had disruptive communications; and had been leaving the school setting without permission. These behavioral issues and their relationship to C.B.'s education were an important element in Item Number 3 of the LBMA and the important intent that the primary focus of C.B.'s education would be that he attend school willingly.

123.	The duration of the LBMA was not just for the then current school year, but was expressly intended to cover the remainder of his school years. Some of the provisions of the LBMA were complied with and others were not.

124.	Plaintiffs intended, and Defendants agreed, that the primary focus of C.B.'s education would be that he attend school willingly. There was an expectation and agreement that Defendants would implement things that would result in C.B. attending school willingly for the rest of the years of his schooling. The Plaintiffs main goal was to make sure that C.B. went to school, that he wanted to go to school, that he would go to school every day, and that they would not have to fight him to go to school every day.

125.	Plaintiffs explained why it was important that academic instruction be adopted to the maximum extent possible in order to present the curriculum in a way that is attractive to C.B. and that the curriculum would be individualized to hold C.B.'s interest as agreed to by the parties in Item 4 of the LBMA.

126.    At the time C.B. left Bremwood at the end of April 2016, instruction had not been

adopted and individualized so that it was attractive to C.B.

127.    At the time that C.B. left Bremwood at the end of April 2016, he was not

attending school willingly.

128.    For the reasons explained by Plaintiffs, C.B. needed to have connections in order

to trust, to always have a safe person that he could go to that he knows. The importance

that safe and trusted individuals be designated to provide emotional support for C.B. was

expressly agreed to in Item 6 of the LBMA.

129.    Prior to C.B. starting at Bremwood on February 15, 2016 and prior to the IEP

meeting on February 19, 2016, the Plaintiffs had not been given any input from

Defendants regarding the new IEP or the new BIP as had been agreed in Item 7 of the

LBMA.

130.    While the full record demonstrates the lack of meaningful academic progress C.B.

experienced with Defendants, as set forth in the IEPs and other documents, the following

excerpts are illustrative and telling. With respect to reading in the February 19, 2016 IEP:

"it is important to note that C.B. was first administered the set of materials at the

fourth/fifth grade level but was unable to answer the first few questions correctly so the

third grade level materials were then used". C.B. was in eighth grade, but Defendants

were administering reading tests at the third grade level and he was having struggles even

in the third grade level. There was nothing in particular that was put into the IEP plan that

would have appropriately addressed C.B.'s unique needs to get his reading out of the

third grade level and up to the eighth grade level. Defendants put nothing in particular

into the IEP that was intended to address C.B.'s deficiencies and fine motor skills.

131.     Other than getting him a Chromebook, which was not considered to be adequate in terms of what was necessary to address C.B.'s unique needs when it came to writing, Defendants did not propose anything to address C.B.'s unique needs when it came to writing.

132.     In the February 19, 2016 IEP, Defendants acknowledged the following regarding "other information essential for the development of this IEP":

- C.B. has had a history of struggling with emotional regulation across all environments, both home and school. C.B. has been diagnosed with anxiety, cognitive delay and RAD by medical professionals. At school C.B. has difficulty expressing his emotions in handling his frustration in an age appropriate manner.

- C.B. escalates quickly sometimes without identifiable triggers in a classroom that may cause him to be overwhelmed and anxious which causes him to walk out of class and/or leave school.

- Identifiable triggers for C.B. include academic tasks that C.B. perceives as being too difficult.

- C.B. has difficulty initiating and maintain friendships in the same age group.

- Specifically, behaviors of concern at school include walking out of class without permission, leaving the school building without permission, becoming physically aggressive with school teachers/staff by attempting to bite and scratch them.

133.     These behaviors were interfering with C.B.'s abilities to receive a meaningful education and had to be adequately addressed in a residential academic program in order for C.B. to get an appropriate education.

134.     Pursuant to the LBMA, Defendants agreed to pay for Monarch Therapy to

provide a mandatory weekly consultation for up to thirty minutes weekly and the IEP

team would consider additional time as need arises. Monarch Therapy had been working

with the Plaintiffs and it was important to them that Monarch Therapy work with the staff

at Bremwood to help them in helping C.B. for the interventions and behavioral issues. It

was important to the Plaintiffs that Bremwood staff meet with Monarch Therapy on

weekly basis and if additional time was needed, the Defendants had agreed to pay for

even additional time. Other than one session, there were no weekly consultations with

Monarch Therapy.

