**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION**

| | |
|---|---|
| CHRISTY BANWART and LANCE BANWART, | |
| Plaintiffs, | Case No. 18-cv-2074-LTS |
| vs. | **REPORT AND RECOMMENDATION** |
| CEDAR FALLS COMMUNITY SCHOOL DISTRICT and AREA EDUCATION AGENCY 267, | |
| Defendants. | |

_____

**TABLE OF CONTENTS**

PAGE

I.  INTRODUCTION.............................................................................. 2

II. PROCEDURAL BACKGROUND...................................................... 3

III. FACTUAL BACKGROUND ............................................................ 3

IV. APPLICABLE LAW.......................................................................... 16

    A.  Jurisdiction ............................................................................ 16

    B.  Standard of Review................................................................. 17

V.  THE PARTIES' POSITIONS .......................................................... 20

VI. DISCUSSION.................................................................................... 22

    A.  The Effect of the LBMA ......................................................... 22

1

B.     *Alleged Violations of the LBMA*................................................**24**

C.     *Did the Bremwood Placement deny C.B. FAPE?* ...........................**34**

D.     *Whether WFC/OGS was a Proper Alternative Placement* ................**43**

E.     *Police Incident* ...........................................................................**44**

F.     *Reimbursement and Attorneys' Fees*.........................................**47**

VII.   *CONCLUSION*...................................................................................**48**

## I.    INTRODUCTION

This action is an appeal from an administrative agency decision. Plaintiffs Christy Banwart and Lance Banwart ("Plaintiffs") originally brought a due process administrative action under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. Sections 1400, *et seq*. They alleged that Cedar Falls Community School District and Area Education Agency 267 ("Defendants") violated the rights of their son, C.B., under the IDEA. Plaintiffs filed a Complaint in this Court (Doc. 1), appealing the decision of Administrative Law Judge ("ALJ") Laura E. Lockard dismissing the due process complaint. Defendants filed an Answer. (Doc. 5.)

On June 21, 2019, Plaintiffs timely filed their brief. (Doc. 25.) On July 26, 2019, Defendants timely filed their brief. (Doc. 28.) On August 15, 2019, Plaintiffs filed a timely reply brief. (Doc. 29.) On August 16, 2019, the Honorable Leonard T. Strand, United States Chief District Judge, referred this case to me for a Report and Recommendation.

For the following reasons, I respectfully recommend that the Court uphold ALJ Lockard's decision and dismiss Plaintiffs' Complaint with prejudice at Plaintiffs' cost.

## II.    PROCEDURAL BACKGROUND

Plaintiffs filed a due process complaint in December 2015 with the Iowa Department of Education alleging Defendants violated the IDEA by, among other things, failing to provide C.B. free appropriate public education ("FAPE").  The parties subsequently mediated their dispute and entered into a Legally Binding Mediation Agreement ("LBMA") that established C.B.'s placement at Bremwood School.  The LBMA also required that certain actions be taken to resolve issues Plaintiffs had raised. C.B. was enrolled in, and began attending, Bremwood in February 2016. Plaintiffs removed C.B. from Bremwood on April 26, 2016 and enrolled him in a private program in Utah.  Plaintiffs filed their second due process complaint with the Iowa Department of Education on August 15, 2017. ALJ Lockard held a hearing on April 2 through 5, 2018 and issued her decision on July 3, 2018 ("the Decision").  (Doc. 1-5.)

## III.    FACTUAL BACKGROUND

Some of the factual background as gleaned from the Complaint (Doc. 1) and Answer (Doc. 5) is not contested.  In addition, the "Findings of Fact" contained in the Decision appear to be thorough and well-grounded in the evidence presented. The parties raise very few points of disagreement with ALJ Lockard's findings of fact, which I will discuss.  I recommend the Court adopt ALJ Lockard's findings of fact, except as noted. I have reviewed the record and conclude that the citations to the record support ALJ Lockard's findings. I summarize the relevant facts as follows:

Plaintiffs are residents of the City of Cedar Falls, Iowa and the Cedar Falls School District ("the District").  Their adoptive son, C.B., was born in 2002 and was 16 years old at the time the Complaint was filed.  Because of his disabilities, which will be described in more detail below, he had been receiving special education services pursuant to routinely updated iterations of an Individual Education Plan ("IEP"), as required by law.

3

C.B. experienced early childhood trauma prior to his adoption. He received diagnoses of reactive attachment disorder ("RAD"), anxiety, and cognitive delays. His elementary school years were marked by behavioral problems and lack of academic progress demonstrated by the inability to meet the goals set out in IEPs. In fall 2014, C.B. began seventh grade in a self-contained special education classroom at Holmes Junior High, but was placed in a psychiatric medical institution for children beginning in January 2015.

In fall 2015, C.B. entered eighth grade at the same school after a Functional Behavior Assessment ("FBA") and a Behavior Intervention Plan ("BIP") were completed. ALJ Lockard's description of the difficulties arising thereafter bears repeating:

> During the start of the 2015-16 school year, Holmes staff observed that Student's behaviors were unpredictable and that he would leave the classroom and the building without any obvious patterns or triggers. Staff also noted that Student was engaging in aggression, violence, threats directed at staff and himself, and mood swings throughout the day. Additionally, staff noted that Student frequently refused teacher requests to get his books out and engage in instruction, refused to listen, and refused to do assigned work. Student frequently told teachers, "I don't have to. I can do what I want." Staff observed that Student was better able to participate in settings where there were no academic expectations; for example, when Student was allowed to play on the computer or watch videos, he could remain in a setting without leaving. (Exh. UUU-9).

> On October 30, 2015 police and Parents were called to Holmes to deal with a situation where Student's behavior had escalated to the point of throwing books at school staff and blocking himself in a room alone; the escalation continued for a prolonged period of time even after intervention by trained staff. Student was handcuffed by police officers who responded. (Mother, Morris testimony; Exh. UUU).

> Student was suspended after the October 30 incident. During the suspension, he was receiving one hour of instruction at the AEA office four

4

days per week. Student's Parents decided that they did not want him to return to Holmes. At some point in fall 2016, Student was placed at Peet Junior High School, also in the Cedar Falls Community School District. (Mother, Father testimony).

On December 16, 2015, a manifestation determination was made with regard to conduct that occurred December 11 at Peet. The determination indicates that Student was being verbally and physically aggressive with school staff, including threatening to harm or kill multiple individuals, acting as though he was going to harm himself or others with a paper cutter and pair of scissors, attempting to bite, hit, and kick school staff, not allowing staff to leave the room by physically blocking their way, knocking over and kicking stools, and upending a trash can on a staff member's head. The document states that Student has a history of significant behavior, including an incident of physical aggression at a prior school and multiple incidents of refusal to comply with directions or school expectations, disrespectful or disruptive communication with school staff, and leaving the school setting without permission. The determination also states that an FBA was completed showing an identified primary function of escaping undesirable environments, particularly when academic coursework was assigned. A secondary function of attention was also identified by the FBA. The determination states that Student "has learned to 'up the ante' in order to achieve his escape related function."

(Doc. 1-5 at 4.) This discussion shows some of the challenges that C.B. and the parties faced in the months leading up to the dispute regarding the appropriate placement. The incident involving the police is also central to Plaintiffs' argument about trust issues that developed. Plaintiffs argue:

To be clear, Banwarts are not asserting claims for the October 30th incident or any failures prior to the LBMA. However, the circumstances leading up to the LBMA are important to understand the context of and the importance of the extended school year services, the importance of an appropriate safe place for C.B., the importance of provisions for providing written confirmation that certain things have taken place and the terms and conditions of the LBMA.

(Doc. 25 at 10-11.)

5

C.B. was thereafter placed at Peet Junior High School within the District, but experienced additional, and more drastic, behavior problems. During this time period, C.B.'s IEP was revised. On December 16, 2015, it was determined that C.B.'s behavior was a manifestation of his disability and that the services currently being provided were insufficient to address his needs.

On December 23, 2015, Plaintiffs filed their first due process complaint against Defendants alleging they failed to determine C.B.'s needs, develop appropriate IEPs and provide him with FAPE, and alleged violations of certain procedural requirements. On January 28, 2016, the District moved C.B. to homebound instruction citing "lack of goal/academic progress and disruptive behaviors." (Ex. 38.)[1]

On February 8, 2016, the parties engaged in mediation and executed the LBMA that resolved all outstanding issues and provided for C.B.'s placement at Bremwood. The LBMA identified 21 "actions to resolve issues" to be undertaken by the District. The LBMA identified the "primary focus" of C.B.'s "education would be that he attend school willingly in order to develop living, learning and working skills that prepare him for postsecondary life." (Doc. 1-5 at 6.) Remaining action items identified more specific means and methods for accomplishing this overall goal. Because Defendants' alleged failure to adequately undertake these action items is at the heart of Plaintiffs' complaint, they will be discussed more particularly below. The LBMA expressly provided, "This is a legally binding agreement enforceable in any state court of competent jurisdiction or in a district court of the United States." (Ex. 33.)

Bremwood[2] is a school located in Waverly, Iowa that serves students with behavior and mental disabilities. Students are enrolled there usually after less restrictive plans in

---

[1] "Ex." Refers to exhibits admitted during the administrative hearing.

[2] ALJ Lockard recounts certain transitions regarding Bremwood's name, the name of the relevant AEA, and certain surrounding circumstances that are not in dispute. (Doc. 1-5 at 11 n.2.) These transitions occurred after C.B. was enrolled and are relevant only because some records were

their districts are unsuccessful. C.B. started at Bremwood after an intake meeting on February 11, 2016 where his needs were discussed, but before a February 19, 2016 IEP meeting. At the IEP meeting, attendees discussed an FBA that had been prepared by employees of the Defendants in January and February 2016.

> The purpose of an FBA is to examine all of the factors that contribute to a student exhibiting challenging behaviors. The team attempts to objectively identify what the challenging behaviors are and conducts record review, interviews, observations, and sometimes testing to determine what the function of each behavior is. The behaviors of concern that had been identified for Student were: 1) elopement (leaving the classroom without permission from an adult or leaving the school building); and 2) aggression (hitting, kicking, biting, and scratching adults). (Exh. J-27; SP / AEA Team Rep testimony).

(Doc. 1-5 at 13.) The FBA was also conducted to find ways to encourage C.B. to engage in academic work and discourage elopement or other behaviors C.B. exhibited to avoid academic tasks. (*Id*. at 13-14.)

