**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**EASTERN DIVISION**

CHRISTY BANWART and LANCE
BANWART,

     Plaintiffs,

vs.

CEDAR FALLS COMMUNITY
SCHOOL DISTRICT and AREA
EDUCATION AGENCY 267,

    Defendants.

No. C18-2074-LTS

**MEMORANDUM OPINION AND**
**ORDER ON REPORT AND**
**RECOMMENDATION**

_____

**TABLE OF CONTENTS**

*I.*   *INTRODUCTION*..................................................................................*2*

*II.*   *APPLICABLE STANDARDS*................................................................*2*

   *A.*   *Judicial Review of the ALJ's Decision under the IDEA* ............................*2*

   *B.*   *Review of Report and Recommendation*.................................................*3*

*III. THE R&R* ...........................................................................................*4*

   *A.*   *Factual Background*.........................................................................*4*

   *B.*   *The Banwarts' Arguments* ..............................................................*13*

   *C.*   *Defendants' Arguments* ..................................................................*14*

   *D.*   *Judge Roberts' Analysis* ................................................................*14*

*IV. DISCUSSION*.....................................................................................*16*

   *A.*   *Was a Residential Placement Necessary for C.B. to Receive a FAPE?*.........*17*

     *1.*   *Residential Program Placements under the IDEA* ..............................*18*

     *2.*   *Did C.B.'s Placement at Bremwood in February 2016 Provide a FAPE?*. *19*

    3.    *Did C.B.'s Continued Placement at Bremwood Provide a FAPE?*.......... 24

  B.  *Defendants' Objections* ................................................................... 34

V.  **CONCLUSION** .................................................................................. 34

## I.    INTRODUCTION

This case is before me on a Report & Recommendation (R&R) filed by United States Magistrate Judge Mark A. Roberts. Doc. No. 41. Judge Roberts recommends that I affirm the dismissal by an Iowa Administrative Law Judge (ALJ) of Christy Banwart's and Lance Banwart's action under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1400, et seq. The Banwarts have filed objections to the R&R, as have defendants Cedar Falls Community School District and Area Education Agency 267. Doc. Nos. 43, 44. Defendants have filed a response (Doc. No. 45) to the Banwarts' objections.

## II.    APPLICABLE STANDARDS

### A.  *Judicial Review of the ALJ's Decision under the IDEA*

Under the IDEA, parents may file a due process complaint to challenge "the identification, evaluation, or educational placement of [their] child, or the provision of a free appropriate public education to such child." 20 U.S.C. § 1415(b)(6)(A). Complaints are resolved by a due process hearing conducted by the state or local educational agency or, if desired by the interested parties, voluntary mediation. *Id.* § 1415(e)–(f). When no procedural violations are alleged, the purpose of the due process hearing is to determine whether the child received a free appropriate public education (FAPE). *Id.* § 1415(f)(3)(E)(i). The burden of proof falls on the party seeking relief. *Sneitzer v. Iowa Dep't of Educ.*, 796 F.3d 942, 948 (8th Cir. 2015).

A party may seek review of the administrative proceedings by bringing a civil action in state or federal court. *Id.* § 1415(g), (i)(2). A federal district court reviewing

an agency decision under the IDEA must conduct a de novo review to determine whether the aggrieved party is entitled to relief based on a preponderance of the evidence. *Id.* § 1415(i)(2)(C)(iii); *I.Z.M. v. Rosemount-Apple Valley-Eagan Pub. Sch.*, 863 F.3d 966, 970 (8th Cir. 2017). However, the court must give "'due weight' to the outcome of the administrative proceedings." *Id.* (quoting *T.F. v. Special Sch. Dist. of St. Louis Cty.*, 449 F.3d 816, 818 (8th Cir. 2006)).

## B. *Review of Report and Recommendation*

A district judge must review a magistrate judge's R&R under the following standards:

> Within fourteen days after being served with a copy, any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

28 U.S.C. § 636(b)(1); *see also* Fed. R. Civ. P. 72(b). Thus, when a party objects to any portion of an R&R, the district judge must undertake a de novo review of that portion.

Any portions of an R&R to which no objections have been made must be reviewed under at least a "clearly erroneous" standard. *See, e.g.*, *Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996) (noting that when no objections are filed "[the district court judge] would only have to review the findings of the magistrate judge for clear error"). As the Supreme Court has explained, "[a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985) (quoting *United States v. U.S. Gypsum Co.*,

333 U.S. 364, 395 (1948)).  However, a district judge may elect to review an R&R under a more-exacting standard even if no objections are filed:

> Any party that desires plenary consideration by the Article III judge of any issue need only ask. Moreover, while the statute does not require the judge to review an issue *de novo* if no objections are filed, it does not preclude further review by the district judge, *sua sponte* or at the request of a party, under a *de novo* or any other standard.

*Thomas v. Arn*, 474 U.S. 140, 150 (1985).


### III.    THE R&R

#### A.    Factual Background

Relying on the ALJ's findings, Judge Roberts provided a comprehensive account of the facts in this case.  Based on my de novo review, I find that Judge Roberts' statement of the facts is supported by the record and therefore adopt it.  The following facts are undisputed unless otherwise noted:

> [The Banwarts] are residents of the City of Cedar Falls, Iowa and the Cedar Falls School District ("the District"). Their adoptive son, C.B., was born in 2002 and was 16 years old at the time the Complaint was filed. Because of his disabilities, which will be described in more detail below, he had been receiving special education services pursuant to routinely updated iterations of an Individual Education Plan ("IEP"), as required by law.

> C.B. experienced early childhood trauma prior to his adoption. He received diagnoses of reactive attachment disorder ("RAD"), anxiety, and cognitive delays. His elementary school years were marked by behavioral problems and lack of academic progress demonstrated by the inability to meet the goals set out in IEPs. In fall 2014, C.B. began seventh grade in a self-contained special education classroom at Holmes Junior High, but was placed in a psychiatric medical institution for children beginning in January 2015.

> In fall 2015, C.B. entered eighth grade at the same school after a Functional Behavior Assessment ("FBA") and a Behavior Intervention Plan ("BIP") were completed. ALJ Lockard's description of the difficulties arising thereafter bears repeating:

4

During the start of the 2015-16 school year, Holmes staff observed that [C.B.'s] behaviors were unpredictable and that he would leave the classroom and the building without any obvious patterns or triggers. Staff also noted that [C.B.] was engaging in aggression, violence, threats directed at staff and himself, and mood swings throughout the day. Additionally, staff noted that [C.B.] frequently refused teacher requests to get his books out and engage in instruction, refused to listen, and refused to do assigned work. [C.B.] frequently told teachers, "I don't have to. I can do what I want." Staff observed that [C.B.] was better able to participate in settings where there were no academic expectations; for example, when [C.B.] was allowed to play on the computer or watch videos, he could remain in a setting without leaving.

On October 30, 2015 police and Parents were called to Holmes to deal with a situation where [C.B.'s] behavior had escalated to the point of throwing books at school staff and blocking himself in a room alone; the escalation continued for a prolonged period of time even after intervention by trained staff. [C.B.] was handcuffed by police officers who responded.

[C.B.] was suspended after the October 30 incident. During the suspension, he was receiving one hour of instruction at the AEA office four days per week. [C.B.'s] Parents decided that they did not want him to return to Holmes. At some point in fall 2016, [C.B.] was placed at Peet Junior High School, also in the Cedar Falls Community School District.

On December 16, 2015, a manifestation determination was made with regard to conduct that occurred December 11 at Peet. The determination indicates that [C.B.] was being verbally and physically aggressive with school staff, including threatening to harm or kill multiple individuals, acting as though he was going to harm himself or others with a paper cutter and pair of scissors, attempting to bite, hit, and kick school staff, not allowing staff to leave the room by physically blocking their way, knocking over and kicking stools, and upending a trash can on a staff member's head. The document states that [C.B.] has a history of significant behavior, including an incident of physical aggression at a prior school

5

and multiple incidents of refusal to comply with directions or school expectations, disrespectful or disruptive communication with school staff, and leaving the school setting without permission. The determination also states that an FBA was completed showing an identified primary function of escaping undesirable environments, particularly when academic coursework was assigned. A secondary function of attention was also identified by the FBA. The determination states that [C.B.] "has learned to 'up the ante' in order to achieve his escape related function."