135.     It was very important to the Plaintiffs that Monarch Therapy would share with the

staff at Bremwood what they and Plaintiffs were learning about how to work with C.B.,

how to have C.B. be willing to learn. To share communication strategies and to get

people at Bremwood trained on how these communication strategies help with C.B.

Plaintiffs did not receive any communication from Defendants that contained the required

notice in writing of what training staff had gotten and what that training entailed. This

was important for Plaintiffs to be comfortable and provided accountability.

136.     Monarch Therapy was chosen to provide weekly consultation because they were

working with the Plaintiffs, there was a huge connection, they knew C.B. inside and out

and they constantly had to modify what people were doing with C.B. because what works

today doesn't work tomorrow. That is why the weekly consultation was important,

because they could get together and discuss what's going on that week and how do the

parties perpetuate the good part that was going on.

32

137.	In addition to his difficulties with reading and writing, C.B. had difficulties with math. Although an eighth grade student, when given coins to one dollar, C.B. was only able to count sums of money with 42% accuracy. He did not count money with automaticity nor was he able to make change from a dollar.

138.	The only alternative offered by Defendants to the Plaintiffs for C.B.'s education was Bremwood. There were no other children at Bremwood who had autism. No one at the Bremwood staff was trained in dealing with children who had autism. The programs at Bremwood were not designed to successfully instruct children who had autism.

139.	Defendants did give the Plaintiffs names of programs and facilities other than Bremwood to look into as alternatives. The Plaintiffs did look into these alternative programs, but C.B. was not accepted into their alternative programs.

140.	There was an important distinction between allowing C.B. to deescalate and go to a safe place on his own versus being physically taken to that cement room. While the cement room at Bremwood was initially a calm place, it did not take long for that not to be a safe place for C.B. as, within the first week, Defendants were physically carrying him and putting him into that cement room. After he was physically taken down to that cement room, the room did not continue to be a safe place for C.B. and Defendants did not provide any alternative safe places for C.B.

141.	The Plaintiffs asked for behavioral logs from Bremwood, but were told that Defendants no longer had them because they had been shredded when things changed from Bremwood to Lead. The behavioral logs would have clearly documented that C.B. was not benefiting from the education he was getting at Bremwood and that he was regressing based on what was going on at Bremwood.

142.     Both the Plaintiffs and Defendants agreed that it was not appropriate for C.B. to be mainstreamed. In the February 2016 IEP, 100% of the 405 minutes in the school day would be in a special education setting. Mainstreaming was not even in the cards for C.B.

143.     Very importantly, the LBMA required that Defendants would provide C.B. with an extended school year program. The extended school year program was a critical part of the LBMA. The purpose of that provision was for C.B. to catch up from the three months he was out of school and at the point in time when he had left school, he was already years behind. This was an extremely important provision of the LBMA to the Plaintiffs.

144.     While the LBMA expressly provided that the IEP team will meet to determine the content and location of the extended school year program by May 1, 2016, as of the last week of April, no meeting had been noticed, no meeting had been held and the Plaintiffs were not in any way consulted or involved in the determination of the content or location of the extended school year program. The IEP team was supposed to include Plaintiffs' meaningful participation on the IEP team as C.B.'s parents.

145.     Ten days prior to May 1, no one from the Defendants had contacted Plaintiffs about a meeting, no one had sent any written materials regarding the proposed content and no one had contacted the Plaintiffs to discuss the proposed location of the extended school year program.

146.     Contrary to the agreed upon provisions in the LBMA, the location of the extended school year program was unilaterally determined by Defendants' representative Greg Koppes, someone with no experience with C.B. and no relationship with C.B. Defendants did not call a single witness nor did they otherwise present any information regarding the

34

proposed content of the extended school year program. The extended school year

program was not developed in consideration of the weekly consultations with Monarch

Therapy, nor could it have been because Defendants did not comply with the weekly

consult provisions of the LBMA.

147.    The extended school year program that Defendants had unilaterally chosen was

for two hours a day, four days a week, for one month in the middle of the summer. The

limited "extended school year program" contemplated by Defendants for C.B. was not

appropriate and was far from sufficient to allow him the structure and instruction he

needed to catch up.