The IEP prepared in February 2016 recognized that C.B.'s behavior adversely affected his ability to make academic progress and identified coping strategies C.B. could use to avoid becoming overwhelmed and anxious. The IEP identified scripted statements to encourage C.B.'s use of those strategies. The IEP also identified academic goals in reading, writing, and math. A BIP was created during the IEP process designed to further these goals. The BIP set out strategies for adults to use with C.B. in response to behavioral issues that included the following passage:

> When [C.B.] engages in verbal threats to himself or others, no emotional reaction, do not engage in any verbal conversation. Communicate with other staff/parents that [C.B.] has made these statements through email to parents.

---

lost or destroyed in the transition. I will refer to the school as "Bremwood" throughout this Report and Recommendation and will explain relevant name changes when necessary to avoid confusion when citing exhibits.

Allow [C.B.] to use de-escalation techniques when he is upset. He can have 30 seconds (count to 30 in head) to choose which technique to use and begin to use it. If he does not make a selection, move to alternate room. Give [C.B.] both time and space while in intervention or alternate room; do not talk to him during the process of de-escalation; step away from him; and handle the situation in a non-threatening manner.

If [C.B.] refuses to complete a task, the adult should count to 30 and then, if no change in behavior, he is removed to alternate classroom. The task should go with and he needs to complete it before returning to his classroom, with NO modifications. He will be given one warning per half day. If he is not in the classroom, he does not earn points and he can be reminded of this.

When [C.B.] completes his work, he will be given immediate access to his chosen leisure activities for his break. The visual timer may be used to provide a reminder of how much time has elapsed.

(*Id.* at 17-18 (quoting Ex. J-24).)

At Bremwood, C.B. was placed in a functional classroom that had fewer students and could be more flexible in responding to student needs. The two-room functional classroom had a "life-skills room" and a main classroom staffed by two special education teachers and five paraprofessionals serving eleven students, including C.B. The five paraprofessionals included special education paraeducator Jordan Smock. Tina Ford was C.B.'s teacher. Jordan Smock was his paraeducator and was assigned to C.B. all day.[3] At first Mr. Smock was assigned only to C.B., but in mid-March 2016 he was assigned a second student as well. Bill Aguiar, who Ms. Banwart had known previously and

---

[3] This report and recommendation need not dwell on the qualifications of the staff of Bremwood or the Defendants' employees involved, other than to say they all appear to be well-qualified. ALJ Lockard thoroughly set forth their credentials and experience. (Doc. 1-5 at 18-19.) Moreover, this dispute is not about the qualifications of staff, but the nature of the school as an appropriate placement for C.B.

trusted, was assigned as an intervention teacher by the LBMA.  As intervention teacher, Mr. Aguiar was C.B.'s designated contact to provide emotional support. Mr. Aguiar, Mr. Smock, school psychologist Krista Hennager, and school principal Greg Koppes were identified as people to whom C.B. could turn when he felt unsafe.  There was another room in the school designated as C.B.'s "safe spot" where C.B. could go when he was having difficulties like refusing to work.  Within this "safety room," was a smaller "intervention room" for students who were being unsafe.

Another component of the LBMA was the agreed involvement of Monarch Therapy Services ("Monarch").  Janelle Eddy of Monarch is a behavioral therapist who had been helping to address C.B.'s RAD in the Plaintiffs' home.  (Christy Banwart Hr'g Test. 108:1-6, Doc. 16-7.)  Under the LBMA, Defendant District had agreed to pay Monarch to train Bremwood staff on strategies to help C.B. deescalate and provide weekly ongoing consulting for up to 30 minutes.

The record reflects extensive planning and coordination leading up to C.B.'s first day at Bremwood.  These preparations included designation of safe areas where C.B. could retreat to deescalate. Efforts were also made to integrate C.B. into activities in the main classroom.

ALJ Lockard described in detail C.B.'s initial success and Plaintiffs' satisfaction with his progress. There were some early concerns about C.B.'s resistance to go to school, but as of March 21, 2016, Ms. Eddy noted, "[C.B.] has been getting up in the morning and going to school. This has been such a huge hurdle for [C.B.] and his parents. [C.B.] has had mini meltdowns in the past week, but has been able to get himself back on track within 15 minutes." (Ex. B-46.)  The record also reflects significant progress at Bremwood toward his academic and behavioral goals.

The difficulties appear to have begun at the end of March 2016.  From his first day, February 16, 2016, until April 6, 2016, C.B. did not miss any school, Plaintiffs

were never called to come get him early, and he stayed in school all day. From April 7 until April 26, 2016, C.B.'s last day, he missed six days of school. Teasing out the cause of these difficulties and the appropriate responses is not an easy task. Plaintiffs suggest that C.B. always experienced a "honeymoon" period with a new school when the experience was new and exciting for him. (Banwart Hr'g Test. 435:20-436:7, Doc. 16-7.) There is no reason to doubt Ms. Banwart's testimony about the existence of this honeymoon effect. However, because of surrounding events, it is difficult to reach the conclusion that the end of the honeymoon would inevitably lead to failure of the Bremwood placement for C.B.

About March 29, 2016, C.B. told Ms. Banwart he had been hit at school. The subsequent investigation apparently yielded no evidence of such an incident, but C.B. remained adamant in his belief he had been hurt. At the same time, a medication change may have contributed to his paranoia. Regardless of the truth of his belief, its persistence contributed to C.B.'s reluctance to go to school. At the same time, Plaintiffs told C.B. they planned to take a trip to Mexico without him from April 7 through April 14, and began preparing him for their absence. On April 7, Ms. Banwart could not get C.B. on the school bus and she believed this was attributable to the planned trip.[4] C.B.'s aunt and uncle stayed with C.B. while Plaintiffs were away, but they were not able to persuade him to attend school on April 8, 12, or 14. Bremwood staff anticipated and encountered difficulties with C.B. during Plaintiffs' absence. Ms. Hennager, the school psychologist, testified that fear of being left by people to whom they are attached is a principal concern of children with RAD. Here, C.B. was most closely attached to his mother and it was clear that her absence would be a challenge for him. C.B.'s aunt and uncle struggled to

---

[4] I note, as ALJ Lockard did, that this is not to suggest Plaintiffs should have stayed home. Plaintiffs are clearly devoted and attentive parents whose primary concern is C.B.'s welfare. In retrospect, the timing of the trip was unfortunate because it muddles the issues of whether C.B. was experiencing the end of a honeymoon period at Bremwood as discussed below.

get him to school. They also struggled with his violence and threats at home. On April 14, then 14-year-old C.B. took the family vehicle and drove to Parkersburg, some 20 miles from his home.

ALJ Lockard addressed the available records regarding C.B.'s behavioral incidents and the interventions at Bremwood, including restraint and seclusion documentation. (Doc. 1-5 at 28-29.) ALJ Lockard noted that some of the intervention documentation was not located because it may have been destroyed in the transition of operational responsibility from the AEA to the Waverly/Shell Rock School District.[5] Because of the absence of the complete record of interventions, trends may be difficult to discern. Nevertheless, ALJ Lockard noted records were missing and does not overstate what conclusions could be drawn from the records. She noted "great improvement" in the time C.B. was spending in class by March 18, but data points thereafter showed less time in class. (*Id.* at 30.) Physical aggression appeared to spike around the time of the medication change and Plaintiffs' trip. The nature of the behavioral problems and the extent to which they escalated appears to have increased after March 29.

Shortly after their return from Mexico, Plaintiffs began to discuss with Ms. Eddy the possibility of an out-of-home placement. Ms. Banwart arranged to have Dr. Paul Conditt, a licensed psychologist, administer an IQ test to C.B. Dr. Conditt's April 22, 2016 report listed C.B.'s diagnoses as Reactive Attachment Disorder, ADHD, Oppositional Defiant Disorder, and anxiety. Previously C.B. had scored in the first percentile on an IQ test. Dr. Conditt, however, placed C.B. in the fiftieth percentile, attributing the difference to the difficulty presented by timed tasks in the prior test. Dr. Conditt's report also indicated C.B. exhibited distinct traits of Asperger's Syndrome on

---

[5] No one has suggested that this destruction was an attempt to make evidence in this case unavailable or suggested that the Court should make any inference based on the destruction. I make no such inference here.

the autism spectrum. Also, on April 22, 2016, Plaintiffs retained educational consultant Karen Mabie for $4,000 to assist in locating a residential placement for C.B. (Banwart Hr'g Test. 147:19-148:5, Doc. 16-6.) Plaintiffs had unsuccessfully attempted on their own to find a residential facility in Iowa or close by.

During a monthly progress meeting at Bremwood on April 22, Ms. Banwart shared the autism diagnosis with some members of the IEP team, but did not request the IEP team convene to discuss the diagnosis or make changes to the IEP. Ms. Hennager indicated that the plan already included strategies appropriate for students with autism. Ms. Banwart expressed difficulties getting C.B. to go to school and mentioned her efforts to find an out-of-state placement for him. However, she did not express dissatisfaction with Bremwood.

Meanwhile, discussions were occurring regarding C.B.'s placement for Extended Year Services ("EYS") (i.e., services that would be made available to C.B. after the conclusion of the regular school year). At the April 22, 2016 meeting, Ms. Hennager explained that the building principal would need to be involved and they scheduled an April 29, 2016 meeting to discuss EYS. Before that meeting could occur, however, Plaintiffs made the decision to enroll C.B. in Seven Stars, a residential treatment center in Utah. C.B.'s last day at Bremwood was April 26 and he enrolled at Seven Stars on April 28. (*Id.* at 128:24-130:1.) Ms. Banwart told Ms. Hennager on April 26 that C.B. would not be back in Iowa for EYS. Ms. Hennager sent a May 4, 2016 Prior Written Notice ("PWN") stating:

> A meeting was scheduled for 4-29-16 to finalize plans for [C.B.] for Extended School Year Services. [Ms. Banwart] and Dr. Tracy Johns were planning on attending via phone. [Mother] notified WSR Lied Education on Tuesday, 4-26-16, that [C.B.] was now in Utah, attending a facility to address his behavioral concerns. She and her husband had made the decision based on [C.B.'s] behavior at home. A phone call between Dr. Tracy Johns, Bill Aguiar, Krista Hennager, with input from Jordan Smock, was made on

Friday, April 29, 2016 to cancel the meeting and make Cedar Falls aware that [C.B.] was not attending the Lied Education Center at this time. [Ms. Banwart] did not attend since [C.B.] will not be attending the remaining weeks of school.[6]

(Ex. X-1, X-8).