This discussion shows some of the challenges that C.B. and the parties faced in the months leading up to the dispute regarding the appropriate placement. The incident involving the police is also central to [the Banwarts'] argument about trust issues that developed. [The Banwarts] argue:

To be clear, [we] are not asserting claims for the October 30th incident or any failures prior to the LBMA.[1] However, the circumstances leading up to the LBMA are important to understand the context of and the importance of the extended school year services, the importance of an appropriate safe place for C.B., the importance of provisions for providing written confirmation that certain things have taken place and the terms and conditions of the LBMA.

. . . .

On December 23, 2015, Plaintiffs filed their first due process complaint against Defendants alleging they failed to determine C.B.'s needs, develop appropriate IEPs and provide him with FAPE, and alleged violations of certain procedural requirements. On January 28, 2016, the District moved C.B. to homebound instruction citing "lack of goal/academic progress and disruptive behaviors."

On February 8, 2016, the parties engaged in mediation and executed the LBMA that resolved all outstanding issues and provided for C.B.'s placement at Bremwood.[2] The LBMA identified 21 "actions to resolve issues" to be undertaken by the District. The LBMA identified the "primary focus" of C.B.'s "education would be that he attend school willingly in

---

[1] Judge Roberts' abbreviation "LBMA" stands for the "Legally Binding Mediation Agreement" that the parties reached after mediation for the Banwarts' first due process complaint.

[2] Bremwood is now known as the Lied Education Center. However, I will continue to refer to it in this order as Bremwood.

order to develop living, learning and working skills that prepare him for postsecondary life." Remaining action items identified more specific means and methods for accomplishing this overall goal. Because Defendants' alleged failure to adequately undertake these action items is at the heart of Plaintiffs' complaint, they will be discussed more particularly below. The LBMA expressly provided, "This is a legally binding agreement enforceable in any state court of competent jurisdiction or in a district court of the United States."

Bremwood is a school located in Waverly, Iowa that serves students with behavior and mental disabilities. Students are enrolled there usually after less restrictive plans in their districts are unsuccessful. C.B. started at Bremwood after an intake meeting on February 11, 2016 where his needs were discussed, but before a February 19, 2016 IEP meeting. At the IEP meeting, attendees discussed an FBA that had been prepared by employees of the Defendants in January and February 2016.

> The purpose of an FBA is to examine all of the factors that contribute to a student exhibiting challenging behaviors. The team attempts to objectively identify what the challenging behaviors are and conducts record review, interviews, observations, and sometimes testing to determine what the function of each behavior is. The behaviors of concern that had been identified for Student were: 1) elopement (leaving the classroom without permission from an adult or leaving the school building); and 2) aggression (hitting, kicking, biting, and scratching adults).

The FBA was also conducted to find ways to encourage C.B. to engage in academic work and discourage elopement or other behaviors C.B. exhibited to avoid academic tasks.

The IEP prepared in February 2016 recognized that C.B.'s behavior adversely affected his ability to make academic progress and identified coping strategies C.B. could use to avoid becoming overwhelmed and anxious. The IEP identified scripted statements to encourage C.B.'s use of those strategies. The IEP also identified academic goals in reading, writing, and math. A BIP was created during the IEP process designed to further these goals. The BIP set out strategies for adults to use with C.B. in response to behavioral issues that included the following passage:

> When [C.B.] engages in verbal threats to himself or others, no emotional reaction, do not engage in any verbal

7

conversation. Communicate with other staff/parents that [C.B.] has made these statements through email to parents.

Allow [C.B.] to use de-escalation techniques when he is upset. He can have 30 seconds (count to 30 in head) to choose which technique to use and begin to use it. If he does not make a selection, move to alternate room. Give [C.B.] both time and space while in intervention or alternate room; do not talk to him during the process of de-escalation; step away from him; and handle the situation in a non-threatening manner.

If [C.B.] refuses to complete a task, the adult should count to 30 and then, if no change in behavior, he is removed to alternate classroom. The task should go with and he needs to complete it before returning to his classroom, with NO modifications. He will be given one warning per half day. If he is not in the classroom, he does not earn points and he can be reminded of this.

When [C.B.] completes his work, he will be given immediate access to his chosen leisure activities for his break. The visual timer may be used to provide a reminder of how much time has elapsed.

At Bremwood, C.B. was placed in a functional classroom that had fewer students and could be more flexible in responding to student needs. The two-room functional classroom had a "life-skills room" and a main classroom staffed by two special education teachers and five paraprofessionals serving eleven students, including C.B. The five paraprofessionals included special education paraeducator Jordan Smock. Tina Ford was C.B.'s teacher. Jordan Smock was his paraeducator and was assigned to C.B. all day. At first Mr. Smock was assigned only to C.B., but in mid-March 2016 he was assigned a second student as well. Bill Aguiar, who Ms. Banwart had known previously and trusted, was assigned as an intervention teacher by the LBMA. As intervention teacher, Mr. Aguiar was C.B.'s designated contact to provide emotional support. Mr. Aguiar, Mr. Smock, school psychologist Krista Hennager, and school principal Greg Koppes were identified as people to whom C.B. could turn when he felt unsafe. There was another room in the school designated as C.B.'s "safe spot" where C.B. could go when he was having difficulties like refusing to work. Within this "safety room," was a smaller "intervention room" for students who were being unsafe.

8

Another component of the LBMA was the agreed involvement of Monarch Therapy Services ("Monarch"). Janelle Eddy of Monarch is a behavioral therapist who had been helping to address C.B.'s RAD in the Plaintiffs' home. Under the LBMA, Defendant District had agreed to pay Monarch to train Bremwood staff on strategies to help C.B. deescalate and provide weekly ongoing consulting for up to 30 minutes.

The record reflects extensive planning and coordination leading up to C.B.'s first day at Bremwood. These preparations included designation of safe areas where C.B. could retreat to deescalate. Efforts were also made to integrate C.B. into activities in the main classroom.

ALJ Lockard described in detail C.B.'s initial success and Plaintiffs' satisfaction with his progress. There were some early concerns about C.B.'s resistance to go to school, but as of March 21, 2016, Ms. Eddy noted, "[C.B.] has been getting up in the morning and going to school. This has been such a huge hurdle for [C.B.] and his parents. [C.B.] has had mini meltdowns in the past week, but has been able to get himself back on track within 15 minutes." The record also reflects significant progress at Bremwood toward his academic and behavioral goals.

The difficulties appear to have begun at the end of March 2016. From his first day, February 16, 2016, until April 6, 2016, C.B. did not miss any school, Plaintiffs were never called to come get him early, and he stayed in school all day. From April 7 until April 26, 2016, C.B.'s last day, he missed six days of school. Teasing out the cause of these difficulties and the appropriate responses is not an easy task. Plaintiffs suggest that C.B. always experienced a "honeymoon" period with a new school when the experience was new and exciting for him. . . .

About March 29, 2016, C.B. told Ms. Banwart he had been hit at school. The subsequent investigation apparently yielded no evidence of such an incident, but C.B. remained adamant in his belief he had been hurt. At the same time, a medication change may have contributed to his paranoia. Regardless of the truth of his belief, its persistence contributed to C.B.'s reluctance to go to school. At the same time, [the Banwarts] told C.B. they planned to take a trip to Mexico without him from April 7 through April 14, and began preparing him for their absence. On April 7, Ms. Banwart could not get C.B. on the school bus and she believed this was attributable to the planned trip. C.B.'s aunt and uncle stayed with C.B. while [the Banwarts] were away, but they were not able to persuade him to attend school on April 8, 12, or 14. Bremwood staff anticipated and encountered difficulties with C.B. during [the Banwarts'] absence. Ms. Hennager, the

school psychologist, testified that fear of being left by people to whom they are attached is a principal concern of children with RAD. Here, C.B. was most closely attached to his mother and it was clear that her absence would be a challenge for him. C.B.'s aunt and uncle struggled to get him to school. They also struggled with his violence and threats at home. On April 14, then 14-year-old C.B. took the family vehicle and drove to Parkersburg, some 20 miles from his home.