148.    Pursuant to the LBMA, Bremwood was to train Para-educators to work and

interact with C.B. on the appropriate strategies for communicating with C.B. and

responding to his unique needs. Defendants further agreed that Plaintiffs would be

notified in writing when training was provided and a summary or outline of what the

training entailed. Plaintiffs were not provided with written notice of what, if any, training

was provided.

149.    When the Plaintiffs informed Defendants' representative Bill Aguir in April of

2016, that C.B. would be enrolled in the Seven Stars program, he asked about the

program, said he understood that, said this is something that Plaintiffs needed to do and

asked if Plaintiffs would keep in touch.

150.    Defendants did not say the Plaintiffs should not remove C.B. to the Seven Stars

program in Utah. Defendants did not say that given the autism diagnosis and the IQ

results that Bremwood would work and to stay at Bremwood. Defendants did not say the

Plaintiffs should wait any number of days before having C.B. go to the Seven Stars program in Utah.

151.     No representative of Defendants told Plaintiffs they should not have taken C.B. to the Seven Stars program in Utah or that they should bring him back to Bremwood, neither in writing nor verbally.

152.     Defendants never articulated to the Plaintiffs why they thought Bremwood was an appropriate place for C.B., never provided documentation supporting their belief that Bremwood was an appropriate place for C.B. and never provided any expert opinions or reports that Bremwood was an appropriate place for C.B.

153.     In the first 19 months in the residential/academic programs at WFC/OGS, C.B. went from a 3rd grade reading level to a 9th grade reading level. In the previous seven years at Cedar Falls Public Schools, C.B. was at a 3rd grade level and in not even two years at WFC/OGN he went from 3rd to 9th grade in reading level.

154.     C.B.'s time in school at the WFC/OGS residential/academic program is now very productive because he is not avoiding class (he is in class) and C.B. has a safe place where he can get away if he needs to. As key members of the IEP team, Plaintiffs most definitely believe that C.B. has benefitted academically from the residential/academic programs at WFC/OGS.

155.     As key members of the IEP team, Plaintiffs maintain that residential/academic placement for C.B. was and is necessary "because the amount of disruption that was happening in school, in home, was so much that in order to have the ability to have a productive member of society and that C.B. doesn't end up with life in prison; [Plaintiffs] figured that was their only option."

36

156.     The intent of the LBMA was to get C.B. in a situation where he felt trusting of people, he would be willing and able to learn and progress. As stated by Plaintiffs, "when you've got a child that can't read and write that's very scary when you look down the future of where he is going to go, what he is going to do."

157.     C.B.'s behaviors both at school and at home were most definitely interfering with his ability to learn. Plaintiffs agreed that C.B. would attend Bremwood only because of the specific provisions in the LBMA that were important to them. Everything in the LBMA was tied back to C.B. wanting to go to school, wanting to sit in a classroom and having the ability to be educated.

158.     The February 2016 IEP sets forth acknowledgments by the Defendants, agreed to by the Plaintiffs, that C.B. continues to need special education related services to be successful, that it is important that C.B. develops a positive relationship with his instructors, that C.B. requires a modified curriculum for all academic areas, that C.B. learns best in a small classroom environment with accessible one-on-one support and that learner supports are important to C.B. Each of these above needs has been and is currently being filled by the residential/academic program at WFC/OGS. These needs were not being met at Bremwood.

159.     Defendants have acknowledged that C.B. was attending Bremwood "to address his significant behavior concerns". If C.B.'s significant behavior concerns were not addressed, C.B. would not be able to receive an appropriate education.

160.     Defendants have acknowledged that the unique needs of C.B. were such that he needed special school placement.

161.     During February, March and April 2016, C.B. experienced problems with his behavior at Bremwood. He was spending up to eight hours a week in the cement room. The Plaintiffs, as key members of C.B.'s IEP team, did not consider this to be appropriate.

162.     On April 21, 2016, Plaintiffs took C.B. to a licensed psychologist in Waterloo, Dr. Paul Condit. He issued a written report on April 22, 2016. Upon learning that C.B. had Asperger Syndrome, they contacted Karen Mabie, who was familiar with facilities that provided appropriate education for children having the unique needs similar to C.B.

163.     Karen Mabie was both qualified and experienced. Plaintiffs entered into a professional services contract with Karen Mabie at a cost of $4,000 for her assistance. Karen Mabie assisted the Banwarts in looking for an appropriate place for C.B. to go that could meet his unique needs, making contact with a number of facilities both within Iowa and closer to Iowa. Karen Mabie helped located Seven Stars.