ALJ Lockard's Findings of Fact contain a thorough discussion of the events surrounding Plaintiffs' decision to move C.B. to Seven Stars. Mr. Aguiar testified regarding the explanation Ms. Banwart gave for enrolling C.B. in the Seven Stars program including the frustration Plaintiffs experienced getting him on the bus and his behavior becoming harder to handle as he grew. (Bill Aguiar Hr'g Test. 683:17-684:12, Doc. 16-7.) Prior to removing C.B. from Bremwood, the record reflects some concern by Plaintiffs regarding the number and nature of interventions at the school, but there is no evidence that Plaintiffs expressed dissatisfaction with the IEP or alleged any violation of the LBMA.

At Plaintiffs' request, Ms. Eddy spoke with Seven Stars about C.B.'s history and her personal assessment, but Plaintiffs did not involve Bremwood staff. Ms. Banwart described Plaintiffs' reasons for moving C.B. to Seven Stars. They believed he was scared and did not want to go to school. It was important for them that he go to school willingly rather than fight about it each morning. They were concerned about the amount of time C.B. spent in the intervention room. Ms. Banwart believed C.B. was receiving insufficient attention after Mr. Smock was assigned a second student. She described a loss of trust in Bremwood and the District. However, Plaintiffs did not communicate any of this apparent dissatisfaction to Rod Ball, Director of Special Programs for the AEA, whom the parties agreed would be the "Shepherd" of the LBMA. Mr. Ball was not advised of the decision to remove C.B. to Seven Stars.

---

[6] By this time, Bremwood was known as Lied Education Center.

One of the issues presented is whether C.B. was making progress at Bremwood or if C.B. was merely experiencing a honeymoon period. Mr. Aguiar testified regarding his communication with Ms. Banwart about this issue. Ms. Banwart discussed with him whether she perceived improvement or deterioration. Bremwood staff expected ups and downs. However, Mr. Aguiar offered his opinion that C.B. had made progress with his behavior despite these ups and downs, but was ultimately trending toward improvement. Mr. Aguiar was aware of significant problems C.B. was experiencing at home, such as taking the family car, which were not happening at school. Mr. Aguiar also perceived, contrary to Ms. Banwart's belief, that C.B. appeared happy at Bremwood and, on many occasions, quite safe. Special Education Teacher Tina Ford opined that with additional progress on behavior, C.B.'s goals and expectations could be expected to increase. Mr. Smock testified that he observed C.B. enjoying being at school. He thought C.B. was making progress despite a "rough week" prior to C.B.'s removal to Seven Stars.

C.B. started in the Seven Stars residential treatment center in Utah on April 28, 2016. An evaluation of C.B. prepared upon his admission includes the reasons for placement, which focused on C.B.'s home behavior, including driving the car, outbursts, and refusal to perform daily tasks and willingly attend school.

Dr. Brandon Park made a neurological assessment of C.B. from May 6 to June 29, 2016 during his stay at Seven Stars and, most pertinent to this dispute, concluded as follows:

> Based on the information obtained through past reports, interviews, and testing it is my strong clinical opinion that [C.B.] will need substantial therapeutic assistance in developing a [sic] good coping skills, identity development, and social/emotional growth found in a well-structured residential treatment facility.

(Ex. 23 at Supp. 270.)  Dr. Gordon Day, the executive director of Seven Stars opined that for C.B. to receive FAPE he needed a residential program combined with a therapeutic and academic program.  (Ex. 2005A at 52-53.)

In August 2016, Plaintiffs' then-lawyer advised the District that C.B. would not return to Bremwood and demanded reimbursement for the cost of his education.  C.B. transitioned from Seven Stars to Waterfall Canyon Academy/Oak Grove School ("WFC/OGS") in Utah in September 2016.  (Doc. 1-5 at 37.)  On August 15, 2017, Plaintiffs filed another due process complaint against Defendants for failing to comply with the IDEA and the LBMA.  Nevertheless, Plaintiffs, representatives of Defendants, staff from the programs in Utah, and others attended an IEP meeting beginning September 7, 2016.  Dr. Park and Dr. Day were among those attending by telephone.  Dr. Park presented information about his assessment of C.B.  Defendants' representatives reviewed, among other things, Plaintiffs' "paraphrase" of Dr. Park's report, which included his recommendation of a residential facility.  Plaintiffs agreed a residential placement was necessary and advocated for such a placement.  The IEP that resulted from this meeting added goals and supporting services, but continued his placement at Bremwood.  (Ex. TT at 21-22.)  A similar IEP with minor modifications was completed in March 2017.  At the time of the hearing on Plaintiffs' second complaint, C.B. remained enrolled in the Waterfall Canyon Academy and Plaintiffs did not plan to return him to school in Iowa.

The parties attended an administrative hearing from April 2 to April 5, 2018, regarding the second complaint.  ALJ Lockard issued a decision in favor of Defendants on July 3, 2018.  On October 1, 2018, Plaintiffs filed a complaint with this Court, alleging that defendants have violated the IDEA by failing to provide a free appropriate public education and have breached the LBMA.  Plaintiffs request that they be reimbursed for the costs associated with placing C.B. in a residential treatment program.

Plaintiffs seek reimbursement for amounts they paid in connection with C.B.'s placement in Utah as follows:[7]

| | | |
|---|---|---|
| 1 | Consultant Karen Mabie | $6,000 |
| 2 | Seven Stars | $59,735 |
| 3 | WFC/OGS | $353,100 |
| 4 | Travel expenses | $1,465 |
| 5 | Consultant Dr. Jennifer Schwartz | $7,500 |
| 6 | Attorney David Roston | $9,096 |
| 7 | Schwartz Law Firm | $25,000 |
| | **Total** | **$461,896** |

## IV.    APPLICABLE LAW

### A.    Jurisdiction

Among other things, the IDEA establishes procedures to challenge the adequacy of educational programs provided to disabled children through administrative proceedings and ultimately through a direct civil action.  28 U.S.C. § 1415.  The IDEA is a comprehensive education statute designed to ensure that children with disabilities receive "a free appropriate public education . . . designed to meet their unique needs." 20 U.S.C. § 1400(d)(1)(A).  Agencies that receive federal funds under the IDEA must "establish and maintain procedures . . . to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of a free appropriate public education by such agencies." 20 U.S.C. § 1415(a).  As defined in the Act, 20 U.S.C. § 1401(9), a "free appropriate public education" includes both instruction, which

---

[7] Plaintiffs may be seeking other amounts than those represented in this chart because they describe some legal expenses as "ongoing."  (Doc. 25 at 36.)

must be specially designed to suit the needs of the disabled child, *see id.* § 1401(14), and "related services," including "such developmental, corrective, and other supportive services . . . as may be required to assist a child with a disability to benefit from special education." *Id.* § 1401(26)(A); *see also Indep. Sch. Dist. No. 284 v. A.C. ex rel. C.C.*, 258 F.3d 769, 773 (8th Cir. 2001).

It is undisputed that C.B. is a "child with a disability" within the meaning of 20 U.S.C. Section 1401(3)(A). If parents of a child with a disability believe an agency is not performing properly, they may complain to the agency "with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child." 20 U.S.C. § 1415(b)(6)(A). The complaining parent has the right to an "impartial due process hearing" conducted by either the state or local educational agency. *Id.* § 1415(f)(1)(A). The Court has jurisdiction over this matter pursuant to 20 U.S.C. Section 1415(i)(2)(A), which permits a party who has been "aggrieved by the findings" of the administrative procedures "the right to bring a civil action. . . in a district court of the United States, without regard to the amount in controversy."

**B.    *Standard of Review***

*I.Z.M. v. Rosemount-Apple Valley-Eagan Pub. Schools* held:

> In an IDEA case such as this where there are no procedural issues, the statute authorizes judicial review of the state hearing officer's "determination of whether the child received a [FAPE]." 20 U.S.C. § 1415(f)(3)(E)(i); see §§ 1415(b)(6) and (i)(2)(A); *Board of Educ. v. Rowley*, 458 U.S. 176, 204-05, 102 S. Ct. 3034, 73 L. Ed. 2d 690 (1982). A FAPE "consists of educational instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child 'to benefit' from the instruction." *Rowley*, 458 U.S. at 188-89, 102 S. Ct. 3034. Whether the District provided I.Z.M. with a FAPE is reviewed de novo. *See M.M.*, 512 F.3d at 458. The reviewing court "must give 'due weight' to the outcome of the administrative

17

> proceedings." *T.F. v. Special Sch. Dist. of St. Louis Cty.*, 449 F.3d 816,
> 818 (8th Cir. 2006), quoting *Rowley*, 458 U.S. at 206-07, 102 S. Ct. 3034.

863 F.3d 966, 970 (8th Cir. 2017) (alterations in original). The burden of proof in an

administrative hearing challenging an IEP is properly placed upon the party seeking

relief. *Sneitzer v. Iowa Dep't of Educ.*, 796 F.3d 942, 948 (8th Cir. 2015) (citing *Schaffer*

*ex rel. Schaffer v. Weast*, 546 U.S. 49, 61-62 (2005)).

> In reviewing the findings made in an IDEA administrative hearing, courts
> are directed to give "due weight" to the decision of the [hearing officer].
> *Heather S. v. State of Wisconsin,* 125 F.3d 1045, 1052 (7th Cir. 1997).
> "'Due weight necessarily implies some sort of deference to the agency's
> decision, and considering the officer's special expertise in education law,
> we think a sound basis exists for giving deference to the decision of the
> hearing officers."' *Id.* (citing *Board of Education of Murphysboro*
> *Community School Dist. No. 186 v. Illinois State Board of Education,* 41
> F.3d 1162, 1167 (7th Cir. 1994)). The testimony of witnesses and evidence
> submitted at the hearings, however, should be independently evaluated by
> the court. *Id.* at 1053; *see also Patricia P. v. Board of Education of Oak*
> *Park,* 203 F.3d 462, 466 (7th Cir. 2000) (the "due weight" standard does
> not imply an "abdication of all judicial function"). A court must, however,
> be mindful of the fact that hearing officers have much greater expertise in
> educational policies than district court judges, *Heather S.,* 125 F.3d at
> 1053, and thus, the court may set aside the administrative order only if it is
> "strongly convinced the order is erroneous." *Alex R. v. Forrestville Valley*
> *Community Unit School Dist. No. 221,* 375 F.3d 603, 612 (7th Cir. 2004).

*Bd. of Educ. of Twp. High Sch. Dist. No. 211 v. Michael R.*, No. 02 C 6098, 2005 WL

2008919, at *1 (N.D. Ill. Aug. 15, 2005).