ALJ Lockard addressed the available records regarding C.B.'s behavioral incidents and the interventions at Bremwood, including restraint and seclusion documentation. ALJ Lockard noted that some of the intervention documentation was not located because it may have been destroyed in the transition of operational responsibility from the AEA to the Waverly/Shell Rock School District.[3] Because of the absence of the complete record of interventions, trends may be difficult to discern. Nevertheless, ALJ Lockard noted records were missing and does not overstate what conclusions could be drawn from the records. She noted "great improvement" in the time C.B. was spending in class by March 18, but data points thereafter showed less time in class. Physical aggression appeared to spike around the time of the medication change and [the Banwarts'] trip. The nature of the behavioral problems and the extent to which they escalated appears to have increased after March 29.

Shortly after their return from Mexico, [the Banwarts] began to discuss with Ms. Eddy the possibility of an out-of-home placement. Ms. Banwart arranged to have Dr. Paul Conditt, a licensed psychologist, administer an IQ test to C.B. Dr. Conditt's April 22, 2016 report listed C.B.'s diagnoses as Reactive Attachment Disorder, ADHD, Oppositional Defiant Disorder, and anxiety. Previously C.B. had scored in the first percentile on an IQ test. Dr. Conditt, however, placed C.B. in the fiftieth percentile, attributing the difference to the difficulty presented by timed tasks in the prior test. Dr. Conditt's report also indicated C.B. exhibited distinct traits of Asperger's Syndrome on the autism spectrum. Also, on April 22, 2016, [the Banwarts] retained educational consultant Karen Mabie for $4,000 to assist in locating a residential placement for C.B. [The Banwarts] had unsuccessfully attempted on their own to find a residential facility in Iowa or close by.

---

[3] Judge Roberts noted, "No one has suggested that this destruction was an attempt to make evidence in this case unavailable or suggested that the Court should make any inference based on the destruction. I make no such inference here." Doc. No. 41 at 11 n.5.

During a monthly progress meeting at Bremwood on April 22, Ms. Banwart shared the autism diagnosis with some members of the IEP team, but did not request the IEP team convene to discuss the diagnosis or make changes to the IEP. Ms. Hennager indicated that the plan already included strategies appropriate for students with autism. Ms. Banwart expressed difficulties getting C.B. to go to school and mentioned her efforts to find an out-of-state placement for him. However, she did not express dissatisfaction with Bremwood.

Meanwhile, discussions were occurring regarding C.B.'s placement for Extended Year Services ("EYS") (i.e., services that would be made available to C.B. after the conclusion of the regular school year). At the April 22, 2016 meeting, Ms. Hennager explained that the building principal would need to be involved and they scheduled an April 29, 2016 meeting to discuss EYS. Before that meeting could occur, however, [the Banwarts] made the decision to enroll C.B. in Seven Stars, a residential treatment center in Utah. C.B.'s last day at Bremwood was April 26 and he enrolled at Seven Stars on April 28. Ms. Banwart told Ms. Hennager on April 26 that C.B. would not be back in Iowa for EYS. Ms. Hennager sent a May 4, 2016 Prior Written Notice ("PWN") stating:

> A meeting was scheduled for 4-29-16 to finalize plans for [C.B.] for Extended School Year Services. [Ms. Banwart] and Dr. Tracy Johns were planning on attending via phone. [Mother] notified WSR Lied Education on Tuesday, 4-26-16, that [C.B.] was now in Utah, attending a facility to address his behavioral concerns. She and her husband had made the decision based on [C.B.'s] behavior at home. A phone call between Dr. Tracy Johns, Bill Aguiar, Krista Hennager, with input from Jordan Smock, was made on Friday, April 29, 2016 to cancel the meeting and make Cedar Falls aware that [C.B.] was not attending the Lied Education Center at this time. [Ms. Banwart] did not attend since [C.B.] will not be attending the remaining weeks of school.

ALJ Lockard's Findings of Fact contain a thorough discussion of the events surrounding [the Banwarts'] decision to move C.B. to Seven Stars. Mr. Aguiar testified regarding the explanation Ms. Banwart gave for enrolling C.B. in the Seven Stars program including the frustration [the Banwarts] experienced getting him on the bus and his behavior becoming harder to handle as he grew. Prior to removing C.B. from Bremwood, the record reflects some concern by [the Banwarts] regarding the number and nature of interventions at the school, but there is no evidence that [they]

11

expressed dissatisfaction with the IEP or alleged any violation of the LBMA.

At [the Banwarts] request, Ms. Eddy spoke with Seven Stars about C.B.'s history and her personal assessment, but [they] did not involve Bremwood staff. Ms. Banwart described [their] reasons for moving C.B. to Seven Stars. They believed he was scared and did not want to go to school. It was important for them that he go to school willingly rather than fight about it each morning. They were concerned about the amount of time C.B. spent in the intervention room. Ms. Banwart believed C.B. was receiving insufficient attention after Mr. Smock was assigned a second student. She described a loss of trust in Bremwood and the District. However, [the Banwarts] did not communicate any of this apparent dissatisfaction to Rod Ball, Director of Special Programs for the AEA, whom the parties agreed would be the "Shepherd" of the LBMA. Mr. Ball was not advised of the decision to remove C.B. to Seven Stars.

. . . .

C.B. started in the Seven Stars residential treatment center in Utah on April 28, 2016. An evaluation of C.B. prepared upon his admission includes the reasons for placement, which focused on C.B.'s home behavior, including driving the car, outbursts, and refusal to perform daily tasks and willingly attend school.

Dr. Brandon Park made a neurological assessment of C.B. from May 6 to June 29, 2016 during his stay at Seven Stars and, most pertinent to this dispute, concluded as follows:

> Based on the information obtained through past reports, interviews, and testing it is my strong clinical opinion that [C.B.] will need substantial therapeutic assistance in developing a [sic] good coping skills, identity development, and social/emotional growth found in a well-structured residential treatment facility.

Dr. Gordon Day, the executive director of Seven Stars opined that for C.B. to receive FAPE he needed a residential program combined with a therapeutic and academic program.

In August 2016, [the Banwarts'] then-lawyer advised the District that C.B. would not return to Bremwood and demanded reimbursement for the cost of his education. C.B. transitioned from Seven Stars to Waterfall Canyon Academy/Oak Grove School ("WFC/OGS") in Utah in September 2016. . . . [The Banwarts], representatives of Defendants, staff from the

programs in Utah, and others attended an IEP meeting beginning September 7, 2016. Dr. Park and Dr. Day were among those attending by telephone. Dr. Park presented information about his assessment of C.B. Defendants' representatives reviewed, among other things, [the Banwarts'] "paraphrase" of Dr. Park's report, which included his recommendation of a residential facility. [The Banwarts] agreed a residential placement was necessary and advocated for such a placement. The IEP that resulted from this meeting added goals and supporting services, but continued his placement at Bremwood. A similar IEP with minor modifications was completed in March 2017. [The Banwarts subsequently filed their second due process complaint in August 2017.] At the time of the hearing on [the Banwarts'] second complaint, C.B. remained enrolled in the Waterfall Canyon Academy and [the Banwarts] did not plan to return him to school in Iowa.

Doc. No. 41 at 3–15 (citations omitted). Other relevant facts will be discussed as necessary.

### B.    The Banwarts' Arguments

The Banwarts contend defendants failed to provide C.B. with a FAPE for two main reasons.  First, they argue defendants breached the parties' mediation agreement from their first due process complaint.  Doc. No. 25 at 38–39.  They assert that these breaches denied C.B. a FAPE and created the necessity to place C.B. in a different educational environment.  *Id.* at 40.  Second, relying primarily of the opinions of Dr. Park and Dr. Day, the Banwarts argue that C.B.'s disabilities and behavioral issues are so sufficiently severe that he requires a residential program to accomplish his educational goals.  *Id.* at 41; Doc. No. 29 at 1–3.  They assert that defendants' failure to recognize C.B.'s need for and to provide a residential educational program denied C.B. a FAPE. Doc. No. 25 at 45.  Because of these failures, the Banwarts argue, they are entitled to recover the past expenses, and all future expenses, of enrolling C.B. in the residential educational programs in Utah, the costs incurred in placing him there, and reasonable attorney's fees and costs.  *Id.* at 46.