164.     Plaintiffs made the decision, agreed to by representatives of Defendants, to take C.B. out of Bremwood because: they could not get C.B. to go to school in the morning, it had become a daily fight; C.B. had been spending much of his time in the cement intervention room at Bremwood and he was scared that he did not feel safe there; Plaintiffs were asking for people to check on things that were happening and they were not getting any help at that point; Defendants' representative had taken on another student so C.B. was not getting the one-on-one support that he needed; it was the middle of April and Defendants had not talked to Plaintiffs about what was going on in the summer for the extended school year program; and Plaintiffs had no trust in Defendants because they had not done what they had said they were going to do in the LBMA

38

165.     At the point in time Plaintiffs took C.B. to Seven Stars in late April, 2016:

Defendants had not even contacted Plaintiffs, let alone had a meeting with them, to come

to an agreement on the content and location of the extended school program; what was

happening at Bremwood was not leading to the primary focus of C.B. attending school

willingly; C.B. was not going to school willingly; C.B. did not want to be at school; C.B.

was scared at school; the academic instruction at Bremwood had not been adopted so that

it was attractive to C.B.; C.B. was not making progress at Bremwood; Defendants

representative was not available very often for C.B.; Defendants representative had been

assigned to someone in addition to C.B.; C.B. was being physically taken to the cement

room as opposed to being in a safe place he could escape to; C.B. said he was being hit at

school; and Bremwood staff was not meeting weekly with Monarch Therapy.

166.     At the time Plaintiffs removed C.B. to Seven Stars in late April, 2016, Defendants

made it clear that the only option Defendants were offering was Bremwood and

Bremwood was not an acceptable option that gave C.B. an appropriate education.

167.     After C.B. made sufficient progress at Seven Stars, he progressed to the point that

there was a proposal that he would then go to a different residential/academic program.

Given C.B.'s unique profile with specific needs, Karen Mabie assisted in finding the

appropriate residential/academic program when C.B. came out of the Seven Stars

program.

168.     Plaintiffs provided timely written notice to Defendants that they were proposing

the residential/academic program at WFC/OGS. The neurophysiological evaluation that

Dr. Park had done was provided to the school prior to the September 7, 2016 meeting to

discuss an appropriate placement for C.B.  Representatives of both Seven Stars and

WFC/OGS were available for that IEP team meeting. Defendants' representatives of C.B.'s IEP team did not give legitimate consideration to what Dr. Park or Dr. Day were opining. Defendants' representative did not provide any information at this IEP meeting that would suggest that Bremwood had somehow changed and would now be an appropriate place for C.B. to go as he exited Seven Stars.

169.    Based on the neuropsychological evaluation that Dr. Park had done, the input from Dr. Day, and the input from the WFC/OGS people, C.B. needed a residential/academic program. As key members of C.B.'s IEP team, Plaintiffs did not consider Bremwood, which was not a residential/academic program, as an appropriate option where C.B. would be able to receive an appropriate education.

170.    No one from Defendants explained how or why they would be able to provide an appropriate education at Bremwood, they were not going to have a residential/academic program at Bremwood and no one from Defendants stated in these IEP meetings that they thought C.B. did not need a residential/academic program. Defendants did not call a single qualified witness to testify that C.B. did not need a residential/academic program.

171.    Plaintiffs would have preferred for C.B. to have come back to Cedar Falls so he could be closer to the family and so they would not have to pay the monthly fees for the residential/academic program at WFC/OGS. Plaintiffs, as key members of the IEP team, felt strongly enough about C.B.'s need for a residential/academic program that they paid and have continued to pay the monthly fees themselves with no assurance that the fees would be reimbursed, notwithstanding their belief that reimbursement is required by the IDEA.

40

172.     Karen Mabie was familiar with the residential/academic program at WFC/OGS, had been out there to view the school, talked to the teachers and understands their program. Karen Mabie had also been out to meet with C.B. Karen Mabie had investigated C.B.'s unique needs to determine an appropriate place for C.B. as he came out of Seven Stars.

173.     During the IEP team meetings in February and March of 2017, Defendants continued to take the position that C.B. can come back to Bremwood and Bremwood could meet his needs. Notwithstanding, Defendants did not provide the Plaintiffs with any information that would support their statement, Defendants did not provide any documentation that Bremwood would be appropriate for C.B. to come back to and that they could meet his needs there and Defendants did not give any information in consideration to C.B.'s actual unique needs in the IEP team meetings in September of 2016 or February and March of 2017.