> [A] court's inquiry in suits brought under [§ 1415(i)(2)] is twofold. First,
> has the State complied with the procedures set forth in the Act? And second,
> is the individualized educational program developed through the Act's
> procedures reasonably calculated to enable the child to receive educational
> benefits? If these requirements are met, the State has complied with the
> obligations imposed by Congress and the courts can require no more.

*Board of Educ. of the Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 206–07 (1982). The IDEA favors education of disabled students "[t]o the maximum extent possible" in a "regular educational environment." 20 U.S.C. § 1412(a)(5)(A). The IDEA "does not require a local educational agency to pay for the cost of education . . . at a private school or facility if that agency made a free appropriate public education available to the child and the parents elected to place the child in such private school or facility." *Jasa v. Millard Pub. Sch. Dist. No. 17*, 206 F.3d 813, 815 (8th Cir. 2000) (quoting 20 U.S.C. § 1412(a)(10)(A)(i)(l) & (C)(i)). If parents "enroll their child in private school without the approval of the public school district [they] do so with the risk they will not receive reimbursement for their costs." *T.F. v. Spec. Sch. Dist. of St. Louis Cty.*, 449 F.3d 816, 820 (8th Cir. 2006) (quoting *Fort Zumwalt Sch. Dist. v. Clynes,* 119 F.3d 607, 611–12 (8th Cir. 1997)).

> A child receives a free appropriate public education if he receives "personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction." *Rowley*, 458 U.S. at 203, 102 S. Ct. 3034. The IDEA requires that public school districts offer eligible children "instruction and supportive services reasonably calculated to provide some educational benefit." *Springfield*, 358 F.3d at 999 n. 7. The statute also requires that students with disabilities be educated in the "least restrictive environment," 20 U.S.C. § 1412(a)(5)(A), reflecting a "strong preference" that disabled children attend regular classes with non-disabled children and a presumption in favor of placement in the public schools. *Independent Sch. Dist. No. 283 v. S.D.*, 88 F.3d 556, 561 (8th Cir. 1996). "[C]hildren who can be mainstreamed should be mainstreamed, if not for the entire day, then for part of the day; similarly, children should be provided with an education close to their home, and ***residential placements should be resorted to only if these attempts fail or are plainly untenable***." *Evans v. Dist. No. 17*, 841 F.2d 824, 832 (8th Cir. 1988).

*Id.* (emphasis added).

Though the District may not have complied with the precise letter of every single provision of the settlement agreement, the totality of circumstances

show that the IEP it formulated and carried out for Lindsey was reasonably calculated to provide her with educational benefit. *Rowley*, 458 U.S. at 207. The Court has already explained that the four month delay in the AT evaluation did not impair Lindsey's education at Conant in the spring or fall of 2003. Likewise, the fact that Powers and her aides may not have provided Lindsey with a communication device in every possible situation did not result in Lindsey being denied a FAPE.

*Michael R.*, 2005 WL 2008919, at *22.

## V. THE PARTIES' POSITIONS

Plaintiffs argue that ALJ Lockard erred in concluding that C.B. was receiving a FAPE at Bremwood. Plaintiffs advance this position using arguments that are not necessarily consistent. Plaintiffs assert that ALJ Lockard made a factual error in determining that a residential placement was not necessary. This factual error, Plaintiffs argue, arises from ALJ Lockard's failure to fully credit the opinions of Dr. Gordon Day and Dr. Brandon Park that a residential placement was necessary on the basis that they had not made a meaningful review of the records regarding C.B.'s time at Bremwood. Plaintiffs contend Dr. Park and Dr. Day had, in fact, reviewed records as shown in the audio recording of the IEP meeting they participated in with Defendants representatives on September 7, 2016. (Ex. 62.)

Plaintiffs' second approach marshals various complaints about Defendants' noncompliance with the LBMA that they claim left them with "no choice but to find and arrange for an appropriate Out-of-District Placement." (Doc. 25 at 40.) This argument is not entirely consistent with Plaintiffs' first position. It necessarily implies that Bremwood would have been an appropriate placement if the LBMA had not been breached. Bremwood is not a residential school. Thus, if compliance with the LBMA would have resulted in FAPE, a residential placement was unnecessary.

Defendants counter that C.B. was provided FAPE at Bremwood. Defendants contend the alleged violations of the LBMA do not amount to a denial of FAPE. Defendants also argue that Plaintiffs failed to provide notice of any alleged breach of the LBMA before removing C.B. from Bremwood. Defendants further assert that they continued to offer C.B. FAPE even after his removal. Citing concerns about creation and implementation of IEPs, staff qualifications, and measurement of C.B.'s progress, Defendants contend that Plaintiffs failed to establish the alternative placement in Utah was appropriate. Finally, Defendants argue Plaintiffs' damages are unsupported by the record and, because Plaintiffs have not established that the nonresidential placement at Bremer was inappropriate, they are not prevailing parties entitled to attorneys' fees.

In reply, Plaintiffs again argue that C.B. was denied FAPE at Bremwood. They assert that by the September 2016 IEP meetings, Defendants knew of Plaintiffs' concerns about the Bremwood placement and they were advocating for a residential program. Plaintiffs argue that Defendants did not question the decision to remove C.B. or discourage the decision until after they were asked to pay the costs of the out-of-state placement.

Plaintiffs argue that Defendants have raised certain arguments about the placement in Utah for the first time on appeal and have thus waived the following arguments: the qualifications of the staff at the residential schools, implementation of IEPs, and measurement of C.B.'s progress. Furthermore, they contend the record established the appropriateness of the residential placement. In response to Defendants' argument that C.B. was making academic and behavioral progress, Plaintiffs assert Defendants had merely lowered expectations to declare success.

## VI.    DISCUSSION

### A.    *The Effect of the LBMA*

AJL Lockard's decision contains a thorough and thoughtful discussion of the impact of the 2016 LBMA on the current dispute, particularly regarding the consequences of a breach by Defendants.  The parties have largely ignored that discussion in their briefs to the Court.  Neither party mentions *E.D. ex rel. Dukes v. Enterprise City Bd. of Educ.*, 273 F. Supp. 2d 1252 (M.D. Ala. 2003) or the other cases ALJ Lockard cites in reaching her conclusion on this issue. (Doc. 1-5 at 41-46.)

The Code of Federal Regulations and the Iowa Administrative Code have adopted rules to implement the IDEA's mediation process.  20 U.S.C. § 1415; 34 C.F.R. § 300.506(b)(6); Iowa Admin. Code r. 281-41.506(2)(f). The LBMA in the instant case qualifies as a "legally binding agreement" under the IDEA, which provides:

> In the case that a resolution is reached to resolve the complaint through the mediation process, the parties shall execute a legally binding agreement that sets forth such resolution and that--
> (i)   states that all discussions that occurred during the mediation process shall be confidential and may not be used as evidence in any subsequent due process hearing or civil proceeding;
> (ii)  is signed by both the parent and a representative of the agency who has the authority to bind such agency; and
> (iii) is enforceable in any State court of competent jurisdiction or in a district court of the United States.

20 U.S.C. § 1415(e)(2)(F).  The LBMA expressly provides that it is "enforceable in any state court of competent jurisdiction or in district court of the United States." (Doc. 1-3 at 11.) However, Plaintiffs have not sought to enforce the LBMA in any court. Although they allege Defendants breached the LBMA, they do not seek to have the terms specifically enforced.  Rather, they filed a new due process complaint alleging C.B. was denied FAPE.

22

Thus, the question becomes how to treat the LBMA in determining if Defendants denied C.B. FAPE. ALJ Lockard rejected Plaintiffs' contention that breach of a settlement agreement necessarily constitutes a denial of FAPE. ALJ Lockard concluded,

> The *E.D.* and *Michael R.* cases provide a more direct parallel to the circumstances here. As in the Seventh and Eleventh Circuits, the Eighth Circuit has also followed a rule requiring that plaintiffs demonstrate some harm in order to be entitled to relief for procedural violations under IDEA. The appropriate standard in this case, then, is the one advanced by Respondents. In order to show that any breach of the LBMA gives rise to a remedy, Complainants must show that the breach constituted a denial of FAPE; it is not enough to show simply that the breach occurred.
>
> Applying this standard makes sense as well because the primary remedy sought by Complainants here is reimbursement for private school placement. Under the IDEA, a district is not required to pay for the cost of special education and related services for a child with a disability at a private school or facility if the district made FAPE available to the child and the parents elected to place the child in a private school or facility. Requiring a district to pay for private school placement only upon a showing that an IDEA mediation agreement was violated, without requiring any showing that the underlying violation caused any educational harm, is inconsistent with the scheme established by the IDEA.

(Doc. 1-5 at 45-46.) I concur with ALJ Lockard's reasoning, that Complainants must show that the breach constituted a denial of FAPE. This does not, however, fully address how the Court should treat the LBMA under these circumstances. *Dukes* addressed an issue very similar to the issue in this case:

> The Plaintiffs' argument is unusual in that they are arguing that the services to which they agreed in the Settlement Agreement were not sufficient to provide a FAPE. As the Plaintiffs point out, a district court outside of this circuit has determined that a Settlement Agreement does not allow a school board to contract around or out of IDEA. *See D.R. by M.R. v. East Brunswick Bd. of Educ.,* 838 F. Supp. 184, 193 (D.N.J. 1993), *aff'd,* 109 F.3d 896 (3d Cir. 1997). That court also concluded, however, that if the school was acting within the law, the parents could not ignore the settlement

agreement in an attempt to get a "better bargain." *Id.* The court further acknowledged that allowing parents to challenge educational services provided pursuant to a settlement agreement could mean that parents could simply disregard the terms of the settlement and would always be free to seek a hearing on the needs of the child. *Id.* The court expressly stated that it was concerned that a narrow reading of its "holding will tomorrow eliminate settlement agreements in special education cases." *Id.* The court explained, however, that in its view, there is a presumption that at the time the settlement agreement was entered into, the agreed-upon services met the child's educational needs. *Id.* It is only upon a showing by the parents that there has been a change in circumstances such that the child's educational needs are no longer being met, that the parent can challenge the settlement agreement. *Id.* at 193–94. The court found this interpretation of its ruling to be necessary to prevent "reducing settlement agreements in special education cases to a nullity . . . ." *Id.* at 194; *see also D.R. by M.R.,* 109 F.3d at 901 ("We are concerned that a decision that would allow parents to void settlement agreements when they become unpalatable would work a significant deterrence contrary to the federal policy of encouraging settlement agreements.").