13

## C.     Defendants' Arguments

Defendants argue that they have not, at any time, failed to provide C.B. with a FAPE. They contend that the IEP they established for C.B. at Bremwood was adequate and resulted in substantial progress in C.B.'s behavior and academics, easily fulfilling their duty under the IDEA to establish a plan that was reasonably calculated to provide meaningful educational benefit to C.B. Doc. No. 28 at 16–18. They also assert that the Banwarts' satisfaction with C.B.'s progress is evident from the record and that the Banwarts' never told anyone at Bremwood that they were dissatisfied with C.B.'s IEP. *Id.* at 16–18, 27. Thus, C.B. was provided with a FAPE at Bremwood and the Banwarts' decision to remove him to a residential facility was not required to provide a FAPE. *Id.* at 16–18, 31–33. Defendants also argue that they did not violate the mediation agreement but, even if they did, no violation resulted in a denial of a FAPE. *Id.* at 19–26.

## D.     Judge Roberts' Analysis

Judge Roberts began by analyzing the role of the mediation agreement in determining whether C.B. received a FAPE. Doc. No. 41 at 22. He noted that the Banwarts are not suing to enforce the agreement, but to argue that defendants' failure to fulfill obligations under the agreement constitutes a denial of a FAPE. *Id.* at 22–23. Agreeing with the ALJ, Judge Roberts concluded that the breach of a mediation agreement arising out of a due process complaint does not, by itself, equate to a denial of a FAPE. *Id.* Instead, the complaining party must show that the breach resulted in failure to provide a FAPE. *Id.* at 22–24.

Judge Roberts concluded that defendants did not fail to provide a FAPE based on the mediation agreement. *Id.* at 24–33. Judge Roberts agreed with the ALJ that defendants did not breach the agreement in most of the ways alleged by the Banwarts. *Id.* at 24–31. Although there was evidence that defendants breached one element of the agreement, he agreed with the ALJ that no breach resulted in a denial of a FAPE. *Id.* at 33.

14

Judge Roberts then turned to whether C.B.'s placement at Bremwood, rather than a residential facility, denied C.B. a FAPE. *Id.* at 34, 36. He agreed with the ALJ that the proper question for determining whether a child in C.B.'s position – who could not remain in a regular classroom due to his or her disabilities – was provided a FAPE is whether the IEP was appropriately ambitious is light of the circumstances such that it provided an opportunity to meet challenging objectives. *Id.* at 34–35. Judge Roberts concluded that the IEP here was appropriately ambitious and led to substantial improvement in C.B.'s education, most notably by decreasing his elopement from the classroom. *Id.* at 38. Although C.B.'s behavior regressed in the weeks before he was removed from Bremwood, which his parents argued was due to the end of a "honeymoon period" of temporary improvement that C.B. had at every new school, Judge Roberts found that C.B.'s regression was very likely related to medication changes and his parents' vacation. *Id.* at 39–40. Because the Banwarts removed C.B. from Bremwood soon after they returned from vacation, Judge Roberts found insufficient evidence showing that C.B.'s regression evidenced the end of a honeymoon period as opposed to being a temporary regression caused by his parents' absence. *Id.* Thus, the Banwarts failed to show that C.B. was not receiving a FAPE. *Id.*

Further, although Dr. Day and Dr. Park opined that C.B. needed a residential program to receive a FAPE, Judge Roberts found that C.B.'s improvement while at Bremwood, while living at home, contradicted this opinion. *Id.* at 39–40. Judge Roberts noted that the lack of evidence that the doctors considered C.B.'s improvement while at Bremwood provided further grounds to give their opinions little weight. *Id.*

Judge Roberts addressed a few additional issues. Defendants raised the question of whether C.B.'s current placement at the schools in Utah is a proper alternative placement to Bremwood, asserting that this is an element the Banwarts must establish. Judge Roberts concluded that this issue was waived because it was not raised before the ALJ. *Id.* at 43. Judge Roberts also addressed the incident when C.B. was handcuffed by a police officer while attending Holmes Junior High. *Id.* at 44. Though he

15

acknowledged that this may have provided grounds for conflict and distrust between the Banwarts and defendants, he concluded that it was not material in determining whether C.B.'s placement and IEP at Bremwood provided a FAPE. *Id.* at 44.

For these reasons, Judge Roberts recommends that I affirm the ALJ's decision.

## IV. DISCUSSION

Both parties have filed objections to the R&R. The Banwarts argue that Judge Roberts erred by finding that C.B.'s placement and IEP at Bremwood provided a FAPE and that placement in a residential program was not required. Doc. No. 43 at 1–13. They contend that both the ALJ and Judge Roberts gave too little weight to the expert opinions of Dr. Day and Dr. Park, as both testified that C.B. should be placed in a residential facility and defendants failed to provide expert testimony to the contrary. *Id.* They also argue that any perceived improvement while C.B. was at Bremwood was due to his IEP's aim line being set too low, not true progress. *Id.* at 14–16. Even if C.B.'s time at Bremwood did result in some improvement, they argue the evidence of improvement is outweighed by the evidence of C.B.'s longstanding difficulties in school, his history of "honeymoon periods" and the doctors' opinions. *Id.* at 1–13. Thus, they contend that they rightly removed C.B. from Bremwood and placed him in an appropriate alternative program. *Id.* at 14–16.

Defendants raise two objections, one factual and one procedural. They first argue that Judge Roberts incorrectly stated that none of their witnesses during the administrative proceedings was a psychologist. Doc. No. 44-1 at 1. They admit that they did not designate an expert witness to counter Dr. Day's and Dr. Park's opinions, but note that Krista Hennager, who testified on their behalf, is a school psychologist. *Id.* They also object to Judge Roberts' finding that they waived their argument as to whether C.B.'s alternative placement at Waterfall Academy/Oak Grove was appropriate. *Id.* at 2–3. They assert that the Banwarts, to be entitled to reimbursement for the alternative placement, must show not only that defendants failed to provide a FAPE but also that the

16

Waterfall Academy/Oak Grove was an appropriate placement. *Id.* They claim that they argued this point in the trial brief for the administrative hearings and, thus, the argument has been preserved for review here. *Id.*

I will begin by addressing the Banwarts' objections.

## A.      Was a Residential Placement Necessary for C.B. to Receive a FAPE?

The fundamental purpose of the IDEA is 'to ensure that all children with disabilities have available to them a free appropriate public education." *Fry v. Napoleon Cmty. Schs.*, 137 S. Ct. 743, 753 (2017) (quoting 20 U.S.C. § 1400(d)(1)(A)). A FAPE includes both "educational instruction specially designed to meet the unique needs of" the child and any "services [that] are necessary to permit the child 'to benefit' from the instruction." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 188–89 (1982). To ensure that schools provide appropriate educational instruction and related services for students with disabilities, the IDEA requires that each qualifying student have an individualized education program (IEP). *Fry*, 137 S. Ct. at 753. An IEP – which is created and routinely reviewed by a team that includes the student's parents, teachers and other educational representatives – identifies the student's present levels of academic achievement and functional performance, sets annual goals for improvement, outlines when and how the student's progress will be measured and describes any services that are required for the student's success. 20 U.S.C. § 1414(d)(1)(B). To provide a student with a FAPE, the IEP must be "reasonably calculated to enable [the] child to make progress appropriate in light of the child's circumstances." *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 999 (2017). Schools must also ensure that an educational program outlined in the IEP is "appropriately ambitious" and provides the child a "chance to meet challenging objectives." *Id.* at 1000.

17

The Banwarts argue that C.B.'s IEPs did not provide a FAPE because they did not place C.B. in a residential program.[4] Doc. No. 43 at 1. They assert that Dr. Day's and Dr. Park's shared opinion that C.B. needs a residential program to receive a FAPE establishes that C.B.'s placement at Bremwood did not provide a FAPE. *Id.* at 5–6.