174.     C.B. has been doing remarkably well in the residential/academic program at WFC/OGS; his last reading test shows he is almost up to 10th grade reading, he goes to school, he loves school, he is learning and he is starting to catch up to where he needs to be.

175.     WFC/OGS has monitored his progress from an objective standpoint and the information regarding the progress that C.B  has been making has been provided to Defendants

176.     No one from Defendants has contacted the Plaintiffs to provide any information regarding any changes that have been made at Bremwood with respect to programs, staff,

41

or changes that have been made at Bremwood regarding the building itself and whether or not there are now places where C.B. would be able to go and feel safe.

177.     No one from Defendants has contacted Plaintiffs or provided any documentation that Defendants would now comply with the various terms and conditions that were required to be provided pursuant to the LBMA, such as weekly sessions with Monarch Therapy or that Defendants have taken any meangingful steps to make Bremwood a place where C.B. would go to school willingly.

178.     Defendants have offered no alternatives but Bremwood.

## DAMAGES

179.     Plaintiffs paid Seven Stars $59,735.

180.     Plaintiffs had travel expenses exceeding $1,465.

181.     Plaintiffs paid WFC/OGS $145,000 from September of 2016 to October of 2017 and since that time have been paying $10,500 a month. As of the date of the administrative hearing, Plaintiffs had paid 19 months at $10,500 per month ($199,500) plus $8,600.

182.     Plaintiffs have paid attorneys' fees following the February 8, 2016 mediation, and ongoing, all related to the IEP meetings in September of 2016 and February and March of 2017 and the 2017-2018 Due Process proceedings.

## ADMINISTRATIVE LAW JUDGE DECISION

183.     The decision of the ALJ dated July 3, 2018 is a final decision in a proceeding conducted pursuant to 20 U.S.C. § 1415 and is therefore subject to this court's de novo review under 20 U.S.C. § 1415(i)(2)(A). See attached Exhibit D which is incorporated herein by this reference.

184.    Plaintiffs are aggrieved by the findings and decision made by the ALJ that

Plaintiffs have not proven that Defendants denied C.B. a FAPE as alleged in the Due

Process Complaint, denying the relief requested by Plaintiffs and dismissing the

Plaintiffs' Due Process Complaint.

185.    Plaintiffs request that this Court determine, basing its decision on a preponderance

of the evidence, that Defendants have denied C.B. a FAPE as a result of its breaches of

the LBMA, by not providing a residential/academic program necessary for C.B. to be

offered an education program providing merely more than de minimus progress from

year to year and by failing to provide an educational program reasonably calculated to

enable C.B. to make progress appropriate in light of his circumstances as required by the

United States Supreme Court as articulated in the *Endrew F.* case.

## STAY PUT

186.    Under 20 U.S.C. §1415(j) and 24 C.F.R. §300.518(a) Plaintiffs request that C.B.

remain at his current educational placement during the pendency of this proceeding.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request the following relief:

1.  That this Court take jurisdiction over the matter, and review the record *de novo*;

2.  That the Court receive the records of the administrative proceedings pursuant to 20 U.S.C
    § 1415(i)(2)(c)(i);

3.  That the Court hear additional evidence at the request of Plaintiffs pursuant to 20 U.S. C.
    § 1415(i)(2)(c)(ii);

4.  That the Court declare the Defendants have breached the LBMA;

5.  That the Court declare that the Defendants have violated the requirements of IDEA;

6. That Plaintiffs be awarded the costs and expenses they have paid to enable C.B. to receive an appropriate education to the fullest extent permitted by the IDEA;

7. That Plaintiffs be awarded their costs and expenses of the Administrative proceedings and this action to the fullest extent permitted by the IDEA; and

8. That the Court grant such other and further relief as the Court determines is appropriate.

Date: October 1, 2018                    **SCHWARTZ LAW FIRM**


*/s/ Brandon M. Schwartz*
Brandon M. Schwartz (Atty. ID #0011248)
600 Inwood Avenue N., Suite 130
Oakdale, MN 55128
Telephone:  (651) 528-6800
Facsimile: (651) 528-6450

*Attorneys for Plaintiffs*

44