273 F. Supp. 2d at 1268 (alteration in original). Similar concerns arise in the case at bar. As in *Dukes*, I conclude that the LBMA should be afforded considerable weight, even a presumption that the terms and conditions contracted for in the LBMA met C.B.'s needs at the time it was entered into. However, as *Dukes* noted, parties are not entitled to bargain around or out of the provision of FAPE. The parties, despite their best efforts and goodwill, might not have struck a bargain that appropriately provides for a child's needs. Thus, while the LBMA should be considered as weighty evidence of the requirements of FAPE, even without a change in circumstances, Plaintiffs may rebut the presumption that the LBMA provided FAPE.

### B.   *Alleged Violations of the LBMA*

In their due process complaint, Plaintiffs raised eleven provisions of the LBMA they contend Defendants violated. ALJ Lockard examined each of the allegations and found two violations: 1) a violation of Provision 9 in failing to provide Plaintiffs written

notification and summary of staff training in RAD and strategies for communication with C.B.; and (2) a violation of Provision 11 for failing to provide weekly consultation with Monarch. (Doc. 1-5 at 49-50.)

Plaintiffs' brief does not attack ALJ Lockard's findings with respect to each of the eleven violations. For example, Plaintiffs do not specifically argue that ALJ Lockard erred in finding no breach by Defendants for failing to "devise an appropriate method to enable [C.B.] to understand his goals and the progress he is making toward his goals." *Id.* at 50. Rather, Plaintiffs' position seems to be that because of the alleged multiple violations of the LBMA they were forced to seek alternative accommodations for C.B. and that Seven Stars was the only suitable alternative. They argue:

> As a result of the violations of the LBMA, including most egregiously the failure to meet and to determine the content and location of an appropriate extended school year program for C.B. as required by Paragraph 20 of the LBMA, Banwarts had no choice but to find and arrange for an appropriate Out-of-District Placement so as to meet the unique needs of C.B. for an appropriate education, which facility was Seven Stars Therapeutic Residential Treatment facility in Syracuse, Utah where C.B. attended from April 29 – September 14, 2016.

(Doc. 25 at 40.)

Other than Defendants' alleged failure regarding extended school year ("ESY") programming, Plaintiffs' brief addresses the violations of the LBMA only in the aggregate. In other words, Plaintiffs do not take issue with ALJ Lockard's specific findings regarding the alleged breaches. The ESY programming will be addressed below. I find it is necessary to address the other breaches only briefly.

> **[Provision #3:] The primary focus of [C.B.'s] education would be that he attend school willingly in order to develop living, learning and working skills that prepare him for postsecondary life. [C.B.'s] education will include "soft skills" such as transition, 21st century skills (see Iowa Core), organization, etc.**

(Doc. 1-3 at 2.)

I concur with ALJ Lockard's conclusion that Defendants could not control C.B.'s subjective belief about attending school. Indeed, the LBMA did not contain a promise by Defendants that C.B. would, in fact, attend school willingly. Rather, Provision 3 requires the "focus of [C.B.'s] education" to be "that he attend school willingly." (*Id.*) Having reviewed the record, I am satisfied that Plaintiffs have not established a breach of this term in devising and implementing C.B.'s IEP to focus on a program that would encourage his willing attendance.

> **[Provision #4:] Academic instruction will be adapted to the maximum extent possible in order to present the curriculum in a way that is attractive to [C.B.]**
> - **Attractive instruction for [C.B.] is: hands on science projects that involve creating or building, math that is applied to hands-on projects and politics in the area of social studies, etc.**
> - **The curriculum will be individualized to hold [C.B.'s] interest and aligned to the Iowa Core.**

*(Id.* at 3.)

ALJ Lockard concluded Plaintiffs had not established a violation of this provision. As with the alleged violation of Provision 3, above, this provision contains no promise that C.B. would, in fact, find the curriculum attractive. As ALJ Lockard pointed out, C.B.'s history of difficulty attending and staying in school long predates his placement at Bremwood. Having reviewed the record, I concur with ALJ Lockard and believe Plaintiffs have not established a breach of this condition.

> **[Provision 6:] Mr. Bill Aguiar or other persons that [C.B.] identifies as safe or trusted will be designated as [C.B.'s] contact who is primarily responsible for providing emotional support when [C.B.'s] anxieties or fears are heightened.**
> - **If [C.B.] does not attach to Bill, alternate adult(s) may be identified based on [C.B.'s] preference.**

- **Other individuals will be available to provide emotional support to [C.B.] in the event that his preferred individuals are not available.**

(*Id.*)

ALJ Lockard found no violation of this provision. Plaintiffs contend that Mr. Aguiar's other duties kept him from interacting sufficiently with C.B. I concur with ALJ Lockard's determination that the evidence showed that Mr. Aguiar placed a high priority on his interactions with C.B. and that he spent a great deal of time with C.B. Moreover, Plaintiffs make no argument that C.B. did not bond with Mr. Aguiar or that Mr. Aguiar was otherwise not suited to bear this responsibility. Finally, the record demonstrates, as ALJ Lockard notes, that C.B. developed a relationship with Jordan Smock as a person he trusted and that Mr. Smock was with C.B. all of the time, even if another student was also present.

**[Provision 7:] The behavior intervention plan included in [C.B.'s] current IEP will remain in place provided that [C.B.'s] parents and the District or Bremwood Staff may agree to mutual modifications.**
- **When the report of the current Functional Behavioral Evaluation is complete, the IEP team will meet to discuss modifications to the Behavior Intervention Plan.**
- **The current safety plan will be modified at the intake meeting (with full parent participation) before starting at Bremwood.**
  - **Modifications would include which behaviors can and cannot be ignored; identification of a safe place within the school grounds where [C.B.] can "escape" to; strategies to redirect [C.B.]; expectations for when it is acceptable for [C.B.] to leave school grounds; and a protocol for how [C.B.] can access individuals he feels safe with.**
  - **AEA 267 Team Rep Debbie Morris will be a part of the BIP writing process.**

(*Id.* at 4.)

Provision 7 provides for use and modification of C.B.'s IEP and BIP. I concur with ALJ Lockard that Defendants followed the procedures set forth in Provision 7 for

27

completing and modifying the IEP and the BIP. As ALJ Lockard noted, Plaintiffs did not express any disagreement with the IEP or BIP that was developed.

Plaintiffs underlying concerns relate to the substance of the IEP and BIP, not the procedure used to develop it, as addressed in Provision 7. Specifically, Plaintiffs seem to complain about the adequacy of the safe places designated for C.B.'s escape. As with C.B.'s willingness to go to school, whether C.B. feels safe in a specific place is wholly subjective and, ultimately, beyond Defendants' control. Some of Plaintiffs' concern on this issue is fueled by C.B.'s unsubstantiated claim that he had been hit at Bremwood. This is not meant to shift blame to C.B. It is possible that his belief that he was harmed and even his desire to avoid school were manifestations of his disability. Nevertheless, Provision 7 does not impose on Defendants an obligation to guarantee C.B.'s subjective assessment that he felt safe. I concur with ALJ Lockard's conclusion that Defendants followed the procedures required by Provision 7 and provided safe places and access to individuals with whom C.B. felt safe.

> **[Provision 8: C.B.'s] current IEP coping skills goal will be amended to include specific skills to calm himself down when escalated and how to ask for a break when he needs it.**
> - **A script with specific strategies and language needed to teach those strategies will be included in the IEP.**
> - **This amendment will be completed without a meeting but after parents have agreed to the language and have received the PWN regarding the changes.**

(*Id.*)

As ALJ Lockard noted, the February 2016 IEP contains a script and specific strategies to assist C.B. to calm down and deescalate. There is more than sufficient evidence that the IEP incorporated the items required by Provision 8 and that the IEP incorporated Plaintiffs' suggestions on these issues. Thus, I concur with ALJ Lockard's conclusion.

28

> **[Provision 9:]** Bremwood will train paraeducators who work and interact with [C.B.] in RAD and the appropriate strategies for communicating with [C.B.] and responding to his unique needs.
>
> Parents will be notified in writing when training is provided and a summary or outline of what the training entailed.

(*Id.* at 5.)

Plaintiffs have not proved that Defendants failed to provide training as required by Provision 9. The training of Jordan Smock, as well as another paraeducator involved in C.B.'s education, was provided by Monarch as suggested by Ms. Banwart. Moreover, it appears that staff at Bremwood participated in the training above and beyond what was required by this provision. ALJ Lockard accurately notes that Defendants did not provide written notification or a summary of the training provided; however, it appears Plaintiffs had actual notice the training took place because they were informed by the trainer. I concur that this provision was breached because the Defendants did not provide the required summary and notification.

> **[Provision 11:]** The district will pay for Monarch therapy to provide weekly consultation with Bill Aguiar or his designee for up to 30 minutes weekly. The IEP team will consider additional time as need arises.

(*Id.*)

The evidence shows that after the initial training from Monarch, no weekly consultations occurred. ALJ Lockard concluded the failure to undertake weekly consultations constituted noncompliance by Defendants. In reaching this conclusion, ALJ Lockard discounted Defendants' arguments that the provision does not require the weekly sessions to take place, only that the District pay for up to 30 minute sessions and consider paying for more time "as need arises."

29

This provision is not drafted as artfully as it could have been. Nevertheless, it contemplated up to 30-minutes-per-week and, therefore, necessarily implied that some shorter amount of time would suffice. It did not establish a minimum amount of time to be devoted to training. The provision does not establish any procedures for determining how long these consultations should occur or place the onus on the District to set up the consultations. Here, there is no evidence of any instance where someone suggested additional consultation that the District refused to participate in or pay for. Thus, I disagree with ALJ Lockard's conclusion that this term was violated.

> **[Provision 12: C.B.] will have an opportunity for physical activity daily at Bremwood via PE or weight room. Weightlifting is a preferred activity for [C.B.].**

(*Id.* at 6.)

I concur with ALJ Lockard's determination that C.B. was provided the requisite opportunity for exercise. Plaintiffs' speculation that C.B. was deprived of physical activity as a consequence for not complying with rules or not listening to his teachers is not supported by the evidence. Plaintiffs do not cite to portions of the record that would support a contrary conclusion.