### 1.    *Residential Program Placements under the IDEA*

The IDEA recognizes that some students with disabilities require placement in a public or private residential program to receive a FAPE. *See* 34 C.F.R. §§ 104.33; 300.104.[5] Residential programs are generally considered an option of last resort, however, with placement in a less restrictive environment within public schools that are close to a student's home being preferred. *T.F.*, 449 F.3d at 820. If parents disagree with their child's placement in a non-residential program, they have a right to remove their child to a private residential program and seek reimbursement for the resulting educational expenses. *See Evans v. Dist. No. 17 of Douglas Cty., Neb.*, 841 F.2d 824, 832 (8th Cir. 1988). They do so at their own financial risk, however, as "[t]hey are entitled to reimbursement only if a federal court concludes both that the public placement violated IDEA and that the private school placement was proper under the Act." *Florence Cty. Sch. Dist. Four v. Carter By & Through Carter*, 510 U.S. 7, 15 (1993). The parents must show that the residential placement is "educationally necessary," meaning that it is necessary to address out-of-school behaviors, issues or needs that hinder a student's ability to learn. *Indep. Sch. Dist. No. 284 v. A.C.*, 258 F.3d 769, 774, 777 (8th Cir. 2001).

---

[4] In their August 2017 due process complaint, the Banwarts argued that C.B.'s "most current IEP and his IEPs for the past two years have not provided him with a [FAPE]." AR 9. However, both parties acknowledge that only the IEPs in connection with C.B.'s placement at Bremwood, which began in February 2016, are at issue here.

[5] Neither the IDEA nor its implementing regulations define what a residential program is, but they include "instruction conducted in . . . hospitals and institutions" as potential elements of providing a "special education." *See* 20 U.S.C. § 1401(25).

Thus, the critical issue here is whether a residential placement was educationally necessary for C.B. to receive a FAPE. Based on the relief the Banwarts seek, and because new evidence regarding C.B.'s disabilities and needs became available after he was removed from his initial placement at Bremwood, this issue involves two questions: (1) did C.B.'s initial placement and IEP at Bremwood provide a FAPE, and (2) after C.B. was removed to alternative residential programs, did his continued placement at Bremwood provide a FAPE? I will address these questions separately.

### 2. Did C.B.'s Placement at Bremwood in February 2016 Provide a FAPE?

C.B. began school at Bremwood on February 16, 2016, after a very difficult and unproductive year in his education. C.B. was enrolled at Tanager Place (Tanager) – a psychiatric medical institution for children (PMIC) in Cedar Rapids, Iowa – from January to August 2015, the second semester of his seventh-grade year. AR 1073;[6] Exh. D, p. 59.[7] C.B. lived and received treatment in the residential portion of Tanager and attended its school during the day. T. 69.[8] C.B.'s time at Tanager was generally unproductive academically, however, primarily due to issues with eloping from school. Exh. B, p. 96 (noting C.B.'s struggles at home and at school shortly after returning from Tanager); Exh. D, p. 4 (documenting C.B.'s poor grades while at Tanager); Exh. D, p. 46 (reporting in C.B.'s August 2015 FBA that C.B. liked to leave school because "that's what [he] learned at Tanager"); Exh. X, p. 3 (noting that C.B. "experienced little if any academic success" at Tanager "and attended school on a limited basis"); Exh. OO, p. 10 (noting that Christy Banwart, during the September 2016 IEP meeting, reported that C.B.'s experience at Tanager was "negative"); Exh. PPP, p. 6 (noting in C.B.'s administrative history at Holmes that C.B. did not do well academically at Tanager and

---

[6] "AR." refers to the administrative record for the Banwarts' second due process complaint.

[7] The cited exhibits are those presented during the due process hearing.

[8] "T." refers to the administrative hearing transcript.

frequently walked out of class); T. 608 (testifying that C.B. learned that he could escape school by going home while he was at Tanager).

In August 2015, C.B.'s IEP team decided to reintegrate him back into his home school, Holmes Junior High (Holmes), for his eighth-grade year. Exh. D, p. 54–55. The IEP team had considered placing C.B. at Bremwood because that was the usual course of action for transitioning students from Tanager. AR 1074. However, the Banwarts did not want C.B. to attend Bremwood, so the IEP team decided to try Holmes again with new strategies, as it presented a less restrictive environment for C.B. *Id.*; Exh. D, p. 54–55. To help facilitate a successful transition back to Holmes, defendants performed a functional behavior assessment (FBA) and created a behavior intervention plan (BIP) for C.B. Exh. D, p. 38–47.

As noted above, C.B.'s reintegration back into Holmes was not successful. From C.B.'s first days at Holmes his behavior was unpredictable, and he frequently refused to do schoolwork, left or attempted to leave class or the school, and sometimes acted aggressively and violently. Exh. PPP, p. 8–49; Exh. UUU, p. 9–11. C.B. had some good days, but his concerning behavior ultimately resulted in a one-day suspension on September 23, 2015, and, after a particularly aggressive outburst on October 30, 2015, an indefinite suspension. Exh. PPP, p. 28, 36; Exh. UUU, p. 1–4. C.B.'s IEP team again considered placing C.B. at Bremwood but ultimately decided to provide homebound instruction until a new IEP could be developed. Exh. D, p. 56–57.

Honoring the Banwarts' preference to avoid further homebound instruction or placement at Bremwood, C.B.'s IEP team eventually chose to place C.B. at Peet Junior High (Peet). *Id.* at 58–59; T. 77. The team planned for C.B. to begin with a shortened school day and to gradually integrate him into a full schedule. Exh. D, p. 58–59. C.B. began attending Peet on November 24, 2015, and his first couple days before a Thanksgiving break "were pretty good." Exh. FFFF, p. 1; Exh. XXX, p. 2. However, after the holiday break his behavior and academic performance worsened. Exh. XXX, p. 2–8; Exh. YYY, p. 2–6. On December 11, 2015, C.B. had another outburst during

20

which he threatened to harm himself and others.  Exh. XXX, p. 7–8; Exh. YYY, p. 3–4; Exh. EEEE.  This resulted in another suspension and a need for another IEP team meeting to determine an appropriate placement for C.B.  Exh. GGGG.

Soon thereafter, defendants again proposed placing C.B. at Bremwood, and the Banwarts filed their first due process complaint.  Exh. D, 59–60; Exh. LLLL.  The parties settled the complaint by mediation on February 8, 2016.  Exh. A.  Although the Banwarts still expressed some reservations about Bremwood, the parties agreed to place C.B. there pursuant to a legally binding mediation agreement.  *Id.* at 5.

In reaching the decision to place C.B. at Bremwood, defendants identified several reasons why it was an appropriate and desirable placement for C.B.  Staff at both Holmes and Peet no longer believed they could provide the support and services C.B. needed to succeed academically.  Exh. D, p. 59–60; Exh. J, p. 37.  They also were concerned about being able to ensure C.B.'s safety, as well as their own.  Exh. D, p. 59–60.  Bremwood's experience with students who have behavioral issues and disabilities like C.B., such as reactive attachment disorder, also played a role in defendants' recommendation to place C.B. there.  Exh. PPP, p. 35; Exh. OOOO, p. 1.  At Bremwood, C.B. would be able to receive more one-on-one attention, a learning environment that focused on life skills, fewer students in his classroom and "safe spaces" for when he felt too overwhelmed.  T. 532–34, 537, 541, 544, 640, 681, 761.

Based on my de novo review, I find that C.B.'s initial placement at Bremwood in February 2016 was appropriate and provided him with a FAPE.  There is no evidence that a residential placement was educationally necessary at that time, especially when the parties had not yet tried a less restrictive option that had been repeatedly recommended.[9]

---

[9] In arguing that a residential placement was necessary for C.B. to receive a FAPE, the Banwarts primarily rely on the opinions of Dr. Park and Dr. Day.  These opinions were not provided until after C.B. was removed from Bremwood and, thus, defendants could not have considered them in determining whether to place C.B. at Bremwood in February 2016.  Therefore, they are of little relevance to the initial placement.

After C.B. returned to the Cedar Falls Community School District in August 2015, members of his IEP team and other school staff repeatedly expressed the opinion that the behavioral issues hindering C.B.'s education could be best addressed at Bremwood. However, they twice yielded to the Banwarts' desire to avoid Bremwood, placed C.B. in a general education public school and sought to facilitate his success there through a specialized IEP, an FBA and a BIP. When these options failed, Bremwood became the next logical destination for providing a FAPE under the least restrictive circumstances appropriate.