> **[Provision 14:] The IEP team will meet to review the behavior evaluation and discuss which executive functioning needs [C.B.] has per the BRIEF assessment.**
>
> **IEP team will use the book "Coaching Students with Executive Skills Deficits" by Peg Dawson and Richard Guare as a reference to support [C.B.].**

(*Id.*)

I concur with ALJ Lockard's conclusion, which follows:

The evidence does not demonstrate that Respondents violated this provision of the LBMA. At the request of the IEP team, the team that conducted the FBA administered the BRIEF assessment. The results reflected that

30

Student has significant difficulties with all aspects of executive functioning. Two of the individuals who conducted the FBA were present at the IEP team meeting, where the results of the FBA, including the BRIEF assessment, were extensively discussed. Student's IEP and BIP have a significant focus on executive functioning; some of Student's greatest identified challenges were in the areas of initiating tasks and staying focused and regulating his emotions. Complainants have not presented any specific evidence regarding their belief that Respondents failed to comply with this provision.

(Doc. 1-5 at 50.)

**[Provision 18:] A method will be devised to enable [C.B.] to understand his goals and the progress he is making toward those goals.**

(Doc. 1-3 at 8.)

ALJ Lockard found no violation of this provision. Plaintiffs' Brief does not point out how ALJ Lockard's finding was in error. The evidence shows both personal review of C.B.'s progress with him by Bremwood staff and computer-based feedback from programs C.B. was using. I, too, find no violation of this provision.

**[Provision 20: C.B.] will be provided with an extended school year program. The IEP team will meet to determine the content and location of this program by May 1st, 2016.**

(*Id.*)

Plaintiffs point to Defendants' alleged failure to plan for C.B.'s ESY program as the most egregious violation of the LBMA, leaving them no choice but to find an out-of-district residential placement. (Doc. 25 at 40.) This argument does not accurately reflect the events or the evident intentions of the Plaintiffs. Rather, the alleged failure to establish the ESY program appears to be an after-the-fact justification for the Plaintiffs' prior decision to remove C.B. from Bremwood.

Plaintiffs argue:

> Perhaps most telling of the disregard demonstrated by Defendants for their obligations under the LBMA and their obligations under the IDEA, Greg Koppes writes an email to Tracy Johns and Krista Hennager on April 22, 2016 stating that there was going to be a telephone conference on Friday the 29th to "finalize C.B.'s extended year service plans – thoughts being 15 minutes tops for this meeting". See Exhibit U, T. 335-336. There was no communication whatsoever with the Banwarts regarding the location, the dates, the times, or the content of the extended school year program. T. 328-333.

(*Id.* at 18.)  The facts as accurately recounted by ALJ Lockard show both Defendants' efforts to establish appropriate ESY services and the fact that Plaintiffs had elected to withdraw C.B. before the process was complete:

> During the April 22 progress meeting, Mother asked what Student's ESY services would look like. School Psychologist/AEA Team Representative informed Mother that they would have to discuss that issue with the building principal. At that time, they scheduled a meeting to discuss ESY services for April 29. After the meeting on April 22, the building principal sent a message to Johns that stated, "Given our meeting today with [Mother], would you be able to phone conference with us this upcoming Friday (4-29-2016) @ 9:00 am to finalize [Student's] extended year service plans?" As of the April 22 meeting, the only information that School Psychologist/AEA Team Representative had received regarding ESY services for Bremwood students was that ESY would occur at Waverly/Shell Rock Middle School; the building principal gave School Psychologist/AEA Team Representative this information on April 22 during a conversation in the hallway. (School Psychologist/AEA Team Representative testimony; Exh. U).
>
> During a phone call on April 26, School Psychologist/AEA Team Representative asked Mother whether Student would be back in Iowa for summer programing and Mother responded that he would not. On May 4, 2016, School Psychologist/AEA Team Representative sent an e-mail to Mother attaching a Prior Written Notice (PWN) regarding ESY services. The PWN indicates:

32

A meeting was scheduled for 4-29-16 to finalize plans for [Student] for Extended School Year Services. [Mother] and Dr. Tracy Johns were planning on attending via phone. [Mother] notified WSR Lied Education on Tuesday, 4-26-16, that [Student] was now in Utah, attending a facility to address his behavioral concerns. She and her husband had made the decision based on [Student's] behavior at home. A phone call between Dr. Tracy Johns, [Intervention Teacher], [School Psychologist/AEA Team Representative], with input from [Special Education Paraeducator], was made on Friday, April 29, 2016 to cancel the meeting and make Cedar Falls aware that [Student] was not attending the Lied Education Center at this time. [Mother] did not attend since [Student] will not be attending the remaining weeks of school.

(Doc. 1-5 at 33 (quoting Exs. X-1, X-8) (alterations in original).) The record supports ALJ Lockard's conclusion that Ms. Banwart discussed ESY services for C.B. at an April 22 progress meeting and a subsequent meeting was scheduled for April 29, 2016. Thus, Plaintiffs had an opportunity to participate in establishing the ESY program but, having decided to withdraw C.B., chose not to. It is noteworthy that Plaintiffs did not raise objections to the ESY program at or near the time of the withdrawal from Bremwood. Moreover, their due process complaint raised only a procedural complaint (i.e., lack of notice) rather than any substantive objection to the proposed ESY program. Thus, I find no basis to disagree with ALJ Lockard's conclusion that there was no violation of this provision.

Ultimately, the few violations of the LBMA found by ALJ Lockard and the even fewer violations I have noted do not themselves add up to a denial of FAPE. In other words, I disagree with Plaintiffs' conclusion that because of the alleged multiple violations of the LBMA they were forced to seek alternative accommodations for C.B. While I cannot conclude that the violations caused a denial of FAPE, by the same token I cannot conclude that compliance with the LBMA necessarily establishes FAPE. Thus,

33

I must determine if the placement at Bremwood, a nonresidential facility, denied C.B. FAPE.

## C.    Did the Bremwood Placement deny C.B. FAPE?

Ultimately, this case turns on whether C.B.'s placement at Bremwood denied him free appropriate public education. Put another way, the issue is whether a residential setting was necessary to provide C.B. FAPE. In 2017 the United States Supreme Court in *Endrew F. ex. rel Joseph F. v. Douglas County School Dist. RE-1* revisited the IDEA for the first time since 1982. 137 S. Ct. 988 (2017). The Court had previously addressed the adequacy of IEPs for children who were fully integrated into the regular classroom, requiring IEPs to be "reasonably calculated to enable the child to achieve passing marks and advance from grade to grade." *Rowley*, 458 U.S. at 204. *Rowley* did not provide guidance about IEPs for children who are not fully integrated into the regular classroom and are not capable of achieving at grade level. Thus, *Endrew F.* addressed the appropriate standard for judging an IEP for a child who, like C.B., is receiving special education services but is not fully integrated into a regular classroom. *Endrew F.* held:

> A reviewing court may fairly expect [school] authorities to be able to offer a cogent and responsive explanation for their decisions that shows the IEP is reasonably calculated to enable the child to make progress appropriate in light of his circumstances.

137 S. Ct. at 1002. ALJ Lockwood correctly stated, "The question here, then, is whether [C.B.'s] educational program was appropriately ambitious in light of his circumstances and whether he was offered the opportunity to meet challenging objectives." (Doc. 1-5 at 53.)

Here, the parties make only passing reference to the requirement that an educational program be "appropriately ambitious." Indeed, the dispute does not focus on whether the program was insufficiently rigorous or overly ambitious. *Endrew F.* rejected the notion that the educational program offered was sufficient if it provided

34

"merely more than *de minimis*" progress. 137 S. Ct. at 1001. In light of the circumstances, especially C.B.'s on-going reluctance to attend school and his efforts to avoid academic work, the LBMA's focus on C.B.'s willing participation and developing "living, learning and working skills that prepare him for postsecondary life," seem appropriately ambitious. Moreover, as ALJ Lockard noted,

> In addition to other methods of instruction, Student worked on two computer-based programs, IXL and Moby Max, where instruction increased in difficulty as Student demonstrated mastery of skills. With IXL, Student started out at the baseline level identified in his IEP. With Moby Max, Student completed an assessment with the program to develop his starting level. When Student arrived at Bremwood, he was below grade level with lots of gaps in his learning. Staff chose these programs to fill in the gaps in Student's learning, as the instructional level would increase as Student demonstrated mastery.

(Doc. 1-5 at 23.) All of this shows that C.B. came to Bremwood below grade level and that Defendants, relying on the LBMA and with Plaintiffs' input, developed an appropriately ambitious educational program.

Here, Plaintiffs do not assert the goals and objectives set for C.B. were too lofty or unobtainable. They do take issue with the rigor of the objectives when they address the "aim line." Plaintiffs complain that "the Defendants [sic] aims for C.B. were so low that it indeed was tantamount to sitting ideally [sic] awaiting the time when C.B. was old enough to drop out, or necessarily left for Utah." (Doc. 29 at 12.) This argument ignores the plentiful evidence in the record that C.B. was far behind grade level. The goals that were set were reasonably obtainable, but obviously presented challenges to him. The argument also ignores the LBMA. The parties agreed, "The primary focus of [C.B.]'s education [will] be that he attend school willingly in order to develop living, learning and working skills that prepare him for postsecondary life." (Doc. 1-3 at 2.) They also agreed that the "[a]cademic instruction will be adapted to the maximum extent possible in order

to present the curriculum in a way that is attractive to [C.B.] . . . . [ .. t]he curriculum will be individualized to hold [C.B.]'s interest and aligned to the Iowa Core." (*Id*. at 3). Given C.B.'s resistance to learning and Plaintiffs' insistence on the importance of C.B. attending school willingly, the curriculum and the "aim line" were sufficiently rigorous.

The main contested issue is not the appropriateness of the goals and objectives but whether, in the absence of residential treatment, C.B. was denied the opportunity to make progress toward these goals and objectives. Having rejected the argument that there were significant breaches of the LBMA constituting a denial of FAPE, as did ALJ Lockard, I must determine whether a residential placement was necessary to provide FAPE.

Plaintiffs disagree with ALJ Lockard's reasoning on this issue which reads as follows:

> Complainants have failed to show, on this record, that Student could not reasonably be expected to make academic progress outside of a residential environment. The evidence reflects that Student made academic and behavioral progress at Bremwood during the two months that he was there. The special school environment, with one to one support from Special Education Paraeducator, clear structure and expectations, consistency from teachers, and focus on employing coping strategies and providing time and space for deescalation, appeared to be working well for Student in the school environment. His time in the classroom increased dramatically; by all accounts, this had been the major factor in his lack of academic progress until the point of his placement at Bremwood. This finding that Student could make academic progress that was appropriately ambitious outside of a residential setting is made with due consideration of the testimony Complainants presented at hearing from Dr. Day and Dr. Park to the contrary, as well as the evaluations that were introduced into evidence from Utah. There is no evidence that any of the educators or other professionals, including Dr. Day or Dr. Park, who have interacted with Student since he has been in Utah undertook any meaningful review of records regarding Student's educational and behavioral progress at Bremwood or spoke with any of the staff who worked primarily with Student at Bremwood. Under these circumstances, their opinions as to whether that placement allowed Student to make progress are not given a great deal of weight.