That is not to say that Bremwood was appropriate simply because it was the next, and last, public education environment defendants could supply short of a residential placement.[10]  *See Seattle Sch. Dist., No. 1 v. B.S.*, 82 F.3d 1493, 1501 (9th Cir. 1996) ("The IDEA does not require [a student] to spend years in an educational environment likely to be inadequate and to impede her progress simply to permit the School District to try every option short of residential placement."), *abrogated in part on other grounds by Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 56–58 (2005).  Because residential programs are usually considered an option of last resort, the fact that C.B. struggled while placed in the residential program at Tanager suggests that it was reasonable for defendants to try other available options before recommending another residential program.[11]  More importantly, Bremwood focuses on addressing the type of behavioral issues with which C.B. struggled.  Exh. PPP, p. 35; T. 537, 544.  Unlike the at-home behavioral issues that led to the Banwarts placing C.B. in Tanager's residential program, the behavioral issues that most hindered C.B.'s education after he returned from Tanager

---

[10] C.B.'s special education teacher at Bremwood, Tina Ford, testified that Bremwood presented "the most restrictive [environment] as far as public education goes."  T. 759.

[11] Neither party argues, nor does the evidence suggest, that the residential program C.B. began attending in September 2016 and the residential program at Tanager are the same or interchangeable.  I only seek to point out that C.B.'s struggles and regression at Tanager would justify any hesitancy to place him in another residential program so soon, especially when a behavior-focused school was available that would allow him to stay at home.

occurred primarily at school, such as refusing to do work, trying to elope from school and becoming aggressive with school staff. T. 69, 84–85. There is little evidence from that time period that a residential placement was necessary to address those behaviors. Bremwood was well-structured to address C.B.'s at-school behavioral challenges because its staff had extensive experience with students who have similar challenges and it was able to provide C.B. with small class sizes, one-on-one attention and guidance, a focus on developing life skills, and the freedom to take breaks or spend time deescalating in a safe space. Therefore, C.B.'s initial placement at Bremwood was reasonably calculated to help him progress sufficiently to provide him with a FAPE.

This conclusion is unaltered by the fact that the Banwarts felt it was necessary to remove C.B. to Seven Stars in April 2016, approximately two months after he began attending Bremwood. The Banwarts' concerns that led to the change – displeasure with some of Bremwood's intervention tactics and C.B.'s worsening behavior at home, regression at school and new autism diagnosis – certainly revealed that C.B.'s needs, and some of Bremwood's attempts to address those need, may have needed reevaluation. *See* T. 441–42; Exh. OO, p. 19. However, the Banwarts did not notify Bremwood of any concerns or dissatisfaction with C.B.'s IEP, did not request changes to the IEP and did not give Bremwood the opportunity to make substantial changes.[12] T. 554, 687, 775–76, 799, 838.

School districts must be notified "of disagreements and given an opportunity to make a voluntary decision to change or alter the educational placement," and only when "it is likely that no change would be made which would benefit [the student] (if the school district had made it clear that no change in the placement would occur), would there be

---

[12] The Banwarts did raise concerns to Bremwood about instances in which its staff used physical force or holds during interventions with C.B. *See* Exh. B, p. 35 (notes from a meeting between the Banwarts, Bremwood staff and C.B.'s Behavioral Health Intervention Services (BHIS) provider regarding no longer physically forcing C.B. into the school's intervention room). However, nothing in the record shows that Bremwood staff members were unresponsive to these concerns or unwilling to adjust their intervention methods.

Case 6:18-cv-02074-LTS-MAR   Document 46   Filed 09/24/20   Page 23 of 35

a denial of a [FAPE]."[13]  *Evans*, 841 F.2d at 831–32.  There is no evidence that defendants were unwilling, or unable, to make adjustments at Bremwood at that time that could have resolved the Banwarts' concerns and adapted to C.B.'s regression.  Therefore, because C.B.'s February 2016 IEP and placement at Bremwood provided a FAPE, and the Banwarts removed C.B. without notifying defendants of their concerns or giving Bremwood an opportunity to address them, C.B.'s placement at Bremwood met the IDEA's requirements at least through the end of his eighth-grade year.

### 3.     Did C.B.'s Continued Placement at Bremwood Provide a FAPE?

After C.B. attended the Seven Stars residential program, the Banwarts, based on the recommendation of two doctors at Seven Stars, requested that C.B. be placed in the residential program at Waterfall Academy/Oak Grove in Utah.  In C.B.'s September 2016 IEP, defendants denied this request and kept C.B.'s placement at Bremwood.  Exh. TT, p. 55–56.  The IEP team believed Bremwood presented the least restrictive educational environment for C.B. because he would be able to continue living at home, he had made progress there before his parents removed him to Seven Stars and he could receive the type of in-school mental health therapy his parents desired at Bremwood, not just at Waterfall Academy/Oak Grove.  Exh. TT, p. 55–56.  The IEP team reviewed and edited C.B.'s IEP from February to April 2017, and again considered Waterfall Academy/Oak Grove, but C.B.'s placement remained at Bremwood.  Exh. LLL, p. 2–44.  After the Banwarts chose to keep C.B. at Waterfall Academy/Oak Grove without

---

[13] The Banwarts have argued that some Bremwood staff members' failure to object to the plan to remove C.B. to a residential program once they learned of it shows that such action was appropriate, necessary and condoned.  I have found no case law requiring school staff or district representatives to object to a unilateral parental placement or to warn about its potential financial consequences.  Even if there were such a rule, it would likely not apply here.  As noted above, the Banwarts never notified Bremwood staff that they believed C.B. was not receiving a FAPE, so the staff had no reason to believe that the choice was anything other than parental preference or that a warning regarding financial consequences was necessary.

revealing a plan to return him to school in Iowa, defendants removed C.B. from their special education services. *Id.* at 45.

The Banwarts argue that C.B.'s continued placement at Bremwood from September 2016 forward denied him a FAPE because he needed a residential placement. In arguing this point they rely primarily on the opinions of C.B.'s doctors during his time at Seven Stars, Dr. Park and Dr. Day.[14] *See* AR 704, 712–13, 772–73, 801–06, 810–11, 814–15, 848–49; Exh. WW, p. 29. According to Dr. Day and Dr. Park, a child with C.B.'s cognitive and behavioral problems needs a residential program to achieve adequate academic progress because most families are simply unable to provide the type of demanding support and structure outside of school that is necessary for their child to adequately progress in school. *See* AR 709–10, 772–73. A residential program would provide a uniformity between in-school and out-of-school structure, support and therapy that was necessary for C.B.'s success but that his family could not realistically provide. *Id.* at 709–10, 801–06, 810–11, 814–15, 848–49. The Banwarts argue that these expert opinions are unrefuted and thus should have been given controlling weight in deciding C.B.'s placement.

While defendants did not challenge Dr. Day's or Dr. Park's credentials, or designate an expert witness to contradict their opinions, that does not mean those opinions were unrefuted or that they automatically merit controlling weight. Conflicting opinions and preferences regarding a student's placement and needs are expected when an IEP is formed and should be considered when evaluating whether that IEP is adequate, but the fundamental question remains whether the district has provided a FAPE. *See Gill v. Columbia 93 Sch. Dist.*, 217 F.3d 1027, 1037 (8th Cir. 2000) ("[A] court should not intervene in . . . questions of education policy so long as it finds that a school district has

---

[14] The Banwarts also point to testimony from several staff members at Waterfall Canyon/Oak Grove who believe C.B. requires a residential placement. *See* AR 250–51, 364, 368, 470–71, 591.

offered a program of specialized services reasonably calculated to enable a child to receive educational benefit."). While the opinion of an expert is helpful and generally entitled to great weight, the views of professional educators are also entitled to weight in determining whether an IEP or placement was appropriate. *See Fort Zumwalt Sch. Dist. v. Clynes*, 119 F.3d 607, 610 (8th Cir. 1997) ("[A] court may choose to credit the hearing panel's findings based on observation of the witnesses and reject the reviewing officer's analysis if it does not appear to give sufficient weight to the views of the professional educators.").