36

(Doc. 1-5 at 56-57.) The principal arguments Plaintiffs assert relate to the opinions of Dr. Brandon Park and Dr. Gordon Day, whose testimony Plaintiffs describe as "unrefuted expert testimony" that "C.B. required a residential program to receive an appropriate education making meaningful progress." (Doc. 29 at 1.) Plaintiffs argue, "Given that Dr. Park's and Dr. Day's opinions were unrefuted, the pivotal question for the Court in the exercise of its independent decision is ALJ's refusal to give these unrefuted opinions 'a great deal of weight.'" (*Id.* at 3.)

Plaintiffs contend that ALJ Lockard should have given their testimony more weight because they provided unrefuted expert opinions and, contrary to ALJ Lockard's conclusion, actually reviewed records regarding C.B.'s progress at Bremwood. I respectfully disagree with Plaintiffs on both contentions. It is true that Defendants did not designate or call their own neuropsychologist or clinical psychologist to testify in opposition to the opinions of Dr. Park or Dr. Day. However, this does not mean that their testimony is unrefuted. Defendants offered testimony of Bremwood's professional staff regarding the progress C.B. made at the school. While none of these witnesses is a psychologist, they were certainly qualified to testify regarding their observations of C.B.'s progress.

The record supports their conclusion that C.B. was, in fact, making progress at Bremwood when he was removed to Seven Stars, as ALJ Lockard noted:

> Despite noting some difficulties, Parents appeared to be pleased with Student's progress in staying in the academic environment at Bremwood during his first weeks there. Mother sent an e-mail to Haberman on February 23 that stated, "[Student] started his 2nd week at Bremwood and has stayed in school all day every day!! I can honestly say we are shocked and thrilled. He does, however, visit the escalation room daily but we are making progress." In a March 11 Clinical Assessment and Training Plan completed by Monarch, it was noted that the family had seen "a big improvement" since Student began at Bremwood. The report states,

"Before, [Student] struggled with Cedar Falls schools and was unable to attend regular classes. Family reports [Student] learning new coping skills to help him de escalate faster since Tanager Plance." (Exh. B-9, B-21).

(Doc. 1-5 at 22 (alterations in original).) Regarding measurement of his academic and behavioral progress, ALJ Lockard noted:

An IEP report card from March 18, 2016 showed Student making progress after having been at Bremwood for approximately one month. The two data points on his vocabulary goal showed 100% and 90% accuracy. The two data points on his writing task showed 70% and 80% accuracy. The two data points on his math goal showed 67% and 93% accuracy. On his behavior goal, the report card indicates that Student has shown great improvement in the amount of time in class since attending Bremwood, with two data points showing 93% of time in class and 97% of time in class. Another summary of Student's progress shows that the next two data points, collected on March 23 and April 6 showed 100% accuracy on spelling skills, 100% and 95% accuracy on math (counting money), and good accuracy on writing tasks. (Exh. N, T, W, AAAAA). Progress monitoring logs with data points from April 8 and April 22 reflect the following accuracy percentages: 100% and 100% (vocabulary); 96% and 80% (writing); 95% and 67% (math); and 81% and 82% (behavior goal one - elopement). With regard to Student's aggression behavior goal, progress monitoring in April showed 5 incidents of physical aggression during the first two-week period and one incident of physical aggression during the second two-week period. Prior to April, only three total incidents of physical aggression were noted in February and March. (Exh. W-7-11). With regard to the data points regarding math, as Student was getting more proficient the computer-based programs he was using increased the difficulty of his tasks; as an example, he increased from counting money up to $5 to counting money up to $10. So while a data point may show a slight dip, that does not necessarily reflect a decline in progress. It can also reflect that the difficulty of the work Student was doing was increasing. As Student started off so well on his academic goals, difficulty was increased. (Special Education Paraeducator testimony). One of the main areas of improvement that Special Education Paraeducator saw in Student was stamina to stay with a task and not needing as many breaks. Special

Education Paraeducator attributed this progress to the consistent routine that had been established and building relationships with staff.

(*Id.* at 23-24.)

The opinions of Dr. Park and Dr. Day are not consistent with the other evidence in the record regarding C.B.'s progress.[8] Their opinions that a residential facility was necessary was based on their evaluation from May 6 through June 29, 2016, as well as on testing, interviews, and other data set forth in their report. (Ex. 23 at Supp. 242.) While there is evidence that they received a packet of information[9] about C.B. and participated in the September 2016 IEP meetings, there is no evidence that they considered this information in formulating their opinions. Their report was prepared without reference to C.B.'s progress – or lack thereof – at Bremwood. It does not appear

---

[8] Plaintiffs cite *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and likens the task to the Court's gatekeeping function to ensure irrelevant or unreliable expert testimony is not admitted. This task is more akin to assessing medical opinions in a Social Security benefits appeal case – a function even more familiar to the Court. "It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians." *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007) (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001) (noting internal citations omitted)). An opinion of a "medical source" under SSA regulations is evaluated using the factors enumerated in 20 C.F.R. § 404.1527: (1) length of the treatment relationship and the frequency of examination, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors. 20 C.F.R. § 404.1527(c)(2). I recognize the instant case does not involve a claim for Social Security benefits and the referenced regulations are not applicable. Nevertheless, the concept of consistency with the other evidence in the record is a useful tool for examining the professional opinions offered by Dr. Park and Dr. Day.

[9] It is not clear what information they received. Plaintiffs state,

During that meeting, Tracy Johns identified that a packet had been sent to the participants (who included Dr. Park and Dr. Day) that included "We do have goal data during his time at the Lied Center (Bremwood)". Dr. Krista Hennager also clarified that "included in that packet is a copy of his recent goals that we had been working on when he entered at that time Bremwood". Exhibit 62. There was then an extensive discussion regarding the goals on a line by line basis that covered, in detail, C.B.'s IEP and his records from Bremwood.

(Doc. 29 at 4 (emphasis omitted).)

they later considered C.B.'s progress at Bremwood and reevaluated their opinions or attempted to harmonize those records with their initial impressions.

The absence of any evidence that Dr. Park and Dr. Day considered C.B.'s progress is important. Because they are challenging the IEP, Plaintiffs bear the burden of proof. *Sneitzer*, 796 F.3d at 948. By changing C.B.'s placement during the pendency of review proceedings, without the consent of Defendants, they did so at their own financial risk. *See Florence Cty. Sch. Dist. Four v. Carter ex rel. Carter*, 510 U.S. 7, 15 (1993) ("Parents who unilaterally . . . change their child's placement during the pending of review proceedings, without consent of state or local school officials, do so at their own financial risk.") (quotation omitted). Plaintiffs removed C.B. from Bremwood upon their return from Mexico at a time C.B. was, to use Dr. Day's terminology, very dysregulated.[10] (AR 29 at 8.) Although Plaintiffs attribute any success at Bremwood to a honeymoon period that would inevitably end, the timing of the removal leaves that prediction in doubt. "[R]esidential placements should be resorted to only if these attempts fail or are plainly untenable." *Evans v. Dist. No. 17*, 841 F.2d 824, 832 (8th Cir. 1988). The timing of C.B.'s removal from Bremwood and the evidence that C.B. was making progress there leaves the record unclear on this issue. In other words, under these circumstances Plaintiffs have not met their burden of establishing the placement at Bremwood was a failure or plainly untenable.

C.B. was diagnosed with Asperger's Syndrome on April 22, 2016, only days before he left Bremwood. Dr. Park discussed C.B.'s "unique" presentation of Autism during the September 7, 2016 IEP meeting. (Ex. OO at 9.) However, C.B. was removed from Bremwood before this diagnosis and any appropriate changes to the IEP could be

---

[10] It appears to have been transcribed incorrectly as "disregulated."

drafted, let alone implemented. Under these circumstances, it is not possible to say that the placement at Bremwood failed or was plainly untenable.

This conclusion relates directly to Defendants' assertion that Plaintiffs removed C.B. from Bremwood without adequate notice. Defendants rely on *Schoenfeld v. Parkway Sch. Dist.*, in which the parents of a disabled student sought to recover the cost of private school tuition. 138 F.3d 379, 380 (8th Cir. 1998). The student in *Schoenfeld* suffered from general and separation anxiety. *Id.* Like C.B., the student was highly resistant to attending school. *Id.* The intervention program agreed to by the parties included strategies not unlike C.B.'s plan at Bremwood to manage anxiety; e.g., allowing him to leave class. *Id.* at 381. There was evidence that the plan in *Schoenfeld* succeeded during the student's seventh grade year. *Id.* However, after the first day of eighth grade, his parents enrolled him in a private school. *Id.* There was no request for reimbursement for more than a year. *Id.* *Schoenfeld* held, in pertinent part:

> Scott Schoenfeld was withdrawn from Parkway after the first day of his eighth grade year and enrolled in Logos before anyone at Parkway knew about it. IDEA requires a meeting of school administrators, the child's teacher, their parents, and when possible the child, to formulate an IEP. Parkway had no opportunity to provide an appropriate education for Scott in the public school as is preferred under IDEA because he transferred to private school after only one day in eighth grade without any discussion with Parkway officials about possible accommodations to meet his current needs. Reimbursement for private education costs is appropriate only when public school placement under an individual education plan (IEP) violates IDEA because a child's needs are not met. Since Parkway was denied an opportunity to formulate a plan to meet Scott's needs, it cannot be shown that it had an inadequate plan under IDEA. Reimbursement for the costs of his private placement would therefore be inappropriate because school officials were excluded from the decision, and because no showing of inadequate services under IDEA can be made.
>
> Scott's unilateral withdrawal from Parkway meant there was no opportunity to modify his IEP to meet his needs for the 1992–1993 school year in public

school as is preferred under IDEA, and no involvement of school officials in the private placement decision. In these circumstances reimbursement for the expenses of his private education is not required even if it were assumed that private placement was appropriate to meet Scott's needs.

*Id.* at 381–82 (citations omitted).