Here, defendants provided several witnesses – C.B.'s teacher, paraeducator, school administrators and school psychologist – who testified that C.B.'s placement at Bremwood was appropriate because of the resources available to him there and the progress he made before he was removed. *See* T. 691, 746, 785–88, 854, 975, 1103–04. The Eighth Circuit has found that such evidence can be sufficient to show that a student received a FAPE. *See Sch. Bd. of Indep. Sch. Dist. No. 11 v. Renollett*, 440 F.3d 1007, 1012 (8th Cir. 2006) (teachers' and paraprofessionals' testimony regarding a student's progress was sufficient to show the student's IEP was reasonably calculated to provide meaningful educational benefit). Thus, the issue is whether the record shows that C.B. was able to make progress while residing at home and attending Bremwood sufficient to justify defendants' conclusion that, contrary to the Banwarts' experts' opinions, C.B. did not need a residential program to receive a FAPE.

The record shows that C.B. experienced improvement in his behavior and academic performance at school at least from the time he began at Bremwood until his parents left on vacation. C.B.'s first days at Bremwood went well; he appeared excited to be there, and he rebounded quickly from the few minor issues he had. Exh. EE, p. 1–5; Exh. GG, p. 9. Approximately one week after beginning school, C.B. had some struggles with wanting to go, but his parents were able to convince him to do so. *Id.* at 12–13. Around that same time his teacher reported that he had been in a good mood,

had been working hard and had recently needed only one intervention. Exh. I. He had his first day with no interventions soon thereafter. Exh. EE, p. 20.

By a month into his time at Bremwood, C.B. appears to have experienced some academic success. His scores in reading, writing and math were far above his target goals for that time. Exh. L, p. 2–4, 7–9, 12–14. He was also staying in class over 90% of the time and averaged only one aggressive incident per week, with each decreasing in intensity. *Id.* at 5–6, 10–11, 15–16. A week later C.B. was still doing well. His therapist noted that C.B. "ha[d] been getting up in the morning and going to school" – which "ha[d] been such a huge hurdle for [C.B.] and his parents" – and that C.B. "had mini meltdowns in the past week, but [was] able to get himself back on track within 15 minutes." Exh. B, p. 46. Throughout his time at Bremwood, C.B. was never permitted to elope from class (other than for permitted de-escalation) and was never sent home early. T. 681. He also did not miss any school from February 16 until April 6, 2016. T. 237. Text messages between Christy Banwart and Bill Aguiar reveal that the Banwarts were generally pleased with C.B.'s progress at Bremwood. *See* Exh. EE.

C.B.'s behavior began to deteriorate at the end of March 2016. C.B. told his parents that Bremwood was not safe because someone had hit him during an intervention, though there is no evidence that this actually occurred.[15] Exh. EE, p. 28–31. Regardless, C.B.'s belief that he was hit led to greater difficulty getting him on the bus some days as well as increased conflicts and behavioral issues at home. Exh. EE, p. 29–31, 48–50; T. 441–42. On March 30, 2016, C.B. drove his mother's car shortly while he was de-escalating in it after a therapy session. T. 246. He later ran away from home and turned off his phone, resulting in his parents and Bill Aguiar searching for him throughout the city. Exh. EE, p. 32–34; T. 670. The uptick in behavioral issues could be explained by a change to C.B.'s medication that resulted in increased paranoia and other issues. Exh.

---

[15] There is evidence that C.B. made a false accusation of physical abuse years before attending Bremwood that resulted in an investigation by the Department of Human Services. T. 578.

B, p. 45; Exh. M; Exh. EE, p. 42–43, 49–51.  It is also possible that his behavior was affected by one of his favorite books being vandalized with explicit drawings when he was on the school bus.  Exh. EE, p. 44–48.

From April 7 to April 14, 2016, C.B. had his most concerning stretch of out-of-school behavior.  His parents left on vacation on April 7 and his aunt and uncle were to stay with him until their return.  T. 240.  C.B. refused to go to school during this time and missed a total of four days.  *Id.* at 237–38, 244.  He also acted out in other ways.  Most concerningly, C.B., despite being only 14 years old, took his family's car and drove to another city approximately 20 miles away.  *Id.* at 254–56.

His in-school behavior around that time also reveals some regression.  Assessments from April 8 to April 20, 2016, show that C.B.'s academic performance was consistent with his performance before his parents' vacation, but he had regressed in the number of aggressive incidents and the amount of time spent in class.  Exh. T, p. 8–17; Exh. GG, p. 3–8; Exh. HH; Exh. KK, p. 1; T. 252.  Most of C.B.'s aggressive incidents occurred during the periods C.B.'s medication was altered and his parents were on vacation.  He also began needing more interventions.  Exh. HH, p. 4.  By April 22, C.B. still had decent academic success and fewer aggressive incidents, but spent a bit less time in class than during his first month at Bremwood.  Exh. W, p. 7–11.

On April 18, 2016, the Banwarts discussed a residential placement for C.B. with Janelle Eddy, who provided in-home behavior intervention services for C.B. and his family.  Exh. B, p. 36.  On April 22, 2016, the Banwarts brought up the possibility of placing C.B. in a residential program at a meeting between the Banwarts, Eddy and Bremwood staff to review C.B.'s progress.  Exh. B, p. 35; T. 208–09, 1063–64.  The Banwarts also discussed their concerns with Bremwood's intervention tactics, particularly those that included physical force or the presence of a police officer, and C.B.'s recent autism diagnosis, but they did not ask for C.B.'s IEP to be reviewed.  Exh. B, p. 35; T. 208–09, 1063–64.  They also expressed that they did not believe C.B. was progressing because he did not want to go to school and was spending too much time in Bremwood's

28

intervention room.  T. 212–13.  Four days later, the Banwarts informed Bremwood staff that C.B. would begin attending a residential program in Utah.  T. 219–20.  The Banwarts believed it was not fair or healthy to continue fighting with C.B. to force him to attend a school where he felt scared, unsafe and unhappy.  *Id.* at 148–49, 219–20.

Based on my de novo review, I find that C.B. experienced sufficient progress at Bremwood to indicate that a residential placement was not necessary for him to receive a FAPE.  The behavioral issues that most affected C.B.'s ability to make meaningful progress in his education immediately before attending Bremwood were in-school behaviors, such as elopement and physical aggression.  At Holmes, C.B. averaged only two periods of successful participation out of a seven-period class schedule, and he often fled class or lashed out unless he was allowed to do what he wanted.  Exh. UUU, p. 10.  During the brief time C.B. attended Peet, he was spending only 12% of his time at school in academic instruction.  Exh. J, p. 34.

In contrast, during his first month at Bremwood, C.B. was spending over 90% of his time at school in an instructional environment.  Exh. L, p. 5, 10, 15.  Even after C.B.'s difficulties arising from his medication changes and his parents' vacation, he still remained in an instructional setting at least 80% of the time when he went to school, which was consistent with his long-term goal.  Exh T, p. 11, 16.  C.B.'s aggressive incidents remained at about one incident every two weeks at Bremwood, but, unlike his aggressive outbursts at Holmes and Peet, none of his incidents at Bremwood resulted in C.B. needing to be sent home, let alone suspended, and they were decreasing in length and intensity before his regression.  Exh. J, p. 34; Exh. L, p. 6, 11, 16.  This improved behavior at school predictably translated into academic success as well.  T. 817.  His reading, writing and math scores were well above the baselines that were based on C.B.'s IEPs at his previous schools.  *Id.*; Exh. L, p. 2–4, 7–9, 12–14.

The Banwarts raise several arguments as to why this evidence of progress should be set aside in favor of their experts' opinions.  They claim that C.B. did not experience progress because he still was not attending school willingly.  *See* T. 212.  That had long

29

been one of the Banwarts' main concerns with his education, and they claim that the effort required to get C.B. on the bus to school was far too difficult, and its negative effects on C.B. far too severe, for C.B.'s education to continue without residential placement. *See id.* at 212 338, 377.