In the case at bar, Defendants had no opportunity to formulate an IEP after C.B. received the autism diagnosis but before he left Bremwood. Defendants had little opportunity to revise the IEP or BIP after C.B.'s reported difficulties following the Mexico trip and/or the end of the honeymoon period and after Plaintiffs removed C.B. from Bremwood. Although Plaintiffs participated in IEP meetings after removing C.B., including those in September 2016, Defendants were not afforded the opportunity to implement any revisions to address the new diagnosis and other developments. Plaintiffs participation in these meetings seems to have been part of their efforts to persuade Defendants to reimburse the costs associated with C.B.'s enrollment in private school. In any event, there is no evidence that shows Plaintiffs offered or intended to return C.B. to Bremwood under the revised IEP. In fact, they did not return C.B. to Bremwood and there was no opportunity to implement the IEP.

Plaintiffs argue that no one from Bremwood advised them to keep C.B. at Bremwood or suggested that they delay the placement. (Doc. 29 at 7-8.) This argument misses the mark. Everyone at Bremwood might have agreed placing C.B. at Seven Stars was in his interest and supported Plaintiffs' decision. In light of the difficulties he was experiencing at home and at school, as well as the recommendation from Seven Stars, a residential placement might well have been in C.B.'s best interest. In retrospect, it may even appear to all involved that Plaintiffs made the best parenting decision on C.B.'s behalf. Plaintiffs were entitled to make what they determined was the best parenting decision when they wanted. It was not Defendants role to discourage them. However, the issue here is not whether Seven Stars was the best placement for C.B., but whether

42

Bremwood, even if inferior to Seven Stars, was providing C.B. FAPE. *See Jasa*, 206 F.3d at 815 (a local school district is not required to pay for private education if it made FAPE available). Here, Plaintiffs' decision to remove C.B. when they did has made it difficult for them to meet their burden and I recommend the Court find they have not done so.

### D. *Whether WFC/OGS was a Proper Alternative Placement*

In their resistance, Defendants question for the first time whether placement at WFC/OGS was an appropriate alternative placement. Defendants also question implementation of IEPs and measurement of C.B.'s progress there. Plaintiffs correctly point out the argument regarding the appropriateness of the alternative placement was not made to ALJ Lockard.

> Regardless of whether a State administrative IDEA decision carries with it the full force of common law preclusion, under *University of Tennessee v. Elliott,* 478 U.S. 788, 799, 106 S. Ct. 3220, 92 L. Ed. 2d 635 (1986), the IDEA prescribes its own rule of preclusion by stating that any decision of the HO "shall be final," except that an aggrieved party may appeal the decision to the HRO. Title 20 U.S.C. § 1415(e)(1).[11] At a minimum, the failure to raise, and to preserve, an issue in the administrative process— absent a demonstration that circumstances warrant a relaxation of the exhaustion requirement—renders the unappealed HO's decision "final," and constitutes a waiver of such an issue in a subsequent civil action.

*Moubry v. Indep. Sch. Dist. 696*, 9 F. Supp. 2d 1086, 1100 (D. Minn. 1998).

Thus, Defendants have waived any argument regarding the qualifications of the WFC/OGS staff. I can find nowhere in the record where Defendants raised the issues of implementation of IEPs and measurement of C.B.'s progress there. Therefore, Defendants have also waived these arguments.

---

[11] Under the current version of the statute, this language is found in Section 1415(i)(1)(A).

### E.    *Police Incident*

Plaintiffs make several mentions of the October 30, 2015 incident at Holmes Junior High when the police were called and C.B. was ultimately handcuffed.  It is important to consider carefully the relevance of this incident. It is troubling to see a young man handcuffed in an educational setting, particularly when the behavior that led to the incident may be a manifestation of a disability.  Plaintiffs are obviously critical of the decision to involve the police, the police response, and the way school staff described the incident.  It should, perhaps, go without saying that the issue before the Court is whether C.B. was provided FAPE, not the propriety of the school or police response to this incident.  Moreover, the issue before the Court is not whether Holmes Junior High was an appropriate placement.  Thus, the incident in question is not especially central to this Report and Recommendation.

> Plaintiffs assert the relevance of the incident for somewhat more subtle purposes:

> Defendants' version of what happened on October 30 is set forth in *Exhibit UUU*, the incident letter from David Walter. What actually occurred on October 30, 2015 can be seen in the videos from the police officers who were there set forth in *Exhibit 31*. The description of the incident as told by Defendants is telling as to Defendants' credibility when compared to the video of the actual event. As was famously said "who are you gonna believe, me or your lying eyes".

(Doc. 25 at 10) (emphasis in original).  Thus, one reason Plaintiffs rely on the October 30 incident relates to credibility.  Plaintiffs apparently contend that there are discrepancies between the written incident reports and the police body camera videos.  Plaintiffs focus primarily on Debbie Morris's recollection and report, asserting:

> The differences in the description of the events on October 30, 2015 between those of Defendants, Exhibit UUU, and the actual videos, Exhibit 31, are dramatic and speak for themselves. So too does the creditability of Ms. Morris' testimony regarding the incident on October 30.

44

(*Id.* at 28.) Ms. Morris testified at the hearing from her recollection of the incident two-and-a-half years later without having reviewed the videotape. The lengthy videos certainly provide details that do not appear in Ms. Morris's incident report. However, I do not note significant discrepancies between her report or testimony and the videos.

Moreover, even if Ms. Morris's testimony about the incident was not believable (which is not my finding), Ms. Morris's credibility is not central to this dispute any more than the incident itself. Ms. Morris is a Special Education and Behavior Consultant for Defendants who was involved with C.B.'s education at Holmes Junior High and not at Bremwood. Even if I were to find Ms. Morris's descriptions of the incident incredible, there is no basis to transfer this concern to other witnesses or make a generalized conclusion about "Defendants' credibility."[12]

Another reason for Plaintiffs' reliance on the October 30 incident is the lingering distrust it engendered on their part:

> C.B. was adamant that someone at the school hurt him, which at first the Banwarts did not give sufficient creditability to. After finally receiving the subpoenaed body cam video from the police and comparing that with the description of the event by Defendants, and after considering the behavior log descriptions by Defendants, Bremwood was not a safe place for C.B. physically.
>
> .   .   .
>
> After viewing the video of the October 30th handcuffing, observing what actually happened and then reading how the school described it, the Banwarts had a different view of whether C.B. was telling the truth or whether the school was telling the truth about what was happening at Bremwood. "I was trying to trust the school. And once I saw that [the Oct. 30th videos], I knew I needed to trust my son." T. 341.
>
> .   .   .

---

[12] *See also* Doc. 29 at 7 n.4 ("A comparison of the videotape to the written description by school officials clearly demonstrates Defendants' lack of credibility as to the handcuffing incident which creates serious concerns as to the credibility of Defendants' descriptions and positions that C.B. was receiving a FAPE at Bremwood.")

> Important to the Banwarts and important to this case is the lack of trust the Banwarts had in descriptions of events from Defendants after they had an opportunity to view the videos of what actually occurred; three officers coming into the situation with their uniforms on, their guns and then handcuffing C.B. (notwithstanding Ms. Morris' description "they didn't come in as cops"[13]) and the importance to the Banwarts of C.B. being in a safe environment.

(Doc. 25 at 25, 19, 28-29 (brackets in original).)   Here, Plaintiffs may sincerely have lost trust in Defendants.   The October 30 incident may have contributed to that loss.   However, they do not appear to have expressed that loss of trust prior to removing C.B. from Bremwood or to have given Defendants the opportunity to address this concern at Bremwood.   Moreover, Defendants could no more guarantee Plaintiffs' subjective sense of trust any more than they could guarantee C.B.'s subjective belief that he would feel safe.

Finally, as previously noted, Plaintiffs rely on the October 30 incident for another reason:

> To be clear, Banwarts are not asserting claims for the October 30th incident or any failures prior to the LBMA. However, the circumstances leading up to the LBMA are important to understand the context of and the importance of the extended school year services, the importance of an appropriate safe place for C.B., the importance of provisions for providing written confirmation that certain things have taken place and the terms and conditions of the LBMA.

(*Id.* at 10-11).   I conclude that ALJ Lockard adequately considered the October 30 incident for these purposes.

---

[13] Obviously, the officers were uniformed and identifiable as "cops."  I interpret Ms. Morris's comment that they "didn't come in as cops" to mean the officers appeared in their role as community caretakers rather than as part of their law enforcement function.

### F.     *Reimbursement and Attorneys' Fees*

ALJ Lockard did not find in favor of Plaintiffs and did not reach the issue of the amount of reimbursement to which Plaintiffs may be entitled.  I recommend the Court also follow this path.  If the Court concludes that Plaintiffs are entitled to reimbursement, I recommend the Court remand the case to ALJ Lockard to resolve the pending issues regarding the sufficiency of the evidence supporting Plaintiffs' claim and whether Plaintiffs are improperly seeking compensatory damages as Defendants claim. *See JB. ex rel. Bailey v. Avilla R-XIII Sch. Dist.,* 721 F.3d 588, 593 (8th Cir. 2013) (compensatory damages are not available through the IDEA).

If the Court upholds the Decision, the Court should decline to award attorneys' fees or costs to Plaintiffs. The IDEA permits a "prevailing party" to recover attorneys' fees and costs. 20 U.S.C. § 14 1 5(i)(3)(B)(i). Plaintiffs prevail when actual relief on the merits of the claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff. *Warner ex rel. Warner v. Indep. Sch. Dist. No.* 625, 134 F.3d 1333, 1336 (8th Cir. 1998).  Any relief obtained must directly benefit the plaintiff at the time of judgment" to be considered a prevailing party. *Drennan v. Pulaski Cty. Spec. Sch. Dist.*, 458 F.3d 755, 757 (8th Cir. 2006) (brackets omitted). Denial of attorneys' fees have been deemed appropriate where a plaintiff prevailed on only a very small and technical part of a claim. *Id.*

In the case at bar, ALJ Lockard ultimately found only two minor violations of the LBMA and awarded no relief on that basis.  I found only one minor violation and recommend the Court award no relief.  Thus, unless the Court declines to follow my recommendations, the Court should conclude Plaintiffs are not prevailing parties and are not entitled to an award of attorneys' fees or costs.

## VII. CONCLUSION

For the foregoing reasons, I respectfully recommend that the District Court **affirm** the Decision of the ALJ and **dismiss the case with prejudice.**

The parties must file objections to this Report and Recommendation within fourteen (14) days of the service of a copy of this Report and Recommendation, in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b). Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. See Fed. R. Civ. P. 72. Failure to object to the Report and Recommendation waives the right to de novo review by the District Court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. United States v. Wise, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**DONE AND ENTERED** this 11th day of June, 2020.

Mark A. Roberts, United States Magistrate Judge
Northern District of Iowa

48