However, the question is whether a residential program was necessary to address out-of-school issues that hindered C.B.'s ability to receive an education, not whether a residential program was necessary to ensure that C.B.'s education led to improved behavior outside of school. *See A.C.*, 258 F.3d at 771–72, 777–79 (residential program was necessary for student whose behavioral and emotional issues caused her to disrupt or skip school and to make impulsive and dangerous choices while out of school). While the extent to which the Banwarts struggled to get C.B. to school before Bremwood is not entirely clear in the record, the behavioral issues that appear to have most affected C.B.'s ability to learn were in-school behaviors. As discussed above, C.B. saw significant progress in that area. He even saw at least temporary progress in waking up and going to school before his medication change. Exh. B, p. 46. Even more to the issue here, C.B. experienced progress at school even while the Banwarts were having a more difficult time getting him on the bus each day. In other words, his unwillingness and reluctance to go to school, and the resulting conflict with his parents, do not appear to have hindered his ability to progress while at Bremwood. Thus, it does not appear he needed 24-hour services to get to school under normal conditions at home. *See A.C.*, 258 F.3d at 779 (the fundamental question in a residential placement case "is whether [the student] should go home at night or remain in a special institution twenty-four hours a day).

The Banwarts also claim that even if C.B. experienced some success initially, his progression stalled in the weeks before he was removed, as he started needing too many interventions at Bremwood and experiencing more behavioral issues at home. The Banwarts assert that the spike in C.B.'s interventions, absences and unwillingness to go to school was due to the end of a "honeymoon period" at Bremwood rather than any true improvement. They also assert that Bremwood's intervention tactics were inadequate

30

and inappropriate and caused C.B. to fear going to school, resulting in even greater issues at home.

While it is true that C.B. began having more interventions and other out-of-school behavioral issues during the end of March and first two weeks of April 2016, that does not mean he did not progress, or could not continue to progress, at Bremwood. Understanding the source of C.B.'s regression is more important to the question of whether C.B. required a residential placement than the fact that it happened. C.B.'s behavioral regression coincided with two major changes that affected his mental and emotional health: a medication change and his parents' vacation. C.B.'s medication change led to increased paranoia and behavioral issues and may account for the increased number of interventions at school and his increasingly-adverse reactions to them.[16] Exh. B, p. 45; Exh. EE, p. 49–51. His mother noted in a text message to Bill Aguiar that C.B. had experienced too many changes that were "ma[king] everything much more difficult for him." Exh. EE, p. 51.

Similarly, due to the nature of C.B.'s disabilities, particularly his reactive attachment disorder, a regression was expected when his parents left on vacation. T. 587–88, 673, 791–92. C.B. had told his therapists in the past that one of the main reasons he did not want to go to school was that he feared his mother would not be at home when he returned. Exh. B, p. 21; T. 587, 635–36. While there is no faulting C.B.'s parents for taking a vacation, the fact remains that C.B. had not missed a single day at Bremwood until his parents' vacation, and some of his most concerning out-of-school behavior occurred while they were gone. Thus, C.B.'s struggles in the weeks leading up to his

---

[16] The appropriateness of Bremwood's intervention tactics is relevant to the adequacy of C.B.'s IEP generally, but not necessarily the question of whether he needed a residential program. Whether or not Bremwood needed to change tactics says little about whether C.B. required round-the-clock services, unless C.B. continued to have severe out-of-school behavior despite Bremwood's resolving the Banwarts' concerns. That is not the case here, however, as the Banwarts removed C.B. before any changes could be made or his IEP reevaluated.

removal appear much more connected to his medication change and his parents' vacation then any inadequacy in his IEP or the lack of residential treatment.

There is also little support for the Banwarts' assertion that C.B.'s early success was merely a honeymoon period that he typically experienced when beginning school in a new setting. C.B. had severe behavioral issues throughout his time at Holmes. Exh. PPP, p. 8–49. And while one district administrator characterized C.B.'s first couple days at Peet as a honeymoon period, the honeymoon was short lived, as C.B. was suspended within three weeks of starting. Exh. FFFF, p. 1. Whatever short periods of success C.B. may have had at these previous schools, none compare to the approximate month-and-a-half period of progress he experienced at Bremwood. The fact that C.B. was removed from Bremwood within days of the Banwarts' return from vacation makes further speculation regarding the nature of his regression difficult. There is no way to know whether C.B. would have improved again, or continued in his regression, especially considering his mother's fear that his behavior while she was on vacation could have established new habits that would need to be addressed going into the future. *See* Exh. EE, p. 59–61.

The Banwarts also argue that C.B.'s academic progress was not genuine because his baselines were set too low. While C.B.'s scores were quite higher than his baselines when he was first evaluated at Bremwood, that does not mean the baselines were too low or that his high scores did not reflect actual progress. The baselines were determined by his prior history and IEPs, some of which did not contain up-to-date or consistent information on C.B.'s abilities due to his behavioral issues and refusals to do academic work. Exh. J, p. 4; T. 816–17, 837–38. Waiting to revise these goals until a more consistent picture of C.B.'s abilities could be formed, even if they appeared low from the outset, was reasonable. *Id.* at 1002–03. Additionally, as discussed above, the main issues hindering C.B.'s education upon entering Bremwood were behavioral, and C.B. saw significant success in those areas. Ultimately, C.B. did not remain at Bremwood a

sufficient time after his regressive episode to further understand the nature of his academic progress.

Finally, the Banwarts argue that the evidence of C.B.'s progress at Bremwood should be given little weight because Dr. Day and Dr. Park considered C.B.'s progress and still opined that he needed a residential program. Whether, or to what extent, the doctors considered the evidence of improvement at Bremwood is unclear. During deposition testimony, Dr. Day explained that his typical clinical review process would include interviewing the parents, reviewing previous records and assessments, talking to previous treating professionals and, sometimes, calling the school to talk to the teachers who know the child. AR 679. In this case, however, he acknowledged that he did not remember who he talked to other than the Banwarts and Karen Mabie, the educational consultant they hired. *Id.* at 684, 697. Dr. Day remembers participating in a telephonic meeting with representatives of the District and the AEA but does not remember contacting them outside of that meeting. *Id.* at 700–01. Dr. Park testified during his deposition that he spoke to C.B.'s parents and to Mabie about C.B.'s history. *Id.* at 761. He admitted that he did not remember what specific information he had about the school C.B. attended before Seven Stars, but he believed he did have some and reviewed it. *Id.* at 818–19, 834, 846. His report stated that the background information he relied on "was provided by a clinical interview, review of available records, as well as support interviews." Exh. WW, p. 2.

Regardless of the extent to which Dr. Day and Dr. Park considered C.B.'s time at Bremwood, I find their opinions inconsistent with and outweighed by the evidence of C.B.'s improvement while attending Bremwood and living at home. Considering his disabilities and the recent behavioral issues he had in other public schools, the progress C.B. made during his first month-and-a-half at Bremwood was significant and appropriate for purposes of the IDEA. Most important to this case is the fact that C.B. made this progress while living at home. In addition, although C.B. subsequently experienced a regression, the evidence shows that the regression coincided with circumstances

33

unconnected to his IEP or at-home placement – his medication change and his parents' vacation. The fact that C.B.'s regression occurred under circumstances that were known, or expected, to be difficult for C.B., rather than under normal conditions at home, weakens the argument that he required a residential placement to make appropriate educational progress. This is exacerbated by the fact that the Banwarts then removed C.B. from Bremwood before conditions outside of school could fully normalize and C.B.'s progression could be reevaluated. Thus, even if C.B.'s increased behavioral issues leading up to his removal could otherwise justify a residential placement, there is insufficient evidence here to find that they actually did.

For these reasons, the Banwarts have failed to provide sufficient evidence to show that a residential placement was required in order for C.B. to make meaningful progress in his education. Therefore, their objection on this ground must be denied.

## B. *Defendants' Objections*

Based on the analysis set forth above, I find defendants' objections to the R&R to be largely moot, apart from the factual clarification that Krista Hennager, who testified on their behalf, is a school psychologist.

## V. CONCLUSION

For the reasons set forth herein:

1. The Banwarts' objections (Doc. No. 43) to the Report and Recommendation are **overruled**.

2. Defendants' objections (Doc. No. 44) to the Report and Recommendation are **overruled as moot**, except for the clarification that they did present testimony from a school psychologist.

3. I **accept** the Report and Recommendation (Doc. No. 41), as modified to reflect that defendants presented testimony from a school psychologist.

4.      Pursuant to Judge Roberts' recommendation, as modified herein, the ALJ's decision is **affirmed**.   Judgment shall enter for defendants and against plaintiffs.   This case his hereby **dismissed with prejudice**.


**IT IS SO ORDERED.**

**DATED** this 24th day of September, 2020.

_____
Leonard T. Strand, Chief Judge